# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DISTRICT OF COLUMBIA

NATIONAL CROP INSURANCE
SERVICES, INC.

           Plaintiff

    v.

OCCIDENTAL FIRE & CASUALTY
COMPANYOF NORTH CAROLINA and
CROP1 INSURANCE DIRECT, INC. d/b/a
CROP1 INSURANCE, INC.

          Defendants

Civil Action No. 1:05cv01417 (RWR)

## DEFENDANT CROP1 INSURANCE DIRECT, INC.'S MOTION TO DISMISS OR, ALTERNATIVELY, FOR A CHANGE OF VENUE

Defendant Crop1 Insurance Direct, Inc., d/b/a Crop1 Insurance, Inc. ("Crop1"), through counsel and pursuant to FED. R. CIV. P. 12(b)(2) and 28 U.S.C. § 1440, respectfully submits this Motion To Dismiss Or, Alternatively, For A Change of Venue.

For the reasons stated in the accompanying Memorandum In Support Of Crop1 Insurance Direct, Inc.'s Motion And In Opposition To The Motion For Preliminary Injunction, Crop1 moves for: 1) dismissal of plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(2) for lack of *in personam* jurisdiction over Crop1; or, in the alternative, 2) transfer of this action to a more convenient forum pursuant to 28 U.S.C. § 1404(a).[1]

---

[1]     Crop1's memorandum accompanying this Motion also opposes plaintiff's motion for preliminary injunction and seeks denial of that motion as moot, or, in the alternative, because plaintiff has failed to demonstrate a sufficiently strong likelihood of success on the merits of its copyright claim.

A memorandum of points and authorities with supporting affidavits and a proposed order accompany this Motion.

August 22, 2005                                        Respectfully submitted,


                                                       _____/s/_____
                                                       Cristen E. Sikes (D.C. Bar No. 473461)
                                                       David E. Mendelsohn (To be admitted P*ro Hac Vice*)
                                                       Kenneth L. Schmetterer (To be admitted P*ro Hac Vice*)
                                                       Michael Kasdin (To be admitted P*ro Hac Vice*)

                                                       DLA Piper Rudnick Gray Cary US LLP
                                                       1200 Nineteenth Street, N.W.
                                                       Washington, D.C. 20036
                                                       TEL:  202-861-3900
                                                       FAX:  202-689-7612

                                                       Attorneys for Defendant
                                                       Crop1 Insurance Direct, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of August 2005, I caused a copy of the foregoing Motion To Dismiss Or, Alternatively, For A Change Of Venue, together with a Memorandum Of Law In Support Thereof, supporting affidavits and a proposed order to be served on the following electronically and by first-class U.S. mail, postage pre-paid:

Michael E. Tucci
Stinson Morrison Hecker LLP
1150 18th Street, N.W. Suite 800
Washington, D.C. 20036-3816

Attorney for National Crop Insurance Services, Inc.

Mary Hulett
Ragsdale Liggett PLLC
2840 Plaza Place, Suite 400
P.O. Box 31507
Raleigh, North Carolina 27622

Attorney for Occidental Fire & Casualty Company of North Carolina

Michael S. Nadel
McDermott Will & Emery LLP
600 Thirteenth Street, N.W.
Washington, D.C. 20005

Attorney for Occidental Fire & Casualty Company of North Carolina

_____/s/_____
Shani C. Dilloff

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL CROP INSURANCE SERVICES, INC.<br><br>　　　　　　Plaintiff<br><br>　　v.<br><br>OCCIDENTAL FIRE & CASUALTY COMPANYOF NORTH CAROLINA and CROP1 INSURANCE DIRECT, INC. d/b/a CROP1 INSURANCE, INC.<br><br>　　　　　　Defendants | Civil Action No. 1:05cv01417<br><br><br>Judge: Richard W. Roberts |

**MEMORANDUM IN SUPPORT OF CROP1 INSURANCE DIRECT, INC.'S MOTION AND IN OPPOSITION TO THE MOTION FOR PRELIMINARY INJUNCTION**[1]

## I.    INTRODUCTION.

Plaintiff National Crop Insurance Services, Inc. ("NCIS"), a Kansas Corporation, has sued Occidental Fire & Casualty Company of North Carolina, a North Carolina company, and Crop1 Insurance Direct, Inc., d/b/a Crop1 Insurance, Inc. ("Crop1"), a Wyoming company with its principal place of business in Iowa, for allegedly infringing NCIS copyrights, misrepresenting

---

[1]　　On August 19, 2005, this Court automatically issued an Order to Show Cause why plaintiff's Motion for Preliminary Injunction should not be granted, suggesting that the deadline to file a response had passed.  That order appears to be based on a computational error.  First, the order states that defendants were served on July 26, 2005.  While Crop1 was served with NCIS' initial complaint on that date, that pleading was superceded by NCIS' First Amended Complaint filed on August 11.  The deadline to file a responsive pleading to that First Amended Complaint has not yet passed. (Fed.R.Civ.P. 12(a)(1)(A)).

On August 11, 2005, NCIS filed and served by mail its motion for preliminary injunction.  Local Rule 65.1(c) imposes a five-day time limit for opposing preliminary injunction motions.  The computation of that time period, however, must exclude intervening weekends pursuant to Fed.R.Civ.P. 6(a), thus imposing an initial deadline to file a response of August 18, 2005.  However, NCIS served its motion by mail, not electronically.  Fed.R.Civ.P. 6(e) adds three days to the due date of any filing served by mail.  Those three additional dates, even if weekends are counted, would bring the due date to Sunday August 21, making the following business day, August 22, 2005, the date to respond to NCIS' motion.

to state agencies throughout the Midwest that NCIS was their advisory organization and statistical agent, and for relying on NCIS forms and data in those same Midwestern states.  In its First Amended Complaint, NCIS asserted claims for copyright infringement (17 U.S.C. § 101, *et. seq.*), violation of 15 USC § 1125, misappropriation of trade secrets, conversion and common law fraud.

