**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **NATIONAL CROP INSURANCE SERVICES, INC.,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | **Civil Action** |
| **OCCIDENTAL FIRE & CASUALTY COMPANY OF NORTH CAROLINA, et al.,** | ) ) ) ) | **No. 1:05-cv-01417-RWR** |
| **Defendants.** | ) ) ) | |

**PLAINTIFF'S CONSOLIDATED RESPONSE (1) TO DEFENDANT CROP1'S
MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS AND IN OPPOSITION
TO THE MOTION FOR PRELIMINARY INJUNCTION [16] AND (2) DEFENDANT
CROP1'S AND DEFENDANT OCCIDENTAL'S CHANGE OF
<u>VENUE MOTIONS [13 and 16]</u>**

Plaintiff National Crop Insurance Services, Inc. ("NCIS"), in opposing the arguments made by defendants' multiple filings, cannot resist the temptation to open its response by quoting Paul Harvey's famous line "…and now for the rest of the story." Defendant Crop1 Insurance Direct, Inc. ("Crop1") has failed to tell "the rest of the story" in seeking dismissal for lack of personal jurisdiction, alternatively a change of venue, and in opposing plaintiff's application for preliminary injunction. Defendant Occidental Fire & Casualty Company of North Carolina ("Occidental") has submitted its own change of venue motion and relies on Crop1's preliminary injunction opposition papers.

The defendants have presented distorted and incomplete factual and legal arguments in support of their efforts to prevent NCIS from protecting its intellectual property rights. For example:

- While admitting that more than 99% of their crop insurance business is "writing Federal Multi Peril Crop Insurance,"[1] defendants never reveal that their counter-party in that business ("MPCI coverage") is the Federal Crop Insurance Corporation ("FCIC") and that, as a result, they necessarily transact substantial business on a continuous basis within the District of Columbia. This negates Crop1's jurisdictional argument and undermines both defendants' venue change arguments.

- Both defendants claim that a contractual arrangement with another entity and non-party, Crop USA Insurance Agency, Inc. ("Crop USA"), permits their infringing activity, but do not recognize that NCIS is not a party to any such arrangement, that the alleged arrangement violates state law, and that Crop USA withheld from NCIS that document when NCIS directly asked for a copy of it.

These examples, and others developed subsequently in this memorandum, typify the misdirection attempted by defendants.

NCIS first addresses in this response the substance of Crop1's personal jurisdiction argument. Then it turns to both defendants' arguments seeking a change in venue. Finally, NCIS offers limited, discreet comments regarding both defendants' opposition to preliminary injunctive

---

[1] See Memorandum in Support of Crop1 Insurance Direct, Inc.'s Motion and in Opposition to the Motion for Preliminary Injunction [Doc. 16] (hereafter, "Crop1 Memo.") at 4; Affidavit of William T. Rose, Jr. (hereafter, "Rose Aff."), ¶ 3.

relief.[2]  NCIS has submitted herewith the Supplemental Declarations of Robert W. Parkerson (hereafter, "Parkerson Supp. Decl.") and of Shane Weaver (hereafter, "Weaver Supp. Decl.") as integral parts of this response.

## ARGUMENT

I.     **Crop1 Has Sufficient Contacts with the District of Columbia To Permit The Exercise of Personal Jurisdiction over It.**

For a party seeking dismissal at the responsive pleading stage and prior to any discovery, Crop1 advances a personal jurisdiction argument with curious factual statements:

- It asserts "Crop1 has <u>almost</u> no contact with the District of Columbia, …."   Crop1 Memo. at 6 (emphasis added).

- "Crop1 has no <u>meaningful</u> connection to the District of Columbia."  <u>Id</u>., at 8 (emphasis added).

These highly ambiguous, subjective, and less than straight-forward statements make Crop1's personal jurisdiction argument facially suspect.  In fact, Crop1 conducts substantial business in the District of Columbia.

At the very outset of its personal jurisdiction argument, Crop1 acknowledges that its business involves primarily writing MPCI coverage,  "Far less than 1% of Crop1's business is the writing of crop-hail insurance."  Crop1 Memo. at 4; Rose Aff., ¶ 3.  That means that more than 99% of its business is writing <u>federal</u> MPCI coverage.

---

[2]  NCIS is aware that it has no automatic right to submit a reply memorandum in support of its injunction motion or to supplement the materials submitted in connection with that motion.  <u>See</u> LCvR 65.1.  Accordingly, as part of the final portion of this response, NCIS identifies several reasons warranting consideration by the Court of the points made at pages 15-16.  Further, given that this memorandum is both an opposition to defendants' separate motions to dismiss and for a change of venue as well as a reply to the opposition to the request for preliminary injunction, NCIS does not believe the 25 page limitation in LCvR 7(e) applies.

What Crop1's brief does not tell the Court is more critical than its arguments on jurisdiction.  Most pointedly, Crop1 and Occidental voluntarily, and in pursuit of their own financial and business interests, have elected to participate in the Federal Crop Insurance Program.  To do so, Occidental, in conjunction with Crop1 as its Managing General Agent, contracted with the FCIC, which is an agency of and within the United States Department of Agriculture ("USDA") and whose principal office is located in the District of Columbia.  7 U.S.C. § 1503.  This relationship requires continuous and significant interaction with USDA's Risk Management Agency ("RMA"), which has jurisdiction over, administers, and oversees the FCIC and all of its operations.  Parkerson Supp. Decl., ¶¶ 3 – 7; 7 U.S.C. § 6933.

Defendants' FCIC contract is known as the Standard Reinsurance Agreement ("SRA").  The SRA under which defendants operate is available on RMA's website (www.rma.usda.gov under "Publications").  By reviewing the SRA published on the website, several salient points become apparent:

- Collection and regular reporting of data and submission of reports, at least weekly, is required.  SRA Sections IV.A. and B.

- Defendants remain subject to compliance examinations and reviews throughout the duration of their relationship with FCIC.  Id., Section IV.H.

- If defendants dispute any actions of the government, they must proceed administratively within USDA, including bringing to the attention to the Manager of FCIC any disputes and generally proceeding to USDA's Board of Contract Appeals.  Id., Sections IV.K. and X.

See also Parkerson Supp. Decl., ¶¶ 3 – 7.  In addition, if Crop1 were to sue FCIC for any reason, it only can do so "in the District of Columbia, or in a district wherein [it] resides or is engaged in

business." 7 U.S.C. § 1506(d). All of these points exemplify the type of persistent, systematic, and continuous contacts which Crop1 voluntarily undertook in the District of Columbia as part of its and Occidental's business decision to offer MPCI coverage and to make it more than 99% of their business. Mr. Rose's eight page, thirty-five paragraph affidavit never once mentions the numerous points of contact between it and the FCIC and RMA, or even notes in passing the SRA.[3]

Second, Crop1 does not address a critical allegation in the Amended Complaint having direct bearing on personal jurisdiction over Crop1 in the District of Columbia. Specifically, the following portion of paragraph 25 has not been contested by Crop1, and it has critical significance with respect to movant's motion.

> This infringing activity has included posting, without authorization, many of the Registered NCIS Works on the website of Crop1 (www.crop1insurance.com) where they have been downloaded by or are available to download by other unauthorized users, or potential users, throughout the United States, including the District of Columbia, and elsewhere in the world where crop insurance is available.

That Crop1 has such an active website, as opposed to a passive, informational one, belies its argument that it does not have continuous and systematic contacts with the District of Columbia.