NCIS now seeks a preliminary injunction based solely on its copyright claim.  That motion should be denied because plaintiff cannot demonstrate a substantial likelihood, or any likelihood, of success on the merits of its claim.  At the outset, the entire Complaint against Crop1 should be dismissed.  Crop1 has no business presence in the District of Columbia and plaintiff's allegations do not arise out of any dealings in, or relationship to, the District of Columbia.  Accordingly, NCIS cannot demonstrate this Court's personal jurisdiction over Crop1. Further, even if there was some basis for this Court to assert such personal jurisdiction, this case nonetheless should be transferred to a more convenient forum.  The District of Columbia has no relationship to any alleged wrongdoing, or to the location of any party, witness, evidence or alleged damages.

Finally, even if this Court were to address the merits of plaintiff's motion and its copyright claim, that claim still should fail, and no injunction should issue.  NCIS claims rights in uncopyrightable government works, blank forms and contracts, as well as other works that NCIS knows or should have known that Crop1 had full authority to reproduce and distribute. Indeed, it appears that NCIS is trying to use copyright law to force members of the crop insurance industry to pay financial tribute to it in order to participate in the industry, notwithstanding the fact that the public policy enunciated by the United States Department of

Agriculture ("USDA") sets the standards and in many cases provides the verbatim language NCIS now claims as its own.

Moreover, NCIS bases its claim on a critical allegation that is not only false, but that Crop1 has since learned NCIS *knew* to be false, well before serving its initial complaint and filing this motion. NCIS claims that a Crop1 independent contractor lied to NCIS officials when representing that Crop1 and Occidental were affiliated with an NCIS member, CropUSA Insurance Agency, Inc. ("CropUSA") (NCIS First Am. Comp. at ¶¶ 68-69), thereby giving Crop1 and Occidental a lawful right to rely on NCIS data and documents. In fact, almost immediately after NCIS filed its original lawsuit, CropUSA's President not only confirmed this affiliation to NCIS, but actually showed NCIS officials a copy of an agency agreement between itself, Crop1 and Occidental. (Aff. of Kent Peterson). Yet NCIS, without further examining that relationship, pursued and even amplified its allegations and request for relief, while maintaining to this Court that such a relationship did not exist. (First Am. Comp. at ¶¶ 68-69).

The NCIS motion is not well grounded in the facts, the law or equity. Its First Amended Complaint should be dismissed for lack of personal jurisdiction or, alternatively, the matter should be transferred to the most logical and convenient forum, Iowa. In any event, plaintiff's motion should be denied.

## II. THE FIRST AMENDED COMPLAINT AGAINST CROP1 SHOULD BE DISMISSED PURSUANT TO FED. R. CIV. P. 12(B)(2) FOR LACK OF PERSONAL JURISDICTION.

### A. FACTUAL BACKGROUND.[2]

Crop1 is an insurance agent in the business primarily of writing Federal Multi Peril Crop Insurance ("MPCI"). (Rose Aff. ¶ 3). Crop1 is a Wyoming corporation with its principal place of business in Iowa. (*Id.* at 2). Far less than one percent of Crop1's business is the writing of crop hail insurance. (*Id.* at 3). Crop1 has submitted applications to write crop hail insurance on behalf of CropUSA and Occidental in Michigan, Minnesota, Iowa, Illinois, Indiana, Texas, Nebraska, Washington and Wisconsin. (*Id.* at 5). Crop1 has actually written crop hail insurance on behalf of CropUSA and Occidental in only one state — Iowa. (*Id.* at 6). Crop1 is not owned by any parent company, has no affiliate companies, and has no wholly owned subsidiaries. (*Id.* at 8).

Crop1 does not write and has never written insurance for any property or any risk located in the District of Columbia. (*Id.* at 9). Crop1 does not contract with, and has never contracted with, any individual or business located in the District of Columbia for purposes of procuring, soliciting, purchasing or otherwise profiting from any risk. (*Id.*).

Crop1 does not have, and has never had, an office, place of business, street address, post office box, or telephone number in the District of Columbia. (*Id.* at 10). Crop1 is not and has never been licensed or admitted to do business in the District of Columbia, and has never advertised in the District of Columbia. (*Id.* at 11). Crop1 has no employees, and has never had employees, resident in the District of Columbia. (*Id.*). It does not own or lease, and has no

---

[2]    In support of the facts set forth in this portion of its memorandum, Crop1 submits as Exhibit A paragraphs 1-16 of the Affidavit of William T. Rose, Jr. ("Rose Aff.").

record of ever owning or leasing, any real property located in the District of Columbia.  (*Id.* at 12).  It does not currently own, and has never owned, any other assets or property located in the District of Columbia.  (*Id.*).  Crop1 has no record of paying any taxes in the District of Columbia. (*Id.*).

Crop1 has no registered agent in the District of Columbia.  (*Id.* at 13).  It has no subsidiaries or parent entities that are incorporated in the District of Columbia, that maintain a principal place of business in the District of Columbia, that maintain a registered agent in the District of Columbia, that maintain any District of Columbia employees or offices, or that conduct any business in the District of Columbia.  (*Id.*).  Crop1 has not billed from any District of Columbia office, has not maintained bookkeepers or any other employees in the District of Columbia to perform its contractual obligations, and has not collected money on contracts from any District of Columbia office or bank account.  (*Id.* at 14).

B.    **ARGUMENT.**

Crop1 has no contacts with the District of Columbia which support this Court exercising *in personam* jurisdiction in this action.  This Court may only exercise personal jurisdiction over Crop1, a non-resident defendant, by finding that there is either (i) specific jurisdiction based on conduct giving rise to the suit, or (ii) general jurisdiction based upon Crop1's continuous and systematic contacts with the District of Columbia.  *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 413-414 (1984).  In either case, the Court must determine (1) whether the elements of the District of Columbia long-arm statute been met[3] and (2) whether the action

---

[3]        Where, as here, the plaintiff alleges diversity jurisdiction and/or federal question jurisdiction without an applicable federal long-arm statute, the court must apply the

*(footnote continued to next page)*

offends local or Federal due process requirements.  *GTE New Media Services Inc. v. Bellsouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000).  Both considerations support a dismissal of this action.  The District of Columbia long-arm statue provides no basis for asserting personal jurisdiction over Crop1 in this case.  Further, because Crop1 has almost no contact with the District of Columbia, haling it into court offends Crop1's due process rights.