This Court may exercise general jurisdiction over Crop1 pursuant to D.C. Code § 13-334 if two conditions are met: (1) Crop1 must be "doing business" in the District; and (2) the exercise of jurisdiction must comport with due process. Ross v. Product Dev. Corp., 736 F. Supp. 285, 290 (D.D.C. 1989). District of Columbia courts have defined "doing business" as any continuing corporate presence in the forum directed at advancing the corporation's objectives. Id. An exercise of general jurisdiction over the defendant comports with due process when the corporation has

---

[3] The SRA is not a "government contract" and the relationship between insurers and FCIC is unlike other government relationships. See Rain Hail Ins. Service, Inc. v. Honor, 2002 WL 539077 at * 1 (Fed. Cir. 2002); American Growers Ins. Co. v. FCIC, 210 F.Supp.2d 1088, 1093 (S.D. Iowa 2002). Participation in the program is entirely voluntary. Parkerson Supp. Decl., ¶ 4.

purposefully availed itself of the privilege of conducting business within the jurisdiction and its contacts with the forum put the corporation on notice that it may be sued in the forum. Id. (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958) and World-Wide Volkswagen v. Woodson, 444 U.S. 286, 297 (1984)).

When a corporation maintains continuous links within the forum and derives substantial business from the forum, the corporation is "doing business" in the forum within the meaning of § 13-334. In Gorman v. Ameritrade Holding Corp., the defendant securities brokerage maintained a 24 hour a day website that was accessible to District residents and solicited securities trades from them. 293 F.3d 506, 513 (D.C. Cir. 2002). The court distinguished the defendant's site from those that are merely accessible and informational. Id.; and see GTE New Media Serv. v. Bellsouth Corp., 199 F.3d 1343, 1350 (D.C. Cir. 2000). The court noted that the interactive site solicited trades from, and permitted trades by, District residents who were sitting in the District on their home or office computers. Gorman, 293 F.3d at 513. The court concluded that the site permitted the defendant to maintain a presence "in the District" that was continuous and systematic "to a degree that traditional foreign corporations can never approach." Id. at 513. In Ross, the corporate defendant also did not maintain an office in the District. 736 F. Supp. at 290. The defendant delivered telephone books within the District seven weeks each year, and had been doing so for more than four years. Id. at 287. In finding the exercise of jurisdiction appropriate, the court found that although the defendant's contacts with the forum were infrequent, they were regular and had continued year after year. Id.

Like the defendant corporations in Gorman and Ross, Crop1 maintains a continuing presence in the District that is directed at advancing Crop1's objectives. Just like the defendant in Gorman, Crop1 maintains an interactive website. Just like in Gorman, the website is present in the

District because the site allows Crop1 to interact with District residents "in the District" while they work at their home or office computers.  Crop1's site is interactive, not passive, permitting residents to view and download material online, and its presence is continuous.  Moreover, Crop1 maintains continuous and systematic contacts with the District through its transactions with the FCIC.  Indeed, Crop1 admits that almost all of its business is federally reinsured MPCI coverage, and thus the volume of business under its contract with the FCIC is substantial.  Like the defendants in <u>Gorman</u> and <u>Ross</u>, Crop1's business links in the District are directed at advancing its corporate objectives.

When the defendant voluntarily maintains systematic, continuous contacts with the forum, the forum may exercise general jurisdiction over the defendant consistent with due process.  Crop1 voluntarily chose to create an interactive website that is accessible in the District.  Crop1 voluntarily conducts business with the FCIC within the District.  By conducting systematic and continuous activities within the District, Crop1 has thus purposefully availed itself of the privilege of conducting business within the District, thus invoking the benefits and protections of its laws.  Moreover, Crop1's continuing contacts with the District provide it with clear notice that it is subject to suit in the District.  Accordingly, as in <u>Ross</u>, this Court can exercise jurisdiction over Crop1 consistent with traditional notions of fair play and substantial justice.

Third, the "lobbying" efforts of Crop1 establish regular contacts with the District of Columbia.  While NCIS agrees that lobbying constitutes a protected First Amendment right, Crop1 is wrong arguing that these activities are irrelevant to the jurisdictional analysis.  As the only case cited by Crop1 on this point so plainly makes clear, lobbying activity <u>by</u> <u>itself</u> does not meet the "doing business" test for jurisdictional purposes.  <u>Dooley v. United Technologies Corp.</u>, 786 F.Supp. 65, 75 (D.D.C. 1992).  <u>See</u> Crop1 Memo. at 8-9.  Here, NCIS notes that Mr. Rose, Crop1's

President and CEO, twice this year already has voluntarily appeared before Congress to advocate Crop1's interests.  See Parkerson Supp. Decl., ¶ 19 and Exs. 3-4.  Coupled with an interactive website and voluntarily contracting with FCIC, these lobbying efforts portray a company with continuous and substantial business interests in the District of Columbia.

Crop1's final argument is that NCIS has failed to plead affirmatively a specific basis for personal jurisdiction.  It misleads the Court by claiming that the only jurisdictionally related allegation is "the bare legal conclusion" that Crop1 conducts business in the District of Columbia. Crop1 Memo. at 9.  In point of fact, the allegation which Crop1 does reference is paragraph 4 of the Amended Complaint, which contains the following now admitted facts:

- That "Occidental is licensed to conduct the business of insurance in the District of Columbia" is admitted in paragraph 9 in the Declaration of David G. Pirrung.

- That "Crop1 is [Occidental's] managing general agent" is admitted in paragraphs 4 and 7 in the Affidavit of William T. Rose, Jr.

Those admitted allegations support the reasoned factual assertion that Crop1 also conducts business within the District of Columbia.  But there is more to the Amended Complaint, as Crop1 either ignores or avoids the personal jurisdiction allegations made in paragraph 25, which NCIS has quoted above.  Plainly, NCIS' personal jurisdiction allegations with respect to Crop1 pass muster, especially as supplemented by defendants' declarations and affidavits.

## II.    Venue in the District of Columbia Is Proper

Defendants' venue change motions should be denied, and this action should remain in the District of Columbia.

Occidental concedes that it is subject to personal jurisdiction in the District of Columbia.[4] Given this concession, it is axiomatic that venue in the District of Columbia is proper with respect to Occidental.  28 U.S.C. § 1391(c).  Amended Complaint, ¶ 3.b.; Pirrung Decl., ¶ 4.  Accordingly, the most for which Occidental can pray is a discretionary transfer under 28 U.S.C. § 1404(a).

The combination of Crop1's personal jurisdiction and venue arguments theoretically create two avenues for a change of venue.  If personal jurisdiction is not proper in the District of Columbia, then a change of venue for the claims against it is appropriate pursuant to 28 U.S.C. § 1631.  On the other hand, if there is personal jurisdiction in the District of Columbia, then venue also is proper under 28 U.S.C. § 1391(c) since Crop1 is a corporation.  Amended Complaint, ¶ 3.c.; Rose Aff., ¶ 2.  Crop1's position foregoes the first argument and focuses instead on discretionary transfer pursuant to 28 § U.S.C. 1404(a).

Quite simply, discretionary transfer under § 1404(a) is not appropriate for the multiple reasons detailed below.  However, if the Court is inclined to grant a discretionary transfer, NCIS respectfully suggests that it rule on the preliminary injunction motion before doing so and, further, that any transfer should be to the District of Kansas and not to the Southern District of Iowa.  If venue is transferred prior to a ruling on plaintiff's injunction motion, NCIS will encounter unnecessary and potentially damaging delay in obtaining interlocutory relief.  A court in the transferee district, quite simply, will have to start from scratch on this issue, unlike this Court.