> **1.    There is no specific jurisdiction over Crop1 because this lawsuit does not arise out of Crop1's activities in the District of Columbia.**

D.C. Code § 13-423 provides, in pertinent part:

> A District of Columbia court may exercise personal jurisdiction over a person … as to a claim for relief arising from the person's (1) transacting any business in the District of Columbia; (2) contracting to supply services in the District of Columbia; (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia; (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business … in the District of Columbia                    …

> When jurisdiction over a person is based solely upon this section, <u>only a claim for relief arising from acts enumerated in this section</u> may be asserted against him.

D.C. Code § 13-423 (emphasis added).  NCIS cannot shoehorn Crop1's activities into this statute.  The Complaint does not allege that this lawsuit arises out of any act within the District. It does not allege that any injuries arose in the District of Columbia or occurred as a result of any act or omission in the District of Columbia.

Further, the claims do not arise from the transaction of any business in the District of Columbia.  Without such a connection to the <u>specific business</u> taking place in the District, this

---

*(footnote continued from previous page)*
long-arm statute of the forum state.  *E.g. Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 509 (D.C. Cir. 2002).

Court cannot assert personal jurisdiction over Crop1. *See Ross v. Product Dev. Corp.*, 736 F. Supp. 285, 289 (D.D.C. 1989) (emphasis added). Even where a corporation "clearly transacted business within the District," the plaintiff could not pursue jurisdiction pursuant to section 13-423 when the cause of action was not directly connected to that business. *Id.* Because the allegations do not remotely suggest that the Complaint is related to any act, omission, injury or business activity in the District, there is no basis for specific jurisdiction under D.C. Code § 13-423.

Indeed, Crop1 does not transact *any* business in the District. A corporation "transacts business" in the District, for purposes of the court's *in personam* jurisdiction, only if that business is of "substantial character." *World Wide Minerals Ltd. v. Republic of Kazakhstahn*, 116 F. Supp. 2d 98, 106 (D.D.C. 2000). In *World Wide Minerals*, the court declined to exercise jurisdiction over a foreign entity where its only contact with the District was the participation in a local trade organization. Without a showing that the activities in the District were integral to the conduct of the business, the nexus between the defendant's conduct and the forum was insufficient. *Id.* The alleged nexus between the Complaint and the District is even more attenuated in this case. Indeed, it is nonexistent.

Because plaintiff's lawsuit does not arise out of an act enumerated in the District of Columbia long-arm statute, there is no specific jurisdiction over Crop1.

        **2.      There also is no general jurisdiction over Crop1 because Crop1 has no systematic contacts with the District of Columbia.**

General Jurisdiction permits a court to constitutionally assert *in personam* jurisdiction over a non-resident defendant when the lawsuit does not arise out of the defendant's contacts with the forum state. *See Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 509 (D.C. Cir.

2002).   In order to satisfy federal due process requirements, courts may only assert general jurisdiction over a defendant that has ongoing and systematic business contacts with the forum. *Id.* at 510 (citing *Helicopteros*, 466 U.S. at 415).  The District's general jurisdiction statute at issue here, D.C. Code § 13-334, is co-extensive with due process limits.  *Id.* at 513.[4]  A court may not exercise jurisdiction over a non-resident defendant unless the defendant's conduct and connection with the forum State are sufficiently extensive such that the defendant should reasonably anticipate being haled into court there.  *World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).  The contacts between a defendant and the District must be sufficient to establish a "corporate presence."  *Crane v. Carr*, 814 F.2d 758, 763 (D.C. Cir. 1987); *see also Hughes v. A.H. Robins Co., Inc.*, 490 A.2d 1140, 1149-50 (D.C. App. 1985) (contacts must be continuous, substantial and fairly extensive to support jurisdiction).

As set forth above, Crop1 has no meaningful connection to the District of Columbia.  It is not licensed to do business in the District.  It has never procured or solicited a risk located in the District.  It has never had employees, offices, assets or other business activities in the District. Crop1's activities in the District are limited to lobbying efforts which constitute an expression of its First Amendment rights and are not "doing business."  *See Dooley v. United Technologies Corp.*, 786 F. Supp. 65, 75 (D.D.C. 1992) (personal jurisdiction cannot be predicated solely on the fact that the defendant is exercising its first amendment rights to lobby Congress).  It is

---

[4]        The District of Columbia has two statutes, D.C. Code §§ 13-334 and 13-422, which provide the authority to exercise general jurisdiction over a party.  In this brief, Crop1 will only address one statute, § 13-334.  Crop1 will not address § 13-422 because it applies to defendants domiciled in, organized under the laws of, or maintaining a principal place of business in, the District of Columbia.  As there are no such allegations in the Complaint directed to Crop1, this section is immaterial.

unreasonable to expect Crop1 to defend a lawsuit in a distant forum where, as here, it conducts no business, and therefore has no reasonable expectation of being sued.

NCIS, moreover, has not explained the basis for jurisdiction over Crop1 in its Complaint. The burden falls on the plaintiff to affirmatively plead the basis for personal jurisdiction over the defendant.  *See Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990).  To satisfy that burden, the NCIS must allege specific facts connecting the defendant with the forum. *Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001). Here, the only allegation to support personal jurisdiction is the bare legal conclusion that Crop1 "conduct[s] business" in the District of Columbia. (Complaint ¶ 4.).  However, in deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(2), the court need not accept this or any of the plaintiff's allegations as true.  *See Capital Bank Int'l. Ltd. v. Citigroup, Inc.*, 276 F. Supp. 2d 72, 74 (D.D.C. 2003).  The court is free to consider affidavits and other relevant matter to assist it in making a determination.  *See id.*  As the attached affidavit makes clear, Crop1 does not conduct business in the District.