Defendants correctly identify the relevant venue change considerations, Occidental Memo. at 6; Crop1 Memo. at 10–11, but misapply each of them.  As a fundamental matter, defendants fail to recognize that some factors carry greater weight than others – with the plaintiff's forum choice leading the pack as the single most important factor.  Pain v. United Technologies Corp., 637 F.2d

---

[4]  See Memorandum of Law in Support of Defendant Occidental Fire & Casualty of North Carolina's Motion for Change of Venue (hereafter, "Occidental Memo.") [DOC. 13] at 4.

775, 783 (D.C. Cir. 1980), overruled on other grounds by Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981). Unless the balance weighs strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed. Thus, the plaintiff's choice of forum is more than just one factor that the court must consider when balancing the equities between alternative forums. Id.; and see also Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947) (discussing the doctrine of *forum non conveniens*, the plaintiff's choice of forum "should rarely be disturbed," and must be strongly outweighed by the factors in favor of the defendant before dismissal should be granted).

Furthermore, the burden is on the defendant to set forth specific facts demonstrating a strong showing that the forum is inconvenient. See, e.g., Air Line Pilots Ass'n v. Eastern Air Lines, 672 F. Supp. 525, 526 (D.D.C. 1987). The defendant may not merely assert that a particular forum would be more convenient because more parties, witnesses, or records are located within that forum. Convenience is not proved by a battle of numbers. See Charles Alan Wright et al., Federal Practice & Procedure:  Jurisdiction § 3851 (2d ed.). Instead, the defendant must describe the witnesses or records that may be unavailable or outside the court's subpoena power, as well as their location and their importance to the trial. Id. In its motion, Crop1 merely alleges "[s]everal well established criteria weigh heavily in favor of transferring this case," it then identifies several factors, and ends its analysis there. Crop1 Memo. at 10. Crop1 does not offer any facts to demonstrate how any of those factors weigh in favor of transfer. Id. Similarly, Occidental fails to offer any specific facts demonstrating inconvenience. See Occidental Memo. at 7-10. For these reasons alone, the requests to transfer should be denied.

NCIS discusses each of the salient factors below.

Plaintiff's choice of forum. Plaintiff's choice of the District of Columbia as its litigating forum should be respected and accepted, as its choice is the dominant relevant factor. NCIS' forum

choice also should be given substantial deference because this forum has substantial connections with the parties and the subject matter at issue. See Initiative & Referendum Institute v. United States Postal Serv., 154 F. Supp. 2d 10, 14 (D.D.C. 2001) (plaintiff's forum choice should be afforded substantial deference unless that forum has no substantial connection with the parties or subject matter at issue). As discussed in the jurisdiction section of this memorandum, both defendants have substantial connections with the forum. Occidental is authorized to do business in the District of Columbia and has a registered agent here. Crop1 is Occidental's agent and transacts substantial business in the District. Moreover, Crop1 has substantial and regular contacts within the forum. Crop1's chief executive officer regularly visits the forum to meet with various individuals and government agencies. These contacts are appropriate to consider when addressing venue because they demonstrate the ease and convenience of Crop1's access to the forum. As further developed below, the subject matter of this suit is substantially connected to every federal judicial district, including the District of Columbia.

Defendants' choice of forum. The defendant's preference to litigate in the state of its place of business is understandable and entitled to some weight. See Wilderness Society v. Babbitt, 104 F. Supp. 2d 10, 15 (D.D.C. 2000). Thus, Crop1's preference to litigate in Iowa is entitled to some weight. On the other hand, Occidental's place of business is North Carolina. Iowa is farther removed from North Carolina than the District. Any argument Occidental advances that Iowa is a more convenient forum should be given little weight.

Furthermore, where the defendants do not want to litigate is, at the very least, interesting. Neither defendant desires to litigate in their states of incorporation, North Carolina and Wyoming, respectively. Occidental wants to avoid the state where it has its principal place of business (North Carolina) and the state where it manages its crop insurance business (Nebraska). Pirrung Decl., ¶

11

4; Coon Decl., ¶ 4. Crop1 prefers the state where it has its principal place of business (Iowa), but this preference enjoys no greater significance than any of the fourteen other states where it admits to conducting crop insurance business. Rose Aff., ¶¶ 4, 5, and 7. As noted above, its choice is entitled to less weight than plaintiff's choice. Wilderness Society, 104 F. Supp. 2d at 13, 15 (generally, the plaintiff's choice of forum is entitled to substantial weight, while the defendant's choice is entitled to some weight).

Locus of the Claim. When it is not clear from the facts where the claims arose, or the facts demonstrate that the subject matter of the suit is not local, the locus of the claim does not weigh in any party's favor. See id. (locus of the claim is an inconclusive factor when it is not clear where the plaintiff's claim arose); and see Initiative & Referendum Institute, 154 F. Supp. 2d at 16 (claims that involve several states or the national application of federal law are not localized controversies subject to the interest of being decided "at home").

There is no clear, unassailable single locus where NCIS' claims arose. That Crop1 disseminated infringing material on its website makes each federal district with internet access an appropriate locus, including the District of Columbia. Amended Complaint, ¶ 25. That Occidental and Crop1 sold MPCI coverage in fifteen states using infringed Registered NCIS Works makes each of them a legitimate forum. Id., ¶ 10.b.; Rose Aff., ¶ 7. That defendants offered crop-hail coverage in nine states, using infringed Registered NCIS Works, renders each of them an appropriate forum. Amended Complaint, ¶10.a.; Rose Aff., ¶ 5. Thus, if the place where the alleged misconduct occurred is to be considered, the Court has fifteen equally situated transferee venues to consider, only one of which is Iowa. In sum, the place (or places) where the claims arose does not lead to any productive analysis.

Party convenience.    No party seriously can object to the District of Columbia on convenience grounds.  NCIS wants to litigate here.    Parkerson Supp. Decl., ¶ 20.  In fact, litigating in the District is more convenient for it than doing so in the Southern District of Iowa.  Id. Occidental and Crop1 conduct more than 99% of their crop insurance business with two USDA agencies based in Washington – FCIC and RMA.  Because defendants regularly have business dealings with these agencies, the District of Columbia must be deemed a forum convenient to them.

Convenience of witnesses and access to proof.  NCIS discusses these inter-related factors as a single issue.  The positions asserted by defendants in opposing preliminary injunctive relief make it evident that critical third-party discovery and likely testimony at trial make the District of Columbia a superior venue choice.  For example, defendants argue that some copyrighted works simply are reprinted and reformatted versions of government forms.   Crop1 Memo. at 20-21. Implicit in any such contention are various factual issues, including the extent to which the NCIS copyrighted materials covered by this contention are, in fact, simply reprinted and reformatted versions of government forms as well as whether RMA has authorized, either explicitly or implicitly, NCIS to assert copyright protection with respect to its own versions of those forms.

As another example, defendants appear to recognize that some forms have been composed from scratch by NCIS, but nevertheless assert that are not copyrightable because their contents are dictated entirely by the federal government.  Crop1 Memo. at 20-21.  This sort of contention has a wholly different set of factual constituents, including discovery from and trial testimony by government officials.

As pointed out in the jurisdictional portion of this brief, supra at 4, the principal place of business of FCIC and RMA is the District of Columbia.  Accordingly, this vital component of

discovery and access to proof at trial necessarily will involve witnesses from those two USDA agencies.