Governing caselaw, the allegations of the Complaint and the evidence now before the Court all demonstrate that this court lacks general jurisdiction over Crop1.  NCIS has failed to allege facts that could even support this Court's personal jurisdiction over Crop1.  Accordingly, the Complaint against Crop1 should be dismissed.

## III.   EVEN IF THIS COURT WERE TO ASSERT PERSONAL JURISDICTION OVER CROP1, THIS CASE SHOULD BE TRANSFERRED TO A MORE CONVENIENT FORUM.

Even if this Court had jurisdiction over Crop1, this matter should be transferred because the District of Columbia is an extremely inconvenient forum.  28 U.S.C. § 1404(a) ("For the

convenience of the parties and witnesses, in the interest of justice a district court may transfer any civil action to any other district or division where it might have been brought").

Crop1 joins in and adopts the motion to change venue and supporting points and authorities submitted by Occidental. The lack of any meaningful connection between the parties, allegations, claims or evidence, on the one hand, and the District of Columbia, on the other hand, applies with equal if not greater force to Crop1.

No party to this case is headquartered in, or has a principal place of business in, the District of Columbia. Crop1 does not even do business in the District of Columbia. Crop1, moreover, has applied with state agencies to write crop hail insurance in nine states — but *not* the District of Columbia. Of those states, NCIS identifies three just three — Iowa, Minnesota and Nebraska — in which Crop1 was required to submit what NCIS claims to be its copyrighted materials. (NCIS Mot. at Exs. 1-3). Crop1 has actually written crop hail insurance in just one state — Iowa. (Rose Aff. at ¶ 6). Crop1 has also written Federal Multi Peril Crop Insurance ("MPCI") (and thus utilized what NCIS claims is copyrightable material) in 15 states — one of which is Iowa — but, again, not in the District of Columbia. (*Id.* at ¶ 7). Further, Crop1 has its principal place of business in Iowa, and thus any alleged wrongdoing by Crop1, whether it is alleged to have acted on its own behalf or as agent for Occidental, also arose in Iowa.

Several well established criteria weigh heavily in favor of transferring this case to the United States District Court for the Southern District of Iowa: the convenience of the parties, the convenience of the witnesses, the ease or access to sources of proof, the place where the claim allegedly arose, and the place where damages are alleged to have occurred. *Trout Unlimited v. U.S. Dept. of Agric.*, 944 F. Supp. 13, 16 (D.D.C. 1996) (identifying factors that led court to transfer case). Further, the deference otherwise given to plaintiff's choice of forum is "greatly

diminished when the activities have little, if any, connection with the chosen forum." *Armco Steel Co. v. CSX Corp.*, 790 F. Supp. 311, 323 (D.D.C. 1991) (citations omitted). The presence of state law claims asserted by NCIS also favors transfer. *Trout Unlimited*, 790 F. Supp. at 324 (case transferred in part because federal court of another state would have greater ability to rule on state claim); *see also*, *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947) ("there is a local interest in having localized controversies decided at home").

For all of these reasons, and for all of the reasons set forth in Occidental's motion to change venue and supporting memorandum, this Court should transfer this case to the United States District Court for the Southern District of Iowa even if this Court *had* jurisdiction over Crop1.

## IV.  EVEN IF THIS COURT HAD JURISDICTION OVER CROP1, AND EVEN IF THIS COURT IS THE APPROPRIATE VENUE, THE MOTION FOR PRELIMINARY INJUNCTION STILL SHOULD BE DENIED.[5]

### A.  INTRODUCTION.

Courts considering requests for injunctive relief determine (1) whether plaintiff has demonstrated a <u>substantial</u> likelihood that it will prevail on the merits of its claim, (2) whether plaintiff will suffer irreparable harm if injunctive relief is not rewarded, (3) whether the issuance of injunctive relief would not substantially harm the other parties and (4) whether awarding the relief is in the public interest. *Health Ins. Ass'n of America v. Novelli*, 211 F. Supp. 2d 23, 28 (D.D.C. 2002). In *Health Ins.*, cited by NCIS, the court refused to enter injunctive relief on the plaintiff's copyright claim because there was a "substantial dispute" over, and was a "lack of

---

[5]  Crop1, of course, maintains that this Court need not and should not reach the merits of NCIS' motion, but should first address the jurisdictional and, if necessary, the venue arguments. By raising an alternative argument, Crop1 does not waive its right to challenge this Court's jurisdiction over it.

clear evidence" to support, that claim. *Id.* at 29. Thus, the court denied the motion on that claim without considering the remaining factors. Here as well, there is at least a substantial dispute and a lack of clear evidence supporting NCIS' copyright claim. Consequently, NCIS has not shown a substantial likelihood on the merits.

NCIS has limited its motion for preliminary injunction to its copyright claims, but its motion is still precisely the sort of gross over-reach that equity abhors. By putting forward 28 different copyright registrations and claiming additional unregistered copyrighted works, NCIS is seemingly asking the Court to ignore the forest through the trees of paper it has submitted. But even without the benefit of discovery or even a cease and desist letter from NCIS before filing suit, when looking at the individual trees here — the individual copyright registration certificates and the relevant works — it is easy to see that NCIS claims rights in *uncopyrightable* government works, blank forms and contracts, as well as other works NCIS knows or should have known Crop1 had authority to reproduce and distribute. Indeed, it appears that NCIS is attempting to misuse copyright law in order to force members of the crop insurance industry to pay financial tribute to it in order to participate in the industry notwithstanding the fact that the public policy enunciated by the United States Department of Agriculture ("USDA") sets the standards and in many cases provides the verbatim language NCIS now claims as its own.