Defendants also appear likely to argue that Crop USA's membership in NCIS somehow entitles them to claim the privileges of membership. Crop1 Memo. at 13. That sort of contention directly implicates discovery involving Crop USA and potential trial testimony by its directors, officers, and employees. Crop USA is based in Overland Park, Kansas. Parkerson Supp. Decl., ¶ 10. Reaching Washington by air takes no more time than driving or flying from Overland Park to Des Moines, where the Southern District of Iowa holds court. Id., ¶ 20. The role which Crop USA may play, therefore, argues either for leaving plaintiff's venue choice undisturbed or a transfer to the District of Kansas.

Public interest considerations. The three public interest factors identified by Occidental do not warrant transfer. Occidental Memo. at 6, 10 – 11.

First, there can be no doubt that federal law governs Counts I and II of the Amended Complaint (the Copyright Act and Lanham Act). This Court is as well equipped as any transferee court to deal with these issues.

Second, defendants have made no showing regarding relative calendar congestion in the District of Columbia compared to any transferee district. All courts are busy, but there is no reason to assume that the merits of the parties' claims and defenses will not be handled as fairly and expeditiously here as they would elsewhere.

Third, the "local interest in local controversies" factor means little here with one important exception. The common law issues (Counts III – V) implicate potentially the local laws of ten states – Kansas, where NCIS is domiciled, plus the nine states where defendants have improperly made filings using proprietary and protected NCSI materials. Amended Complaint, ¶¶ 6, 31-66.

14

The one meaningful exception actually argues in favor of litigating in the District of Columbia. The SRA to which Occidental and Crop1 are parties requires them to comply with all applicable state laws and regulations, including licensing requirements, unless specifically preempted in regulations issued by the FCIC.  See SRA § IV.H.2., which is accessible on the website identified at page 4.  Holding proceedings in the District of Columbia makes it far easier for the FCIC and RMA to monitor them and to ascertain whether any federal regulatory or supervisory action is required.  Thus, to the extent that public interest considerations are involved, they weigh against a change of venue.

In sum, if the Court decides to reject plaintiff's choice of forum, despite the obvious importance of discovery from and testimony by government officials in the District of Columbia, and in complete derogation of plaintiff's forum choice, there is no obvious alternative venue choice other than the District of Kansas.  NCIS and both defendants conduct business there, NCIS has its only office in Kansas, and Crop USA also is located there.

## III.    NCIS Remains Entitled to a Preliminary Injunction.

Defendants' opposition to NCIS' request for a preliminary injunction contains misstatements of fact, raises red herrings, and attempts to misdirect the Court's attention away from the issues before it.  As many of the defendants' misstatements and exaggeration can be easily identified and corrected, NCIS takes this opportunity to do so.  Furthermore, this reply may alleviate the need for a hearing in this matter.  While NCIS requested a hearing in its application for a preliminary injunction, the arguments raised in opposition can likely be adequately addressed without a hearing.  Consequently, this reply to those arguments should obviate the need to burden the Court with a hearing, and NCIS respectfully requests that the Court consider this reply.

Defendants' counter argument to NCIS' showing that it will likely succeed on the merits boils down to three points. First, they give considerable attention to contrasting NCIS' MPCI forms with the RMA's alleged standard for forms and allege that NCIS has wrongly copyrighted government forms and government required language. As detailed below, defendants' position not only is wrong on the point they belabor, but it also is wholly inapplicable to the vast majority of Registered NCIS Works, which are crop-hail forms and not used in the Federal Crop Insurance Program. Regarding the crop-hail documents, defendants argue that their use of NCIS' protected material is authorized under an agreement between Occidental, CropUSA, and Crop1 (the "Occidental-CropUSA Agreement"). NCIS addresses this point first. Finally, Crop1 argues that NCIS' action in bringing its infringement action amount to copyright misuse.

### A.    The Copyrighted Crop-Hail Documents

#### 1.    Crop1's Assertions That It Had Authorization To Copy The Crop Hail Materials Is Without Merit.

First, only full members in good standing are authorized to utilize proprietary and copyrighted crop-hail materials. That Occidental and Crop1 are not members of NCIS is made clear by the uncontroverted declarations of Robert W. Parkerson and James M. Crist. As those declarations make clear, use of NCIS' works only extends to full members of NCIS in good standing for the duration of their membership. Parkerson Decl., ¶¶ 2, 10 – 12; Crist Decl., ¶¶ 2, 7 – 10.

Second, the argument that Crop1 is entitled to full use of crop-hail forms as the "general agent" for Occidental pursuant to the previously undisclosed Occidental-CropUSA Agreement is nothing more than a meritless charade.[5] Crop1 Memo. at 13 – 15, 23. There are multiple reasons

---

[5] Crop1's feigned indignance to NCIS' lack of knowledge of the terms of the Occidental-CropUSA is part of the charade. As noted in Mr. Parkerson's supplemental declaration, NCIS was not given

that this argument does not pass muster, and they are set forth in substantial detail in ¶¶ 14 - 16 of the Supplemental Declaration of Robert W. Parkerson.  In brief, the following points need to be noted.

NCIS is an advisory organization and statistical agent under the laws of the states where Occidental and Crop1 offer crop-hail coverage and MPCI coverage.  As such a licensee, one of NCIS' primary obligations to state regulatory authorities is to accumulate, evaluate, and report final average loss cost ("FALC") data to these regulatory bodies.  In performing these duties, it is essential for NCIS to know the identity of organizations reporting their crop-hail loss cost data because of its obligation to audit and verify such data (using statistical sampling and similar evaluative tools) so that the state regulatory authorities to whom it reports this data have a reasonable degree of confidence in its accuracy.  Knowledge of members' identities also enables NCIS to advise state regulatory authorities on an annual basis of the identity of its membership. That reporting, in turn, permits those authorities to review premium rates of companies who are NCIS members with a degree of confidence that the data on which they are relying in their individual filings is derived from the accumulation, evaluation, auditing, and verification processes which NCIS performs.  Parkerson Supp. Decl., ¶ 14.

Additional reasons for knowing the identity of companies using NCIS data and forms involve two considerations.  First, because its Board of Directors expects NCIS to protect proprietary and copyrighted materials which NCIS has developed at members' expense, it must know the full identity and scope of authorized users in order to maximize control of authorized distribution and copying of such materials.  Second, each member, regardless of how low its

---

a copy of the Occidental-CropUSA Agreement at the meeting between NCIS and CropUSA, and CropUSA failed to respond to a subsequent written request for the document.  Parkerson Supp. Decl., ¶ 10.  Accordingly, NCIS' first opportunity to read the Agreement was when served with Crop1's opposition.  Id.

premium volume may be, pays a minimum annual assessment (for example, $5,000 for associate members, and somewhat higher for full members, depending on the services selected). Thus, NCIS does not allow one member, in effect, to rent its membership to others so that they may avoid the financial obligations which come with membership. Id., ¶ 15.

The Bylaws of NCIS are quite specific regarding membership classes. Full members only can be insurance companies writing primary coverage, affiliated groups of insurance companies under common management writing primary coverage, or a managing general agent for one or more such companies. Crop USA qualifies in this category for membership because it serves as the managing general agent ("MGA") for Austin Mutual Insurance Company ("Austin Mutual") in its writing of MPCI coverage and perhaps to some extent, although it is still unclear, as the MGA for Occidental with respect to crop-hail coverage pursuant to the Occidental-CropUSA Agreement. Paragraph 3 of Mr. Petersen's affidavit describes the relationship among his company, Occidental, and Crop1. As described by Mr. Petersen, Occidental fulfills the role of a company writing primary coverage for crop insurance, Crop USA fits in the category of an MGA for Occidental, and Crop1 is a general agent for Crop USA. Therefore, under CropUSA's understanding, Crop1 does not qualify for the rights and privileges of a full member of NCIS with respect to writing of crop-hail coverage under NCIS' Bylaws. As a general agent, Crop1 might be able to qualify as an associate member, but if it did so, its utilization of NCIS services and materials would be on a case-by-case basis under terms and conditions determined at the time of admission to membership.