Further, the undisputed evidence now before this Court demonstrates that NCIS was, in fact, aware of the agency relationship between defendants and an NCIS member which gave defendants a right to use rely on the vast majority of the documents at issue, even if they *were* copyrightable. NCIS not only failed to advise the court of that relationship, but maintains allegations directly to the contrary. (*Compare*, Aff. of Kent Peterson *with* First Am. Comp. at ¶

68). For a variety of reasons, plaintiff's motion should be denied even if this Court *had* jurisdiction over Crop1 and kept this case in this venue.

## B.    BACKGROUND FACTS.[6]

### 1.    The Occidental, CropUSA, Crop1 Agency Agreement.

For 2005, Crop1 was a General Agent ("GA") and CropUSA was the Managing General Agent ("MGA") for Occidental pursuant to a General Agency Agreement for purposes of producing certain classes of hail insurance in certain states. (Rose Aff. at ¶ 4). In its capacity as GA, Crop1 served as agent for CropUSA to write crop hail policies that were issued on behalf of Occidental. (*Id. See also,* Peterson Aff. at ¶¶3, 5-6). Crop1, in that capacity, assisted in the preparation and submission of information required to permit Occidental and its crop hail MGA, CropUSA, to issue crop hail insurance policies for certain states. (Rose Aff. at ¶ 5; Peterson Aff. at ¶ 4). Cory Bremer, in turn, worked as Crop1's independent contractor for purposes of assisting Crop1 in its efforts to develop a crop hail insurance program for Occidental and its MGA, CropUSA. (Rose Aff. at ¶ 17). In accordance with CropUSA's agreement with NCIS, CropUSA will pay all appropriate fees and commissions due or that may come due to NCIS. (Peterson Aff. at ¶ 5-6; Rose Aff. at ¶ 5).

Further, Crop1 has regularly paid increased "non-member" fees to NCIS for attending NCIS training seminars. (Rose Aff. at ¶ 18). There are currently seventeen companies that deliver MPCI crop insurance. Of those seventeen companies, Occidental and its federal crop agent Crop1 maintain the only program that for the past three years has been approved by the

---

[6]    The facts supporting this portion of Crop1's brief are set forth in the Affidavit of William T. Rose, Jr. ("Rose Aff."), attached as Exhibit A, and the Affidavit of Kent Peterson ("Peterson Aff."), attached as Exhibit B.

federal government to offer a discount on federal crop insurance – in accordance with a program that NCIS and its members have vigorously and publicly opposed. (*Id.* at ¶ 17). For the 2006 crop-year, Crop1 will be the only domestic company in the industry that is not a direct member of NCIS. (*Id.* at ¶ 18).

On July 14, 2005, CropUSA President Kent Peterson spoke on the telephone with NCIS President Robert Parkerson. (Petersen Aff. ¶ 7). Mr. Peterson told Mr. Parkerson that Crop1 and its independent contractor, Cory Bremer, were working on behalf of CropUSA to implement CropUSA's hail insurance program. (*Id.*). The following day, NCIS filed (but did not yet serve) its Complaint in which the NCIS alleged that a representation made by Crop1's independent contractor Cory Bremer — that Crop 1 was affiliated with CropUSA's NCIS membership — was false and deceitful. (Comp. ¶ 38).

On Monday, July 18, 2005, Mr. Parkerson and NCIS attorney John Owens met with Mr. Peterson. (*Id.* at ¶ 8). During that meeting, Mr. Peterson again informed Mr. Parkerson that Crop1 and Cory Bremmer were writing crop-hail coverage on behalf of CropUSA. (*Id.*). Mr. Peterson then showed Mr. Parkerson and Mr. Owens a copy of the agency agreement between CropUSA, Crop1 and Occidental. (*Id.*). NCIS did not withdraw its allegation but rather, thereafter, served its Complaint, filed and served its First Amended Complaint in which it repeated its allegation now known to be false (First Am. Com. at ¶ 68), and filed the instant motion.

CropUSA is, and has been for all of 2005, a member in good standing of NCIS, and had the right, therefore, to access both MPCI data and forms, as well as crop hail data and forms. (Peterson Aff. at ¶ 4; Rose Aff. at 33). NCIS acknowledges that agents of NCIS members have lawful access to access material claimed by NCIS as copyrightable, at least for purposes of that

agency relationship. (*E.g.*, First Am. Comp. at ¶ 18) (acknowledging that Crop1, when it was agent of a different NCIS member "had access to certain Registered NCIS Works").

Exhibits 1-3 to NCIS' motion are copies of filings submitted to state insurance departments in Iowa, Minnesota and Nebraska seeking authority for Occidental to write crop hail insurance in those states. Those filings were submitted by Filing Analyst Cory Bremer as an independent contractor of Crop1 and on behalf of Occidental by Crop1 in furtherance of its duties under the Agency Agreement between and among Crop1, CropUSA, and Occidental. (Rose Aff. at ¶ 23).

Exhibits 8(b) through 22(b) to the NCIS motion for preliminary injunction are portions of contract provisions also submitted in connection with applications to write crop hail insurance in Iowa, Minnesota and Nebraska. Again, those insurance contract forms were submitted by Crop1 in its capacity as agent for Occidental's MGA, CropUSA. (*Id.* at ¶ 32). Exhibits 23(b) through 28(b) to the NCIS motion for preliminary injunction are Final Average Cost Analysis data for Iowa, Minnesota and Nebraska for 2002 and 2004. This data was filed so that CropUSA and Occidental could write crop hail insurance in those states. (*Id.* at ¶ 34). Crop1 arranged to have its independent contractor assemble and file this information as part of its duties under the agency agreement between Crop1, CropUSA and Occidental. (*Id.*).