However, despite Mr. Petersen's characterization, Crop USA is not the MGA under the terms of the Occidental-Crop USA Agreement or applicable state law. Furthermore, if Crop USA were the MGA under that agreement, its delegation of duties to Crop1 under it would violate applicable state law. These points have two consequences for defendants' argument. First,

because Crop USA legally cannot be viewed as Occidental's crop-hail MGA, it does not qualify as a full member of NCIS for use of its proprietary and copyrighted materials.    Second, the Occidental-Crop USA Agreement evidences a sham transaction, a mere charade for purporting to bring Crop1's and Occidental's conduct under the umbrella of Crop USA's NCIS memberhip.

In order to qualify as an MGA, Crop USA must be vested with the authority and capacity to produce business and pay claims and/or negotiate reinsurance terms.[6]  Not all of those duties have been delegated by Occidental to Crop USA under the Occidental-Crop USA Agreement.    Crop USA has only been delegated the authority to produce business.    See Ex. 1 to Rose Aff., Section III.A.  In reality, Crop1 has been given more authority than Crop USA because it settles claims and negotiates reinsurance, Id., Sections III and XII.    Crop1, however, cannot use these provisions to argue that it acts as the MGA for Occidental's crop hail insurance program.    That argument fails as a matter of law, because state law prohibits MGA's from appointing sub-managing general agents

---

[6] Iowa Insurance Code 510.1B Definitions.
As used in this chapter, unless the context otherwise requires:

...

4. *a. "Managing general agent"* means any person who engages in all of the following:
(1) Negotiates and binds ceding reinsurance contracts on behalf of an insurer or manages all or part of the insurance business of an insurer, including the management of a separate division, department, or underwriting office, and who acts as an agent for such insurer whether known as a managing general agent, manager, or other similar term or title.
(2) With or without authority and either separately or together with affiliates, directly or indirectly produces, and underwrites, an amount of gross direct written premium equal to or greater than five percent of the policyholder surplus in any one quarter or year as reported in the last annual statement of the insurer.
(3) Engages in either or both of the following:
(a) Adjusts or pays claims in excess of an amount determined by the commissioner.
(b) Negotiates reinsurance on behalf of the insurer.

...

According to filings obtained from the National Association of Insurance Commissions, Occidental had approximately $118 million surplus at year end 2004.    See www.naic.org/cis2004/p/an932637.pdf.  Accordingly, for CropUSA to qualify as an MGA it would have to produce about $6 million in premiums per year.  Based on its own admissions, CropUSA clearly does not qualify as an MGA under state law.

and delegating away their MGA functions. <u>See</u> <u>generally</u> Model Managing General Agent Act § 4-J-8.[7]  Thus, even if CropUSA is treated as the MGA for Occidental, as alleged by Mr. Peterson, the parties have entered into an arrangement that violates state law, and Crop1 could not derive any rights to use the copyrighted works from CropUSA through any alleged agency with CropUSA.

Moreover, a fair reading of the Occidental-CropUSA Agreement leads to the inference that it is simply a sham designed to allow Occidental and Crop1 to improperly "piggy-back" on CropUSA's NCIS membership.  As discussed above, the agreement purports to make CropUSA the MGA for Occidental, but it does not invest CropUSA with the authority of an MGA.  Instead, Occidental invests the necessary authority directly in Crop1 and, in reality, has made Crop1 the MGA for its crop hail insurance program.  Rose Aff., Ex.1, Sections III and XII.A.  The parties assert that, through the agreement, Crop1 became the general agent of CropUSA.  Petersen Aff. ¶ 3; Coon Decl. ¶ 6; Rose Aff. ¶ 4.  However, CropUSA did not appoint Crop1 as its agent or delegate any authority to Crop1 in the Occidental-Crop USA Agreement.  Even the recitals assert that <u>Occidental</u> appointed Crop1.  Rose Aff., Ex. 1, Recitals.  The parties do not even include CropUSA in the agreement's dispute resolution provision. <u>Id</u>., Section XV.  The substance of the agreement is the grant by Occidental of a managing general agency to Crop1, which leads to a fair inference that the managing general agency purportedly created in CropUSA is merely a sham.

That the contract among Occidental, Crop1, and Crop USA is simply a sham arrangement also is evidenced by the following:

- Mr. Petersen's affidavit does not claim that Crop USA has written any crop-hail policies.

---

[7] <u>See</u> <u>also</u> Ind. Code § 27-1-33-7(11)(H); Ia. Code. § 510.5(3)(h); Mich. Comp. Laws. § 500.1409(h)(viii); Minn. Stat. 60H.04(j)(8); Neb. Rev. Stat. § 44-4905(8); Wash. Rev. Code § 48.98.015(10)(h); Wisc. Admin. Code Ins. 42.03(13)(h).

- Mr. Rose's affidavit does admit in paragraph 6 that Crop1 has sold crop-hail policies.

- Crop USA's website does not disclose that it offers crop-hail coverage, and it includes no crop-hail forms.  Amended Complaint, ¶ 68.

- Crop1's website (as of the commencement of this litigation) disclosed that it offered crop-hail coverage and included crop-hail forms.  Id., ¶ 25.

In short, Crop USA had and has no role in Occidental's and Crop1's offering of crop-hail coverage other than to lend them, without authorization, its membership in NCIS.

> **2.    Crop1 Has No Valid Defense To Its Infringement Of NCIS's Registered Crop Hail Materials (Crist Decl. Registration Ex. 8A-28A)**

It is unclear to what extent, if any, Crop1 is challenging the originality of the insurance policies, special provisions, applications, endorsements, and FALC analyses of NCIS. Instead, it relies mainly on its authority argument discussed above, while attacking NCIS' MPCI works (addressed below).  Crop1 does argue that, with respect to forms for the contract of insurance, insurance companies are entitled to make contracts embracing like contractual provisions. However, case law makes it clear that insurance companies are free to "use suitable words to express the provisions of such contracts **so long as it does not copy the particular means of expression originated by [another]."** Dorsey, 98 F.2d 872, 874 (emphasis added).  Crop1 has not simply developed similar contracts with like provisions, it has copied the identical expression developed by NCIS.  Accordingly, Crop1 has infringed on NCIS's protected works.

B.    **The Copyrighted MPCI Documents.**

1.    **Defendants' Arguments Directed at the NCIS MPCI Documents Are Specious.**

a.    **NCIS' Copyrights Are Valid.**

All of the works asserted by NCIS have been registered by the U.S. Copyright Office.  While Crop1 is correct that a presumption of validity is mandated by statute only for those registrations obtained within five years of first publication of the work, the overwhelming majority of the copyrights asserted in this litigation meet that criteria. Crist Decl., Exs. Nos. 1A, 2A, 3A, 4A, 8A, 9A, 10A, 11A, 12A, 13A, 14A, 15A, 18A, 19A, 20A, 21A, 23A, 24A, 25A, 26A, 27A, 28A. These registrations establish a prima facie case of validity, and the burden has shifted to Crop1 to present evidence of invalidity. See 17 U.S.C. §410(c); Hasbro Bradley, Inc. v. Sparkle Toys, Inc., 780 F.2d 189, 192 (2nd Cir. 1985); Original Appalachian Artworks, Inc. v. The Toy Loft, Inc., 684 F.2d 821, 826 (11th Cir. 1982); Nimmer §12.11[B].  The Court in its discretion may accord a similar presumption to the remaining six registrations.  17 U.S.C. §410(c).  In any event, NCIS has asserted that the works comprise original expression, and Crop1 has failed to present evidence that credibly challenges those assertions.  NCIS further submits the Supplemental Declaration of Shane Weaver attached hereto to address the issues raised by Crop1 respecting originality.