## 2.  NCIS claims copyrights in government regulated MPCI forms.

The marketing and writing of MPCI policies is regulated by the Risk Management Agency ("RMA"), an agency of the United States Department of Agriculture. The RMA has developed and published a handbook called a "Document and Supplemental Standards Handbook" (the "DSSH"). (Rose Aff. at Ex. 2). The stated purpose of the DSSH is to provide submission requirements and document standards established by the RMA for the administration

of certain crop insurance policies, in accordance with the Standard Reinsurance Agreement and the Federal Crop Insurance Act.  (*Id*. at Ex. 2 at 1, ¶ 1).  The RMA has maintained similar versions of the DSSH, and containing identical or substantially similar forms or requirements for several of the forms, since at least 1998 (Rose Aff. at ¶ 25) — a year before NCIS claims authorship.  (*E.g.* NCIS Ex. 6(a)).

Documents described in the DSSH "are required to contain all items identified as 'Substantive.'"  (Ex. 2 to Rose Aff. at 2, ¶ 4).  Further, the DSSH requires that certain forms contain certain specific information (for example, Ex. 2 to Rose Aff. at pp. 67-74), and that forms comply with standards regulating such matters as, among many others, the location and contents of certain insurer information, the font-size of the text, and numerous abbreviations and definitions required to be used.  (Ex. 2 at pp. 3-5).  The DSSH indicates that forms not contained in the DSSH can be found in either the Loss Adjustment Manual ("LAM"), the Crop Insurance Handbook ("CIH") or other RMA publications.  (Ex. 2 at 5, ¶ 7(B)).

NCIS has copied entire government publications and claim or suggest those works to have been authored by NCIS.  For example, the NCIS copied a several hundred page January 2004 LAM Manual published by the Federal Crop Insurance Corporation ("FCIC"), a corporate subsidiary of the USDA administered by the RMA, "created" its own identical February 2004 NCIS LAM Manual, and designated that document as its own copyrighted work.  (Rose Aff. at ¶ 25, and ex. 3 thereto).

Exhibit 4(B) to the NCIS Motion for Preliminary Injunction is a "Crop Insurance Withdrawal of Claim" form.  Crop1's Withdrawal of Claim form is attached to Mr. Rose's affidavit as exhibit 4.  Each item contained on both sides in this form is specifically <u>required</u> by

the RMA, in accordance with the requirements set forth in the DSSH. (Rose Aff. at Ex. 2, at ex. 22, pp. 74-75).

Exhibit 5(B) to the NCIS Motion for Preliminary Injunction is a "Simplified Claims Qualification and Notice of Loss Form." A copy of Crop1's Simplified Qualification and Notice of Loss Form is attached to Mr. Rose's affidavit as exhibit 5. The data set forth in each box set forth in the top of exhibit 4 is required by the RMA's "Data Acceptance System." That is, Crop1 is required to submit the information requested at the top of Ex. 4 to secure RMA reimbursement for the policy holder. Further, substantial additional information requested on Ex. 4 are required in substantially similar form by RMA written guidelines pursuant to RMA Bulletin Number MGR-98-030 (see Rose Aff. at ex. 6) or by provisions of a Loss Adjustment Manual. (Rose Aff. at ¶ 28).

Exhibit 6(b) to the NCIS Motion for Preliminary Injunction is a "Power of Attorney" form. A copy of Crop1's Power of Attorney form is attached to Mr. Rose's affidavit as exhibit 7. That Power of Attorney form is _virtually identical_ to the specific form required by the RMA, in accordance with the requirements set forth in the DSSH. (Rose Aff. at Ex. 2, at ex.15, p. 50).

Exhibit 7(b) to the NCIS Motion for Preliminary Injunction is a "High Risk Land Exclusion Option." A copy of Crop1's High-Risk Land Exclusion Option document is attached to Mr. Rose's affidavit as exhibit 8. The information contained in this form is _virtually identical_ to that required by the RMA, in accordance with the requirements set forth in the DSSH. (Rose Aff. at Ex. 2, at ex. 20, at p. 67).

### 3.     NCIS did not send Crop1 a request or cease and desist letter.

Crop1, on its website, urges anyone who may believe that Crop1 has misused a copyrighted work, to so-advise Crop1. NCIS, while knowing that the challenged documents

have been used by Crop1 since well before 2004, never contacted Crop1 about any copyright concern, and never sent Crop1 a cease and desist letter before filing this lawsuit and this motion for a preliminary injunction. (Rose Aff. at ¶ 35).

### C.    ARGUMENT.

NCIS has properly articulated the standard for prevailing on a claim of copyright infringement, but it has failed to provide evidence showing a likelihood of success on the merits for meeting that standard. (NCIS Br. at pp. 6-7). In particular, as a copyright claimant, NCIS must establish (1) that it owns *valid* copyrights in the works, and (2) that defendants copied *protected* elements of the works. (*Id.* at 6) NCIS says that its "motion involves twenty-eight works, authored, owned, and copyrighted by NCIS (the "Registered NCIS Works"). (*Id.* at 7). But NCIS' proof as to authorship and ownership, and thus copyrightablility, are all but completely ignored by NCIS' motion. NCIS has not met — and Crop1 believes that discovery will show that NCIS cannot meet — its burden of proving that any of the allegedly infringing works of Crop1 infringe any copyrightable work of NCIS. On this basis alone, the preliminary injunction may be denied. Beyond that, Crop1 had a right to use NCIS crop hail documents, forms and data even if they *were* copyrightable as an agent of an NCIS member, at least for purposes germane to that agency relationship.

### Validity

The first threshold issue as to which NCIS has failed to submit proof is the question of the validity of several of NCIS' copyright registrations themselves.[7] Copyright certificates are only *prima facie* evidence of the validity of a copyright and of the facts stated in the certificate

---

[7]    NCIS' omission on this point may come from its failure to recite all of the language of 17 U.S.C. §410(c).

when the registration is made "before or within five years after first publication of the work."  17

U.S.C. §410(c).  With respect to Crist Declaration Exhibits 5A, 6A, 7A, 16A, 17A, and 22A, the

certificates of registration all show works first published more than five years before the date of

the certificate.  While evidentiary weight of certificates made later than five years after first

publication is a matter of judicial discretion, 17 U.S.C. §410(c), it should be recognized that in

seeking the extraordinary relief of a preliminary injunction, NCIS has offered no other evidence

of its original authorship of these exhibits.  Indeed, the DSSH provides evidence to the contrary.