Crop1 alleges that NCIS' copyrights are invalid solely on the basis that the works lack originality.  Specifically, Crop1 argues that the works lack originality because they include facts, ideas, and/or government mandated language.  Even if true, this alone is not a sufficient basis for finding that the works as a whole lack originality.  Copyright is intended to protect expression, the manner in which facts or ideas are expressed.  It does not extend to the underlying ideas or facts themselves. See Television Digest Inc. v. United States Telephone Association, 841 F.Supp. 5, 7

(D.D.C. 1993), citing Financial Information, Inc. v. Moody's Investors Services, Inc., 751 F.2d 501 (2d Cir. 1984).

> The right secured by a copyright is not the right to the use of certain words, nor the right to employ ideas expressed thereby. Rather it is the right to that arrangement of words which the author has selected to express his ideas.

Dorsey v. Old Surety Life Ins. Co., 98 F.2d 872, 873 (10th Cir. 1938) citing Holmes v. Hurst, 174 U.S. 82, 86, 19 S.Ct. 606, 43 L.Ed. 914 (1899). Furthermore, the fact that a work contains non-original elements does not mean the work as a whole lacks originality. It simply means that copyright protection only extends to those aspects of the work that are original. See Feist, 499 U.S. at 348; Sturdza v. United Arab Emirates, 281 F.3d 1287, 1296 (D.C. Cir. 2002)(*scenes a faire* and common business practices contained in work are not protected). See also Harper & Rovv Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 547-548 (1985)("Copyright does not prevent subsequent users from copying from a prior author's work those constituent elements that are not original – for example…facts or materials in the public domain- as long as such use does not unfairly appropriate the author's original contributions."); Television Digest Inc., 841 F.Supp. at 8 ("the mere fact that component parts of a collective work are neither original to the plaintiff nor copyrightable by the plaintiff does not preclude a determination that a combination of such component parts as a separate entity is both original and copyrightable").

The relevant inquiry is not whether the work includes facts, ideas, or public domain materials, but whether the manner in which those facts, ideas, or public domain materials are expressed is original. Copyright protection extends to that original expression and infringement will be found if that original expression has been copied.

> **b.**    **Crop1's First Example Of A Work It Alleges Is Not Copyrightable Is Not Even Before The Court**.

In its attack on NCIS' protected works, Crop1 uses the Loss Adjustment Manual ("LAM") as its prime example of a government work not copyrightable, stating "the NCIS copied a several hundred page January 220 LAM Manual published by the Federal Crop Insurance Corporation ("FCIC")...and designated that document as its own copyrighted work."  Crop1 fails to inform the court that the LAM Manual has not been registered by NCIS and is not part of the claims in the Amended Complaint in this proceeding and is therefore not covered by NCIS' request for a preliminary injunction.  That document is entirely irrelevant to this proceeding.

> **c.**    **Crop1 Copied Protected Material.**

Once Crop1 turns to the actual documents at issue, it is plain to see that it has no response to NCIS' claims of infringement.  Crop1 alleges that NCIS Corp Insurance Plan Comparison is not copyrightable because it contains basic factual information.   In reality, however, NCIS' Plan Comparison includes a series of paragraphs describing different types of insurance coverage, followed by a summary chart including selected information about the different types of insurance coverage.  Crist Decl., Exs. 1B, 2B, and 3B.  Crop1 has distributed and made available on its website a strikingly similar document also entitled "Crop Insurance Plan Comparison" which includes a series of paragraphs describing types of insurance coverage followed by a summary chart.  Weaver Decl., Ex. No. 1.  Crop1 does not deny copying and modifying NCIS's Crop Insurance Plan Comparison, but, as noted, simply asserts that the chart is not copyrightable because it contains basic factual information.  However, Crop1 did not address the descriptive paragraphs.

A review of Crop1's publication reveals that it copied five of the six descriptive paragraphs contained in NCIS' work almost verbatim.  To illustrate the extent of copying, a side by side

comparison of the language of one descriptive paragraph is provided below with any differences in wording highlighted in bold:

| NCIS – Crop Insurance Plan Comparison | Crop1 – Crop Insurance Plan Comparison |
|---|---|
| Crop Revenue Coverage (CRC) | Crop Revenue Coverage (CRC) |
| The most widely availability revenue protection policy **is CRC**.  This policy guarantees an amount of revenue (based on **the individual producer's** actual production history (APH) x commodity price) called the final guarantee.  The coverage and exclusions of CRC are similar to those for the standard **MPCI** policy.  This final guarantee is based on the greater of the spring-time generated price (base price) or the harvest-time generated price (harvest price).  While the guarantee may increase, the premium will not.  Premium will be calculated using the base price.  Since the protection of **producer** revenue is the primary objective of CRC, it contains provisions addressing both yield and price risks.  CRC covers revenue losses due to a low price, low yield, or any combination of the two.  A loss is due when the calculated revenue (production to count x harvest price) is less than the final guarantee for the crop acreage. | **CRC is** the most widely availability revenue protection policy.  This policy guarantees an amount of revenue (based on **your** actual production history (APH) x commodity price) called the final guarantee.  The coverage and exclusions of CRC are similar to those for the standard **APH** policy.  This final guarantee is based on the greater of the spring-time generated price (base price) or the harvest-time generated price (harvest price).  While the guarantee may increase, the premium will not.  **Your** premium will be calculated using the base price.  Since the protection of **your** revenue is the primary objective of CRC, it contains provisions addressing both yield and price risks.  CRC covers revenue losses due to a low price, low yield, or any combination of the two.  A loss is due when the calculated revenue (production to count x harvest price) is less than the final guarantee for the crop acreage. |

The paragraphs entitled "Group Risk Income Protection (GRIP)", "Group Risk Plan (GRP)", "Income Protection (IP)" and "Revenue Assurance (RA)" are similarly almost identical in text.

A review of the Crop1 publication also reveals that the text, as well as the selection and arrangement of text and facts contained within NCIS' charts has also been copied.  While Crop1 has changed some items, a significant amount of NCIS' original expression remains.  The Supreme Court has made clear that the selection and arrangement of facts is protectable, even though the underlying facts are not.  Feist Publications, 499 U.S. 340.  Crop1 did not simply prepare a work containing the same facts, it copied NCIS' selection and arrangement of those facts within the chart.

### d. Crop1 Copied NCIS' MPCI Forms (Copyright Registration Exhibit Nos. 4A-7A) Used In Federally Reinsured Crop Insurance.

Crop1 argues that NCIS' MPCI forms include government mandated language and are therefore not entitled to protection. Again, NCIS is not seeking to prevent Crop1 from creating its own forms complying with government requirements. It is seeking to prevent Crop1 from copying those original aspects of the forms that NCIS created.