Of course, even when certificates are made within five years of first publication, the

certificates themselves create no more than a rebuttable presumption of validity and the facts

stated in the certificates.  Since, unlike the Patent and Trademark Office,  the Copyright Office

undertakes no significant effort to examine an application for copyright, the burden of proving

the bona fides of whether a work is copyrightable at all still falls upon a copyright claimant and,

as discussed below, many of the so-called NCIS Registered Works are not properly

copyrightable at all.  *See, e.g.*, *MidAmerican Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995)

("this is simply a rebuttable presumption and . . . the burden of proof in the sense of the risk of

nonpersuasion remains throughout the trial upon the party on whom it was originally cast.")

### Original Authorship

Copyright law protects only *original works of authorship* fixed in a tangible medium of

expression.  17 U.S.C. §102(a).  Copyright law does not protect any work of the United States

Government (including any work prepared by an officer or employee of the government that are

part of official duties).   17 U.S.C. §105 (the definition of "work of the United States

Government" is found in 17 U.S.C. §101); *accord Pfeiffer v. Central Intelligence Agency*, 60

F.3d 861, 865 (D.C. Cir. 1995).  It likewise does not protect:

> any idea, procedure, process, system, method of operation, concept
> principle, or discovery, regardless of the form in which it is
> described, explained, illustrated, or embodied in such work.

17 U.S.C. §102(b); *see also Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349-50

(1991); *accord Veeck v. Southern Bldg. Code Congress Int'l, Inc.*, 293 F.3d 791, 800-01 (5th Cir.

2002) (*en banc*); *MidAmerican Title*, 59 F.3d at 719.

### Government works

The most obviously egregious example of NCIS' overreaching in this case can be seen by

reviewing the "Power of Attorney" form (Crist Ex. 6B) and its applicable copyright registration

certificate. (Crist Ex. 6A).  In June 2005, Crist certified as agent of NCIS that the text of the

Power of Attorney form was authored by NCIS.  But Crist failed to disclose to the Copyright

Office that the text was actually drafted by the United States Department of Agriculture, Risk

Management Agency, Product Development Division ("RMA") or at least, by July 2003, had

been adopted virtually verbatim by RMA.[8]  (See Rose Aff. at Ex. 2 at p. 50).

With regard to several works at issue in this case, the text at issue is likewise set forth

verbatim or – to use the words of NCIS "copying argument" in a "strikingly similar" way in

government authored document such as those of the RMA.  Each item in Crop1's and NCIS'

Crop Insurance Withdrawal of Claim Form (NCIS Ex. 4(B); Rose Ex. 4) is specifically required

by the RMA.  Likewise, the NCIS and Crop1 "Simplified Claims Qualification and Notice of

Loss Form" (NCIS Ex. 5(B); Crop1 Ex. 5) contain request for information required by RMA

guidelines.  Again, the NCIS and Crop1 High Risk Land Exclusion Option forms (NCIS Ex. 7(b)

---

[8]     Claimant's counsel, on July 15, 2005, also failed to note this information during the
telephone call with the Copyright Office in which the Copyright Office amended the
copyright application to delete from the claim of authorship the "Form Layout").  (Ex.
6A).

and Crop1 Ex. 8) request information virtually identical to that expressly required by the RMA. (Rose Aff. at Ex. 2 at ex. 20, p. 67). Further, on the back side of many of the works at issue contains statements regarding the "collection of information and data (privacy act) and a "non discrimination statement," both of which are required by the RMA as well as the other federal laws and regulations cited in the statements. (*Compare*, e.g., NCIS Ex. 4A *with* Rose Aff. ex 2 at p. 75).

For all of these works, injunctive relief is inappropriate because NCIS can be entitled to no relief whatsoever for any so-called copying of any U.S. Government-authored or government-adopted work. *Accord Veeck*, 293 F.3d at 791.

### Forms, Contracts and Factual Statements

NCIS' assertion of copyright in the forms and contracts at issue here are further examples of overreaching. To fully appreciate just how much NCIS has overreached, it must first be noted that on form after form asserted as being validly copyrighted, the Copyright Office, with the consent of Penny Slicer of Stinson Morrison Hocker LLP, attorney for claimant, struck from the claim of authorship for which copyright is claimed for "form" and "layout". (*See*, *e.g.* NCIS Mot. at ex. 4A). All that remains with regard to NCIS' claims of authorship for these forms, then, is the text. As set forth above, the text for the forms comes from the Government and, therefore, cannot be the subject of a valid copyright. Thus, for each of these forms, NCIS is not entitled to injunctive relief.[9]

---

[9]      Of course, even if the text was not authored or adopted by the Government, blank forms such as those at issue here are not properly the subject of copyright. This principle of Copyright law dates back to the Supreme Court ruling in *Baker v. Selden,* 101 U.S. 99 (1879) and remains the law today despite the amendments and various redrafting efforts of Congress with respect to the Copyright Act. *See*, *e.g.*, *Brown*

*(footnote continued to next page)*

Further, with respect to the forms for the contract of insurance themselves (e.g. NCIS Exs. 8-22(b)), it has long been held that insurance companies are

> free to make contracts embracing like contractual provisions . . . and to use suitable words to express the provisions of such contracts so long as it does not copy the particular means of expression originated by [another]. *** A copyright upon a form of contractual provision should not be constructed so as to impinge upon the natural right of persons to make contracts containing the same contractual provisions and creating like contractual rights and obligations, and similarity of expression should not be held to constitute infringement in such cases. Necessarily, where the same contractual provision is to be expressed there will be similarity of language. To constitute infringement in such cases a showing of appropriation in the exact form or substantially so of the copyrighted material should be required.