For example, Crop1 copied NCIS' "Crop Insurance Withdrawal of Claim" form, identically, except that it removed NCIS' form number, inserted Crop1's logo and added a requirement for a tax ID number:

## CROP INSURANCE
## WITHDRAWAL OF CLAIM

| 1. Insured's Name | 2. Policy No. | 3. Claim No. |
|---|---|---|

| 4. Crop(s): | |
|---|---|

| 5. Unit(s): | |
|---|---|

| 6. Insurance Provider Name | 7. Insurance Provider Address |
|---|---|

| 8. Agency Name | 9. Agency Address |
|---|---|

For the unit numbers listed above I withdraw this claim against the Insurance Provider on this policy up to this date.
I agree and understand that signing this withdrawal in no way changes the terms of the policy nor affects any other loss that may subsequently occur.

| 10. Insured's Signature | Date |
|---|---|

© NCIS-M 920 Rev. '03

---

Form 721

### CROP INSURANCE
### WITHDRAWAL OF CLAIM

| 1. Insured's Name / Tax ID# | 2. Policy No. | 3. Claim No. |
|---|---|---|

| 4. Crop(s): | |
|---|---|

| 5. Unit(s): | |
|---|---|

| 6. Insurance Provider Name | 7. Insurance Provider Address |
|---|---|

| 8. Agency Name | 9. Agency Address |
|---|---|

For the unit numbers listed above I withdraw this claim against the Insurance Provider on this policy up to this date.
I agree and understand that signing this withdrawal in no way changes the terms of the policy nor affects any other loss that may subsequently occur.

| 10. Insured's Signature | Date |
|---|---|

(See reverse side of form for statement required by Privacy Act of 1974)

Crist Decl., Ex. 4B; Weaver Decl., Ex. 2.

While it is true that FCIC suggests that insurers use NCIS' Withdrawal of Claim form, that statement is not fully accurate. The manual to which Crop1 refers specifically states that the insurance provider should "complete and have the insured sign a 'Withdrawal of Claim,' NCIS-M920 **or other FCIC approved 'Withdrawal of Claim' form**…" <u>See</u> FCIC-25010(LAM) p. 125 attached as Exhibit 3A to Rose Aff. (emphasis added); Weaver Supp. Decl., ¶ 12. Thus, Crop1 was not required to use the NCIS form and it could have developed its own form for approval. Rather than create its own form, Crop1 chose instead to copy verbatim the form developed by NCIS. <u>See</u>, Weaver Supp. Decl., ¶¶ 5-9 and 12.

As to the "Simplified Claims Qualification and Notice of Loss Form" of NCIS, a comparison of the specific words and arrangement of text reveals that Crop1 also substantially copied this form. Crist Decl., Ex. 5B; Weaver Decl., Ex. 3. Crop1 does not deny copying the form, but asserts that some of the data and information requested in the form is required by government guidelines. What Crop1 does not say is that <u>none</u> of the specific wording and arrangement of text is mandated by the government guidelines. Weaver Supp. Decl., ¶ 14. The guidelines simply include concepts.

Furthermore, this form is not a government mandated form, but is a form that NCIS developed for its members to use in implementing Simplified Claims Processing (SCP). NCIS provided a bulletin to its members explaining this form and specifically stating:

> This form is available to NCIS member companies as an optional method of implementing the SCP. Reinsured companies may submit their own SCP forms and procedures to RM for approval.

Weaver Supp. Decl., ¶ 13-14 and Ex. 4 thereto.

As to the Power of Attorney documents (Crist Decl., Ex. 6A; Weaver Decl., Ex. 4), much of the language used in NCIS' form is set forth in the Document and Supplemental Standards

Handbook ("DSSH"); however, the specific organization and arrangement of text is not. Weaver Supp. Decl. ¶ 16. The DSSH sets forth substantive statements and information that must be included within the forms. It does not provide the forms themselves. Instead, the forms are to be prepared by the insurance providers or trade associations and submitted for approval by the RMA. Weaver Supp. Decl., ¶ 6. Others in the industry have developed their own Power of Attorney forms consistent with government regulations that are not strikingly similar in overall appearance and text to that of NCIS. An example is the Power of Attorney form of NAU Country Insurance Company ("NAU"). See, Weaver Supp. Decl., ¶ 9 and Ex. 2 thereto. Both the NCIS and NAU versions of the Power of Attorney meet the standards of the DSSH, but each differs from the other. The following differences are apparent from a comparison of the two versions:

a.  The NCIS and NAU forms are formatted and arranged differently.

b.  The NAU form provides space for multiple data entries for which there is no substantial equivalent in the NCIS form (basically, the top one-third of the NAU form).

c.  NAU has added terminology not included in the NCIS form (for example, adding "and/or contract" in two places.

d.  NAU expresses the notarization instructions using text that differs from the equivalent portion of the NCIS form.

e.  The NAU form deletes passages that appear in the NCIS form (for example, deleting "I hereby accept the foregoing appointment" from the signature area for the appointee).

Weaver Supp. Decl., ¶ 6. The foregoing analysis shows that two versions of the same type of document can comply with the DSSH, yet be written, formatted, and structured differently. Crop1

could have developed a form with a different arrangement of text, but it chose to instead derive its materials from NCIS.

Crop1 also copied verbatim the High-Risk Land Exclusion Option form of NCIS:

MULTIPLE PERIL CROP INSURANCE
OPTIONAL ENDORSEMENT
2000-NCIS 764

HIGH-RISK LAND EXCLUSION OPTION

(This is a continuous endorsement - see Item 5)

| INSURED'S NAME | POLICY NUMBER | CROP YEAR |
|---|---|---|
| STREET or MAILING ADDRESS | CROP(S) | |
| CITY, STATE & ZIP CODE | COUNTY(IES) | |
| IDENTIFICATION NO (SSN/TAX) | | |

Upon our approval of this Option, we agree to amend your Multiple Peril Crop Insurance Policy to exclude from crop insurance coverage all high-risk land for the identified crop(s) and county(ies) in which you have a share, subject to the following terms and conditions:

1. The Option must be submitted to us on or before the final date for accepting applications for the initial crop year in which you wish to exclude high-risk land.

2. In the event of a loss on any insured unit, you must provide separate production records showing planted acreage and harvested production for any acreage which is excluded from crop insurance coverage under this Option.

3. By signing this Option, you are declining crop insurance coverage under the general crop insurance policy and the crop endorsement on your high-risk land.

4. As used in this Option, "high-risk" land is any land to which a high-risk classification and premium adjustment factor applies as shown on the actuarial table when the "R" system is employed to classify the crop.

5. This Option may be canceled by either you or us for any succeeding crop year by giving written notice on or before the cancellation date provided by the policy, preceding such crop year.

6. You must report, on the acreage report for each crop year, the acreage of the crop planted on high-risk land.

7. All other provisions of the policy not in conflict with this Option are applicable.

The information I have furnished on this form is complete and accurate. I understand that any false or inaccurate information may result in the sanctions outlined in my policy and administrative, civil, and criminal sanctions under 18 U.S.C. §§1006 and 1014; 7 U.S.C. §1506; 31 U.S.C. §§3729 and 3730 and other federal statutes.

| INSURED'S SIGNATURE | DATE |
|---|---|
| AGENT'S SIGNATURE & CODE NUMBER | DATE |
| APPROVED BY (SIGNATURE OF) INSURANCE PROVIDER'S REPRESENTATIVE | DATE |
| INSURANCE PROVIDER'S NAME AND ADDRESS | |

© 1999 National Crop Insurance Services, Inc.

---

crop
INSURANCE
Representing
Occidental Fire & Casualty Co.