*Dorsey v. Old Surety Life Ins. Co.*, 98 F.2d 872, 874 (10th Cir. 1938).

Moreover, purely <u>factual</u> statements are not copyrightable.

> "[N]o author may copyright facts or ideas. The copyright is limited to those aspects of the work – termed "expression" – that display the stamp of the author's originality." *Feist Publ'ns*, 499 U.S. at 350, 111 S.Ct. at 1289 (internal quotation marks and citations omitted) alternation in original), *see also*, 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery . . . ")

*Sturdza v. United Arab Emirates*, 281 F. 3d 1287, 1295 (D.C. Cir. 2002).

Thus, Crop1's Crop Insurance Plan Comparison charts (NCIS Exs. 1-3(b) and Crop1 Ex. 4) are not copyrightable because they contain basic factual information commonly used by insureds to be able to compare and contrast different types of federal insurance coverage. (Rose Aff. at ¶ 24). Indeed, the information describing the "premium" sections of those comparison

---

*(footnote continued from previous page)*
    *Instrument Co. v. Warner*, 161 F.2d 910 (D.C. Cir. 1947); *John H. Harland Co. v. Clark Cheeks, Inc.*, 711 F.2d 966, 971-72 (11th Cir. 1983).

charts set forth formulae required by federal regulation. (*Id.*) Additional documents at issue, Exs. 9-15(b), 20-21(b) are contract provisions which also contain facts, legal definitions and contractual standards.

The deficiencies in NCIS' motion are amplified by the fact that Crop1 was the agent of an NCIS member in good standing, and thereby authorized to use NCIS crop hail form contracts, forms and data for the purpose for which they were created. (NCIS Exs. 9(b)-28(b)). Thus, even if any NCIS crop hail contracts, forms or data were copyrightable, the ones that were copied or relied upon by Crop1 were copied or relied upon pursuant to permission to do so granted to NCIS members and their agents.

**Copyright Misuse also Bars Relief**

Though, as noted throughout this Memorandum, no discovery has yet occurred, the minimal evidence available to Crop1 strongly suggests that NCIS is engaged in copyright misuse in this case. As first affirmatively recognized by the Fourth Circuit, copyright misuse is the use of copyright in a manner contrary to public policy. *Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970, 979 (4th Cir. 1990). Copyright misuse bars the entry of injunctive relief as well as awards of damages for copyright misuse. *Id.* Courts in this District have recognized the equitable nature of this defense. *National Cable TV Ass'n, Inc. v. Broadcast Music Inc.*, 772 F. Supp. 614, 652 (D.D.C 1991). While further discovery will be necessary to establish this defense in total, the questions raised by the manner in which NCIS is seeking to block everyone other than those it approves from using Government-mandated language certainly raises such significant questions as to NCIS' ability to prevail on the merits as to require denial of preliminary injunctive relief. That the NCIS brings it claim against Crop1, the sole crop hail

insurance agency to not sit as a member of the NCIS and to offer a lower-cost service to farmers in accordance with federal regulations, only amplifies those questions.

NCIS' inequitable conduct is amplified by its awareness of, yet failure to investigate or even acknowledge, the agency relationship between Crop1, CropUSA and Occidental; falsely alleging that Crop1's independent contractor lied when indicating that there was a relationship between Crop1, CropUSA and Occidental; copying government forms, or following the specific dictates of forms required by the government, and falsely claiming them to be NCIS' own original work; and failing — after registering its works just prior this lawsuit — to even send Crop1 a cease and desist letter, much less asking Crop1 about its relationship with CropUSA.

### B. The remaining factors otherwise considered in preliminary injunction motions cannot support NCIS' motion.

Where, as here, the NCIS cannot demonstrate a substantial likelihood of success on the merits, the Court need not consider the remaining factors otherwise considered for a preliminary injunction motion. *Health Ins.*, 211 F. Supp. 2d at 29, 32. In any event, although the balance of the harms and public interest generally favors the one whose copyrights have been infringed (which is not the case here), the court may consider "countervailing considerations." *WPOW, Inc. v. MRLJ Enterprises*, 584 F. Supp. 132, 138 (D.D.C. 1984). For reasons already discussed, neither the appropriate balance of equities nor the public interest is served by the use or misuse of copyright laws to try to copyright government works or forms required by government regulation, or to use copyright law to force members of the crop insurance industry to pay fees to the NCIS to secure the "right" to use government required forms.

## V.     CONCLUSION.

WHEREFORE, for the foregoing reasons, and for any additional reasons set forth in the motion and brief submitted by Occidental, Defendant, Crop1 Insurance Direct, Inc. d/b/a Crop1 Insurance, Inc. respectfully requests that this Court: 1) dismiss this entire lawsuit pursuant to Fed. R. Civ. P. 12(b)(2) for lack of *in personam* jurisdiction over Crop1; or, in the alternative, 2) transfer this action to a more convenient forum pursuant to 28 U.S.C. § 1404(a) and deny plaintiff's motion for preliminary injunction as moot; or, in the alternative, 3) deny plaintiff's motion for preliminary injunction because plaintiff has failed to demonstrate a sufficiently strong likelihood of success on the merits of its copyright claim.

August 22, 2005                              Respectfully submitted,


                                             _____/s/_____
                                             Cristen E. Sikes (D.C. Bar No. 473461)
                                             David E. Mendelsohn (To be admitted P*ro Hac Vice*)
                                             Kenneth L. Schmetterer (To be admitted P*ro Hac Vice*)
                                             Michael Kasdin (To be admitted P*ro Hac Vice*)

                                             DLA Piper Rudnick Gray Cary US LLP
                                             1200 Nineteenth Street, N.W.
                                             Washington, D.C. 20036
                                             TEL: 202-861-3900
                                             FAX: 202-689-7612

                                             Attorneys for Defendant
                                             Crop1 Insurance Direct, Inc