MULTIPLE PERIL CROP INSURANCE
OPTIONAL ENDORSEMENT
HIGH-RISK LAND EXCLUSION OPTION

Form 104

(This is a continuous endorsement - see Item 5)

| INSURED'S NAME | POLICY NUMBER | CROP YEAR |
|---|---|---|
| STREET or MAILING ADDRESS | CROP(S) | |
| CITY, STATE & ZIP CODE | COUNTY(IES) | |
| IDENTIFICATION NO (SSN/TAX) | | |

Upon our approval of this Option, we agree to amend your Multiple Peril Crop Insurance Policy to exclude from crop insurance coverage all high-risk land for the identified crop(s) and county(ies) in which you have a share, subject to the following terms and conditions:

1. The Option must be submitted to us on or before the final date for accepting applications for the initial crop year in which you wish to exclude high-risk land.

2. In the event of a loss on any insured unit, you must provide separate production records showing planted acreage and harvested production for any acreage which is excluded from crop insurance coverage under this Option.

3. By signing this Option, you are declining crop insurance coverage under the general crop insurance policy and the crop endorsement on your high-risk land.

4. As used in this Option, "high-risk" land is any land to which a high-risk classification and premium rate factors are contained in the actuarial document.

5. This Option may be canceled by either you or us for any succeeding crop year by giving written notice on or before the cancellation date provided by the policy, preceding such crop year.

6. You must report, on the acreage report for each crop year, the acreage of the crop planted on high-risk land.

7. All other provisions of the policy not in conflict with this Option are applicable.

The information I have furnished on this form is complete and accurate. I understand that any false or inaccurate information may result in the sanctions outlined in my policy and administrative, civil, and criminal sanctions under 18 U.S.C. §§1006 and 1014; 7 U.S.C. §1506; 31 U.S.C. §§3729 and 3730 and other federal statutes.

| INSURED'S SIGNATURE | DATE |
|---|---|
| AGENT'S SIGNATURE & CODE NUMBER | DATE |
| APPROVED BY (SIGNATURE OF) INSURANCE PROVIDER'S REPRESENTATIVE | DATE |
| INSURANCE PROVIDER'S NAME AND ADDRESS | |

See reverse side of form for statement required by Privacy Act of 1974

See Crist Decl., Ex. 7B; Weaver Decl., Ex. 5.

The only difference in these forms is that Crop1 removed NCIS's copyright notice and inserted its logo.  While much of the content of this form is set forth in the DSSH, the specific words and arrangement of text used by NCIS possesses a sufficient degree of creativity, which is all that is required.  See Original Appalacian Artworks, Inc., 684 F.2d 821, 824 (minimal degree of originality necessary for copyright protection); Television Digest Inc., 841 F. Supp. 5, 7-8.  Crop1 did not simply use the government mandated language, it copied the NCIS form identically.

There can be no doubt that Crop1 and Occidental have copied, either verbatim or substantially, MPCI coverage documents copyrighted by NCIS.  Their defense that the copyrights are not valid is belied by the facts.  Even if one grants that RMA's DSSH specifies some text that must be used in Federal Crop Insurance Program documentation, it still leaves room for substantial original expression, as the differences between NCIS' and NAU's Powers of Attorney eloquently demonstrate.  Defendants need not join NCIS, but they at least should not be allowed to pirate its copyrighted works.

### C.    NCIS Has Not Misused Copyright Law.

Contrary to the defendants' arguments, NCIS is not seeking to "block everyone other than those it approves from using Government-mandated language" or to "force members of the crop insurance industry to pay fees to the NCIS to secure the 'right' to use government required forms." Crop1 Memo. at 23-24.  NCIS is simply seeking to prevent Crop1 from using the materials that NCIS has developed for its members.

Crop1 offers rank, and baseless, speculation when it opines "that NCIS is attempting to misuse copyright law in order to force members of the crop insurance industry to pay financial tribute in order to participate in the industry…." Crop1 Memo. at 12.  That spurious assertion is

contradicted by the record.  As a matter of fact, NCIS makes many of its services available to non-members.  Crist Decl., ¶ 8; Parkerson Decl., ¶ 11; Amended Complaint, ¶ 17.  Indeed, Mr. Rose admits that Crop1 personnel attend NCIS training seminars and pay non-member fees for doing so.  Rose Aff., ¶ 18.

This suit has nothing to do with the discounted premium program Occidental and Crop 1 offer to MPCI customers.  That argument is a real stretch, since only seven of the twenty-eight registered works involve MPCI coverage.  Nor is NCIS trying to force these defendants to become members.  In any event, such matters do not amount to misuse.  As a matter of law, the filing of a meritorious copyright infringement lawsuit does not constitute anti-competitive or exclusionary conduct.  Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 56 – 60 (1993).  NCIS' motivation in filing this suit, moreover, only is relevant if this action "is objectively meritless…."  Id. at 60.

Crop1 also asserts that NCIS is guilty of copyright misuse because NCIS did not send Crop1 a cease and desist letter before filing suit.  NCIS is unaware of any requirement to send a cease and desist letter before filing suit.

Finally, Crop1 further alleges inequitable conduct and/or misuse on the basis of allegedly false statements made by NCIS respecting the relationship between Crop1, Occidental and CropUSA.  Crop1's assertions in this regard are without merit and are addressed in full in Section III (A)(1) supra.  In short, the record and the law simply do not support any allegation of misuse, and defendants' mere allegations should not prevent entry of a preliminary injunction.

In sum, Crop1 has failed to show that NCIS does not enjoy a substantial likelihood of success on the merits of its claims for copyright infringement.  Accordingly, NCIS is entitled to a preliminary injunction.

## **CONCLUSION**

A preliminary injunction should be granted on the terms sought by NCIS. Crop1's dismissal motion should be denied, and venue should remain in the District of Columbia.

Dated: August 29, 2005             Respectfully submitted:


/s/ Michael E. Tucci
MICHAEL TUCCI (# 430470)
Stinson Morrison Hecker LLP
1150 - 18th Street, N.W., Suite 800
Washington, D.C. 20036
Tel: (202) 785-9100; Fax: (202) 785-9163

AND


/s/ P. John Owen by Michael E. Tucci
P. JOHN OWEN
National Crop Insurance Services, Inc.
8900 Indian Creek Parkway, Suite 600
Overland Park, KS 66210
Tel: (913) 685-2767; Fax: (913) 685-3080


AND

/s/ Bruce E. Baty by Michael E. Tucci
BRUCE E. BATY
PENNY R. SLICER
Stinson Morrison Hecker LLP
1201 Walnut, Suite 2800
Kansas City, MO 64106-2150
Tel: (816) 842-8600; Fax: (816) 691-3495

*Attorneys for Plaintiff National Crop Insurance Services, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served via First Class U.S. Mail, postage prepaid, this 29th day of August, 2005  to the following:

Charles R. Work, Esq.
Karla L. Palmer, Esq.
Michael S. Nadel, Esq.
McDermott Will & Emery LLP
600 Thirteenth Street, N.W.
Washington, D.C. 20005

Mary Hulett
Ragsdale Liggett PLLC
P.O. Box 31507
Raleigh, NC 27622-1507

Cristen E. Sikes, Esq.
David E. Mendelsohn, Esq.
Kenneth L. Schmetterer, Esq.
Michael Kasdin, Esq.
DLA Piper Rudnick Gray Cary US LLP
1200 Nineteenth Street, N.W.
Washington, D.C. 20036

/s/ Michael E. Tucci
Michael E. Tucci