IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATIONAL CROP INSURANCE SERVICES, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Civil Action |
| OCCIDENTAL FIRE & CASUALTY COMPANY OF NORTH CAROLINA, et al., | ) ) ) ) | No. 1:05-cv-01417-RWR |
| Defendants. | ) ) ) | |

## SUPPLEMENTAL DECLARATION OF ROBERT W. PAKERSON

I, Robert W. Parkerson, declare under penalty of perjury and in accordance with 28 U.S.C. § 1746, that the following factual statements are true and correct.

1.    This declaration supplements my declaration of August 10, 2005, in this matter. It is given in response to the arguments of Crop1 Insurance Direct, Inc. ("Crop1") that the case against it should be dismissed for lack of personal jurisdiction in the District of Columbia, to the arguments of Crop1 and Occidental Fire & Casualty Company of North Carolina ("Occidental") that venue for the pending action should be transferred to the Southern District of Iowa, and in reply to certain arguments of Crop1 and Occidental that the pending motion for preliminary injunction should be denied.

2.    I have been involved personally in the crop insurance business since 1976. Over the course of the years since then, including my tenure as President/CEO of NCIS since 1993, I have become personally familiar with and knowledgeable about traditional private sector coverage of

farmers against perils such as hail and wind ("crop-hail coverage") and the Federal Crop Insurance

Program through which private sector participants (such as Occidental and Crop1) write multiple

peril crop insurance policies ("MPCI coverage"). In fact, my involvement with the Federal Crop

Insurance program dates back to the inception, in 1980, of the public-private partnership between

the Federal Crop Insurance Corporation ("FCIC") and crop insurers in selling and servicing MPCI

coverage. My experience in the crop insurance business since 1976 includes substantial work with

insurance companies, their managing general agents, and reinsurers.

      3.    In order to participate in the Federal Crop Insurance Program and to offer MPCI

coverage, a private sector company must contract with the FCIC. The principal office of the FCIC

is in Washington, DC. Since the United Department of Agriculture ("USDA") was reorganized in

the 1990s, the operations of FCIC have been overseen and directed by USDA's Risk Management

Agency ("RMA"). RMA also is an agency within USDA and has its principal place of business in

Washington, DC.

      4.    The United States has many property casualty insurers, but only approximately

seventeen of them offer traditional crop-hail coverage. The decision by any company, including

companies offering traditional crop-hail coverage, to offer MPCI coverage is not compelled by any

statute, rule, or regulation known to me. Instead, any company's decision to write MPCI coverage

represents its sole and voluntary business decision to engage in that line of business. If a company

elects to write MPCI coverage, the company must submit an application to RMA for approval to

participate in the Federal Crop Insurance Program and then, once approved, execute a Standard

Reinsurance Agreement ("SRA") with the FCIC. The initial application and contracting process

typically involves meetings with RMA personnel in Washington, DC.

5.      Once a company has executed an SRA with the FCIC, the company commences a substantial and continuous relationship with the FCIC and RMA, both with respect to formal, contractual performance obligations under the SRA and with respect to the regular flow of communications necessarily involved in any contract requiring continuous performance. Among the formal and explicitly contractual matters involved in dealing with the FCIC and RMA are submitting reports on a periodic basis (at least monthly), submitting data with respect to each company's book of business (on both a weekly and monthly basis), submitting an annual plan of operation for continuing eligibility to participate in the program, and undertaking to conform to various compliance requirements as well as submit to compliance reviews by the federal government. Matters incidental to, but nevertheless an integral and regular part of, the contractual relationship include continuing communications to and from FCIC and RMA. Such communications generally involve, for all participants in the Federal Crop Insurance Program, periodic meetings with RMA (both on an industry-wide basis and on an individual company basis), corresponding with RMA (consisting typically of letters and e-mails both to and from the government), and participation in conference calls with RMA officials.

6.      I am personally familiar with the communications, including meetings, that occur between multiple private sector SRA signatories and the RMA, as I regularly participate in them. Virtually all such communications – whether in the form of conference calls or in the form of meetings (generally at RMA's offices in Washington, D.C., and Kansas City, Missouri) – include persons known by me to be representing Crop1, including its President, Billy Rose. Also, because the terms and conditions of the SRA are identical for all private sector participants in the Federal Crop Insurance Program, the reporting, data submission, communication, and compliance requirements are necessarily identical for Occidental and Crop1 to those of which I am personally

3

familiar and have described in paragraph 5. Although I am not personally familiar with any of the one-on-one communications which Occidental and Crop1 have had with the FCIC and RMA, it would be highly unusual that Occidental's and Crop1's course of dealing with the federal government differs form the practices followed by and involving all other private sector insurance providers working with those agencies, as I have described in paragraphs 3 – 5.

7.    Crop USA Insurance Agency, Inc. ("Crop USA") has been a member in good standing of NCIS. Its principal office is located in Overland Park, Kansas, at 8500 110th Street. I personally have visited that office, and it is less than one mile from the NCIS offices at 8900 Indian Creek Parkway in Overland Park, Kansas.

8.    I have read the affidavit of Kent Petersen given in this matter.

9.    Paragraph 7 of Mr. Petersen's affidavit refers to a telephone conversation with me on July 14, 2005.    Mr. Petersen's affidavit incorrectly and incompletely describes our conversation.  Mr. Petersen distinctly told me that Cory Bremer worked as an independent contractor for Crop USA and also may have done so for Crop1.  Crop USA's relationship with Occidental came up at least twice in our conversation, and Mr. Petersen's statements regarding this issue were both confusing and contradictory.  At one point, Mr. Petersen explained that Crop USA used to have a relationship with Occidental, but that it had ended. Mr. Petersen indicated that Crop USA initially listed Occidental as its policy issuing company for crop-hail coverage, but that Crop USA had not pursued any crop-hail business to be written by Occidental because Ken Coon of Occidental had demanded that Crop USA pay an excessively high fronting fee. At another point in the conversation, Mr. Petersen made comments to the effect that Crop USA continued to have a relationship with Occidental, but that the relationship was either being wound down or deemphasized because of Crop USA's separate relationship with Austin Mutual Insurance

Company, as its policy issuing company for MPCI coverage. I do not recall whether Mr. Petersen and I discussed meeting in person, but I do recall, as I reflected on this conversation, deciding that doing so would be a good idea because of the lack of clarity and apparent inconsistency in his statements regarding Crop USA's relationship with Occidental.

10.   Paragraph 8 of Mr. Petersen's affidavit correctly states that on Monday, July 18, our General Counsel, John Owen, and I met with him and Steve Williams. We met them at Crop USA's offices in Overland Park, Kansas. Mr. Petersen states that he "showed" Mr. Owen and me a copy of a contract between Crop USA, Crop1, and Occidental. Mr. Petersen "showed" this document to us in only the most literal sense of the term, as all he did was remove it from a folder, display its first page to us, and then return it to the folder. He did not offer to let us read the document or to provide a copy of it. At my instruction, Mr. Owen subsequently wrote Mr. Petersen on July 28, 2005, and (among other matters) specifically referred to that aspect of our conversation on July 18 and also asked for a copy of the contract. A genuine copy of Mr. Owen's letter to Mr. Petersen is attached as Exhibit 1. Mr. Owen's July 28 letter included the following passage:

> Although we shall be amending the existing suit to assert copyright infringement claims, we do not foreclose making other amendments. That would include, if appropriate, modifying the existing allegations regarding use by Occidental and Crop1 of proprietary NCIS state filings, such as final average loss costs and policy forms. In that regard, we are willing to review any agreements or documentation which CropUSA has that may bear on the existing allegations. Accordingly, we would appreciate receiving as promptly as possible, and obviously on a voluntary basis, the following information, if it exists:
>
>    □  Producer or agency agreements you have with Occidental.
>
>    □  Producer or agency agreements Crop1 has with Occidental.
>
>    □  Sub-producer or sub-agency agreements you have with Crop1.
>
>    □  TPA or other administrative agreements you have with Occidental.
>
>    □  TPA or other administrative agreements Crop1 has with Occidental.

5

□  TPA or other administrative agreements you have with Crop1.

\* \* \* \* \*

Thank you in advance for supplying any information which you believe we should consider in connection with pursuing the allegations that already have been made.

Before executing this declaration, I confirmed with Mr. Owen that he had not received any response of any nature to his July 28 letter and that no copy of the contract referenced by Mr. Petersen in his affidavit had been provided to us. In fact, the first time we ever saw the contract referenced by Mr. Petersen was when we received Mr. Rose's affidavit last week.

11.    Paragraph 8 of Mr. Petersen's affidavit also refers to confirming to Mr. Owen and me "that Crop1 and Cory Bremer were writing crop-hail coverage on behalf of Crop USA." I specifically told Mr. Petersen and Mr. Williams that such an agency relationship had not been disclosed previously to NCIS. In objecting to it, we did reaffirm that, to the extent Crop USA directly writes crop-hail coverage for Occidental, such activity is within the scope of Crop USA's membership in NCIS. I plainly told Mr. Petersen and Mr. Williams, however, that Crop1 is not a member of NCIS and that its use of NCIS materials in writing crop-hail coverage was not covered by the membership of Crop USA in NCIS.

12.    Mr. Petersen also stated at the July 18 meeting that Crop1 would report its crop-hail premium to Crop USA, which it then would add to CropUSA's crop-hail premium and be reported to us. Mr. Petersen covers this issue in paragraph 6 of his affidavit. What he did not disclose is that, as of his execution of that affidavit, Crop USA had not submitted any crop-hail premium reports. I checked with our staff this morning and learned that, as of _11:25_ a.m. CDT on August 29, 2005, Crop USA had not submitted any report to us for crop-hail premiums (whatever the source). Since paragraph 6 of Mr. Rose's statement admits writing crop-hail policies in Iowa, I

find it disturbing that the premium for these policies has not been reported. That is especially so since, by this date, we typically have preliminary crop-hail premium reports from numerous members because all such reports are due no later than September 2, 2005.

13.    Since receiving Crop1's and Occidental's recent filings in this matter, I have read the contract to which Mr. Petersen refers in paragraph 8 of his affidavit (and which is attached as Exhibit 1 to the Affidavit of Mr. Rose). This prompted me to check with Jim Crist, our Controller, to determine the extent to which Crop USA had disclosed to us any relationship with either Occidental or Crop1. In doing so, I determined that Mr. Petersen wrote Mr. Crist on January 21, 2005, reporting that it had signed "a MGA agreement" with Occidental. A genuine copy of this letter is attached as Exhibit 2. I note that Exhibit 1 to Mr. Rose's affidavit is dated January 18, 2005, and that Mr. Rose executed it on January 18, 2005. Thus, Mr. Rose's execution of this agreement on behalf of Crop1, as well as its effective date, predates the January 21 letter to Mr. Crist from Mr. Petersen. I find it, at a minimum, unusual that the Crop1 relationship to Crop USA was not disclosed on January 21 and that the agreement referred to as "a MGA agreement" in Mr. Petersen's letter is, instead, a "General Agency Agreement" – the title which Exhibit 1 to Mr. Rose's affidavit bears. In the insurance business, there generally are significant differences between managing general agency agreements and agency agreements. As a membership organization, one of the significant issues for NCIS is that agents can not be full members with all the rights to such membership, although managing general agents can be and are full members. Also, state insurance laws recognize significant distinctions between MGA and GA agreements, although the legal aspects are not within my areas of experience. Accordingly, I can state as the Chief Executive Officer of NCIS that full disclosure of such relationships is expected so that we know who are members are and that they are not "renting" their memberships for use by

7

undisclosed parties.   If we had received a copy of Exhibit 1 to Mr. Rose's affidavit along with Mr. Petersen's January 21 letter to me, I would have referred it to counsel for review.  I would have done so because, in my nearly forty years' experience in the insurance business, I have never seen an agreement between a company, a managing general agent, and a general agency structured in this fashion.  For instance, it assigns to the general agent the role of placing reinsurance, but in my experience that is a key portion of the managing general agent's responsibilities to the company.

14.    There are multiple reasons that we do not allow non-member companies to "piggy-back" the rights and privileges of member companies.  As stated in paragraph 13 of my initial declaration in this matter, NCIS is an advisory organization and statistical agent under the laws of the states where Occidental and Crop1 offer crop-hail coverage and MPCI coverage.  In fact, we are so licensed in all states other than Alaska and Hawaii.  As such a licensee, one of our primary obligations to state regulatory authorities is to accumulate, evaluate, and report final average loss cost ("FALC") data to these regulatory bodies.  I so noted in paragraph 14 of my initial declaration, and paragraph 2 of the declaration of Therese M. Stom also deals with this issue.  In performing these duties, it is essential for us to know the identity of organizations reporting their crop-hail loss cost data to us because of our obligation to audit and verify such data (using statistical sampling and similar evaluative tools) so that the state regulatory authorities to whom we report this data have a reasonable degree of confidence in its accuracy.  Also, we must know the identity of the reporting organizations so that we can perform our auditing and verification functions.  Stated differently, there is no way that we can perform these functions without knowing the source of the data.  Knowledge of our members' identities also enables us to advise state regulatory authorities on an annual basis of the identity of our membership.  That reporting, in turn, permits those authorities to review premium rates of companies who are our members with a degree of

8

confidence that the data on which they are relying in their individual filings is derived from the accumulation, evaluation, auditing, and verification processes which we perform, which we have reported as FALC data to those authorities.

15.    Additional reasons for knowing the identity of companies using our data and forms are internal to NCIS, and, in essence, they involve two considerations. First, because our Board of Directors expects us to protect proprietary and copyrighted materials which NCIS has developed at members' expense, we must know the full identity and scope of authorized users in order to maximize our control of authorized distribution and copying of such materials. Second, there is a revenue issue. Each member, regardless of how low its premium volume may be, pays a minimum annual assessment (for example, $5,000 for associate members, and somewhat higher for full members, depending on the services selected). Thus, we do not allow one member, in effect, to rent its membership to others so that they may avoid the financial obligations which come with membership.

16.    The Bylaws of NCIS are quite specific regarding membership classes. Full members only can be insurance companies writing primary coverage, affiliated groups of insurance companies under common management writing primary coverage, or a managing general agent for one or more such companies. Crop USA initially qualified for membership in this category because it serves as the managing general agent for Austin Mutual Insurance Company ("Austin Mutual") in its writing of MPCI coverage. Paragraph 3 of Mr. Petersen's affidavit describes the relationship among his company, Occidental, and Crop1. As stated in that description, Crop1 is a general agent. If this description is correct, Crop1's status does not qualify it for the rights and privileges of a full member of NCIS with respect to writing of crop-hail coverage. Those rights and privileges would flow directly only to Crop USA, as our member, and indirectly to Occidental

through its managing general agent, Crop USA. Crop1 is another step removed, and it is not entitled to the rights and privileges of a full member. Service members of NCIS constitute another membership category, but it is limited strictly to the same types of organizations who are qualified to become full members, but who are designated as service members because they have elected not to subscribe to all of the assessment based services which we offer. If Crop1 only is a general agent, it does not qualify for that category of membership, for the same reasons that it does not qualify as a full member for crop-hail purposes. Nor does Crop1 qualify as an international insurance company service member in that membership category. As a general agent, Crop1 might be able to qualify as an associate member, but if it did so, its utilization of NCIS services and materials would be on a case-by-case basis under terms and conditions determined at the time of admission to membership. Obviously, Crop1 is not a member of NCIS, a point made in my original declaration in paragraph 2. To sum it up, if Mr. Petersen and Mr. Rose have accurately described in their affidavits the relationship between each of their companies and Occidental, the end result is that, under the Bylaws of NCIS, Crop1 is not entitled to use proprietary and copyrighted materials of NCIS. Crop USA is entitled to use such materials, but then only to the extent that it is directly working for and assisting Austin Mutual in placing MPCI coverage or for Occidental in making underwriting decisions with respect to acceptance of crop-hail coverage and adjusting the losses of Occidental's crop-hail policyholders. Assuming the terms of the contract among these three companies is as stated in Sections XI and XII thereof (Ex. 1 to Mr. Rose's affidavit), Crop USA is not performing those functions for Occidental. Accordingly, because Crop1 performs those functions, neither it nor Occidental is entitled to use of proprietary and copyrighted NCIS crop-hail materials.

17.    I understand defendants are claiming that we authorized Crop1's use of NCIS crop-hail materials due to the fact that Crop USA is a member. That is not true. NCIS never gave such authorization. For the reasons stated in paragraphs 13 and 14 of this declaration, we do not grant such authorizations since we must know the identity of all authorized users of our crop-hail FALC data and forms.

18.    As indicated above, I also have read the entirety of Mr. Rose's affidavit. It requires me to offer various additional facts not disclosed by him which are necessary for a complete, accurate understanding of issues he has raised.

19.    Paragraph 16 of Mr. Rose's affidavit refers to lobbying activities of "independent contractors" retained by Crop1. Mr. Rose has not informed the Court that twice this year, as Crop1's President, he personally testified before Congress – first on May 4, 2005, before the Subcommittee on General Farm Commodities & Risk Management of the House Committee on Agriculture and then on June 28, 2005, before the Senate's Agriculture, Nutrition, and Forestry Committee. Copies of Mr. Rose's prepared testimony are attached as Exhibits 3 and 4.

20.    Last, I want to offer some facts related to the argument that litigating in the Southern District of Iowa (Des Moines) may be more convenient than litigating in the District of Columbia. It takes approximately three and one-half hours to drive between our office in Overland Park, Kansas, to downtown Des Moines. There is no scheduled non-stop air service between Kansas City and Des Moines, so flying takes longer. Non-stop flights between Kansas City and Reagan National Airport are scheduled for approximately two and one-quarter hours. Thus, driving to the airport, checking in, going through security, and flying to Washington takes approximately the same time as driving to Des Moines. These facts are based on personal experience in attending meetings in Des Moines (where we have three members) and in Washington (where FCIC and

RMA are headquartered).    We do not have regular counsel in Des Moines.    Thus, it is more

convenient for NCIS to litigate in the District of Columbia than in Des Moines, Iowa.


Dated: August 29th, 2005                                    Robert W. Parkerson

# EXHIBIT 1

*A World Of Information*

N**ational** C**rop** I**nsurance** S**ervices**

VIA HAND DELIVERY

July 28, 2005

Kent Petersen, President
Steve Williams, National Claims Manager
CropUSA
8500 110th Street, Suite 420
Overland Park, KS 66210

> Re:    NCIS Litigation against Occidental and Crop1

Dear Kent and Steve:

Thank you for meeting with Bob Parkerson and me last Monday, July 18. We appreciate the time you spent with us and your recognition of the importance of maintaining the integrity of NCIS copyrighted and proprietary materials. The purpose of this letter is to address follow-up matters.

On behalf of NCIS, Bob and I made clear last week that CropUSA has been a member in good standing and, therefore, is entitled to use in its own business the copyrighted and proprietary materials provided by and available through NCIS. Although Occidental Fire & Casualty Company of North Carolina is not a member of NCIS, to the extent that CropUSA writes crop-hail coverage for Occidental, Occidental derivatively enjoys the same membership benefits. I indicated during our meeting that NCIS would be contacting the insurance departments where we believe Crop1 had made filings on behalf of Occidental, both reaffirming your membership status with us and stating our position with respect to unauthorized use of the same materials by Crop1 on behalf of Occidental. Those letters now have been sent and copies are enclosed for your information.

Bob and I also indicated that copyright infringement claims against Occidental and Crop1 were under active investigation. Although that investigation is not quite complete, it is far enough along that we can predict that the existing lawsuit will be amended quite soon to assert copyright infringement claims. Solely on an informational basis, we will furnish to you a copy of the amended complaint once it has been prepared and filed.

Although we shall be amending the existing suit to assert copyright infringement claims, we do not foreclose making other amendments. That would include, if appropriate, modifying the

Kent Petersen, President
Steve Williams, National Claims Manager
July 28, 2005
Page 2 of 2

existing allegations regarding use by Occidental and Crop1 of proprietary NCIS state filings, such as final average loss costs and policy forms. In that regard, we are willing to review any agreements or documentation which CropUSA has that may bear on the existing allegations. Accordingly, we would appreciate receiving as promptly as possible, and obviously on a voluntary basis, the following information, if it exists:

- ☐ Producer or agency agreements you have with Occidental.

- ☐ Producer or agency agreements Crop1 has with Occidental.

- ☐ Sub-producer or sub-agency agreements you have with Crop1.

- ☐ TPA or other administrative agreements you have with Occidental.

- ☐ TPA or other administrative agreements Crop1 has with Occidental.

- ☐ TPA or other administrative agreements you have with Crop1.

- ☐ Producer or agent appointment forms appointing you or any of your employees as agents for Occidental in the states of Illinois, Indiana, Iowa, Michigan, Minnesota, Nebraska, Texas, Washington, and Wisconsin.

- ☐ Producer or agent appointment forms appointing Crop1 or any of its employees as agents for Occidental in the states of Illinois, Indiana, Iowa, Michigan, Minnesota, Nebraska, Texas, Washington, and Wisconsin.

Thank you in advance for supplying any information which you believe we should consider in connection with pursuing the allegations that already have been made. We also reiterate our appreciation for your meeting with us last week and for your recognition of the importance of the forms which NCIS has developed.

Very truly yours,

*P. John Owen*

P. John Owen

Enclosure

Cc:    Robert W. Parkerson

# EXHIBIT 2

I I I Main Street
P.O. Box 538
Lewiston, ID
83501-0538
(208) 799-9000 - Fax (208) 746-8159

January 21, 2005

Mr. Jim Crist, Controller
National Crop Insurance Services
8900 Indian Creek Parkway
Suite600
Overland Park, Kansas 66210

Dear Jim,

As we discussed this morning we would like to add crop hail to our NCIS membership. We have signed a MGA agreement with Occidental Fire and Casualty Company to front the hail product. We will need a company code for this company. We will use Austin Mutual as our MPCI issuing carrier.

*550*

Attached is the membership request for services on which I have listed the states in which each product will be marketed.

If you have any further question please don't hesitate to call me.

Sincerely,

President

**1995-NCIS 331**

## MEMBER REQUEST FOR SERVICES
## AND STATES OF OPERATION

As a member of National Crop Insurance Services, we wish to receive the following services for the year ending December 31, 20_05_.

### Please Check Each Service Requested

☑ Crop-Hail Insurance    ☑ Multiple Peril Crop Insurance (MPCI)

☑ Loss Adjustment Support Service    ☐ Rain Insurance

Please check each state in which you operate:

| State | Crop-Hail | MPCI | State | Crop-Hail | MPCI |
|-------|-----------|------|-------|-----------|------|
| Alabama | | | Nebraska | ✓ | ✓ |
| Arizona | | | Nevada | | |
| Arkansas | | ✓ | New Hampshire | | |
| California | | | New Jersey | | |
| Colorado | | | New Mexico | | |
| Connecticut | | | New York | | |
| Delaware | | | North Carolina | | |
| Florida | | | North Dakota | | ✓ |
| Georgia | | | Ohio | | ✓ |
| Idaho | | ✓ | Oklahoma | | ✓ |
| Illinois | ✓ | ✓ | Oregon | | |
| Indiana | ✓ | ✓ | Pennsylvania | | |
| Iowa | ✓ | ✓ | Rhode Island | | |
| Kansas | | ✓ | South Carolina | | |
| Kentucky | | | South Dakota | | ✓ |
| Louisiana | | | Tennessee | | |
| Maine | | | Texas | ✓ | ✓ |
| Maryland | | | Utah | | |
| Massachusetts | | | Vermont | | |
| Michigan | ✓ | ✓ | Virginia | | |
| Minnesota | ✓ | ✓ | Washington | ✓ | ✓ |
| Mississippi | | | West Virginia | | |
| Missouri | | ✓ | Wisconsin | ✓ | ✓ |
| Montana | | ✓ | Wyoming | | |

Signature: _Ken H Patterson_    Title: _President_

Date: _1-21-05_

# EXHIBIT 3



Agriculture.Senate.gov

**Agriculture, Nutrition and Forestry Committee**

| 2002 Hearings | 2001 Hearings | 2000 Hearings | 1999 Hearings | 1998 Hearings | 1997 Hearings |

Full transcripts from Government Printing Office

Hearing schedule
(Re-select each time to see previous or next month)

| | |
|---|---|
| Hearing/Meeting: | **Review the Agricultural Risk Protection Act of 2000 and related crop insurance issues**<br><br>Full Committee Hearing |
| Date & Time | Tuesday, June 28 2005<br>10:00 AM |
| Location | Russell Building 328-A |
| Description | The Agricultural Risk Protection Act of 2000 structures the premium costs and coverage levels for crop and livestock losses. Purchase of these insurance policies manages the financial risks from adverse market and weather extremes that are beyond the control of the farmer or rancher.<br>  REPLAY audio  of hearing(2 hrs, 30 mins)<br>  Free audio software download  from RealPlayer™<br><br>USDA's Risk Management Agency has  more information   about the federal crop insurance program. |

**Mr. Billy Rose**
**Chief Executive Officer**
**Crop 1**

**EXECUTIVE SUMMARY**

**Congress authorized the federal crop insurance system to offer premium reduction plans for farmers in 1994 and again in the Agriculture Risk Protection Act (ARPA) of 2000. The premise is simple: If an insurance company is willing to meet USDA's Risk Management Agency (RMA) criteria for administrative and operating efficiencies, the savings can be passed on to farmers in the form of Premium Reduction Plan (PRP) policies.**

**Some large insurance companies and agents are attempting to stop RMA from spending FY2006 dollars to administer PRP on federal crop insurance. This is both bad federal**

PRP on federal crop insurance. This is both bad federal policy and bad for farmers. To accept such an amendment tells farmers Congress cares more about insurance company profits and agent commission checks than about helping farmers save money.

Occidental Fire and Casualty Insurance of North Carolina (Occidental) and its managing general agent, Crop 1 Insurance (Crop 1), have been approved to offer PRP. In an effort to make PRP broadly available they have appointed over 400 independent agents in 15 states who have written over 16,000 farm policies. Additional companies have applied to sell PRP, but have not yet been approved pending the current RMA rulemaking or, in some cases, were not approved for other reasons.

Occidental, Crop 1, their employees, licensed agents and, most importantly, their farmer customers will be the victims of any precipitous act by Congress. What is their "crime"? They applied in good faith for a federal government program that was approved by an agency of the federal government.

PRP's success has companies which have not yet been approved to sell PRP nervous. Why? Farmers have shown they want to save money and reduce risk by purchasing higher coverage levels with PRP. The attacks on PRP and its providers come down to an issue of competition among crop insurance companies. Rather than competing in the marketplace, some companies are asking Congress to effectively kill the PRP program along with the first and only company approved by the federal government to provide farmers a price discount on their crop insurance. Reduced competition will enable large, existing insurance companies to retain higher profit margins and market share.

Prior to PRP, crop insurance companies didn't compete on the farmer's cost for insurance; rather they competed with each other on agent commissions. Companies "recruited" other firms' agents by offering higher and higher commissions, leading to the departure from the marketplace of companies that could not afford the bidding war. This practice continues today.

Perhaps the most significant risk to the viability of companies approved to offer the federal crop insurance program is continued escalation of commissions. This was one of the factors leading to the collapse of American Growers and it still occurs today. Crop 1 has evidence other companies are offering its agents in excess of 20% commissions if they will move their farmers from Crop 1. To date our agents have resisted these predatory attempts to undermine the PRP's agent delivery force since they believe in the program.

RMA is expected to complete its formal rulemaking updating PRP participation in the next several weeks. When the rule is released, it is expected all companies that wish to sell PRP will be required to apply or reapply for approval. This is fair.

If the issue is really the merit or value of PRP rather than marketplace competition – as some allege – then Congress should stop talking with insurance companies and start talking directly with farmers for whom the crop insurance

program was created to benefit. They are best positioned to discuss the relative merits of programs designed for their benefit. Crop 1 and its agents are eager to cooperate in any legitimate effort to make a good program – one with obvious farmer benefit – better.

In the meantime, opponents of PRP and critics of RMA want Congress to accept an amendment to the FY2006 agricultural appropriations bill based on distortion, myths and rumors.

Below are the myths and facts being circulated about PRP and Crop 1:

**Myth: Crop 1 is a "government-sponsored monopoly" because it's the only firm selling PRP.**

**Fact. Crop 1 is simply the first company to sell PRP because Occidental's application, naming Crop 1 as its crop insurance general agency, was approved by RMA. Six other companies have applied but have not yet been approved. We hope other companies will be approved to offer savings to farmer in the near future.**

**Myth: Crop 1 sells insurance only over the Internet.**

**Fact. Crop 1 has over 400 independent agents selling PRP in 15 states. Crop 1 invested over $3 million in software and an IT platform allowing its agents to provide faster, more comprehensive evaluations and service to farmers. This is part of the reason why Crop 1 has met or exceeded every requirement of RMA to sell PRP. While other crop insurance companies may have upgraded their IT systems, the benefit of these upgrades are not passed along to the farmers in the form of premium reductions.**

**Myth: Crop 1 is "cherry picking" – selling only in low-risk states and to large farmers.**

**Fact. Crop 1 is in 15 states, including high-risk states such as Texas and North Dakota, and plans to expand to six additional states in 2006. For the 2004 crop year – the last year for which the most recent statistics are available -- by policy, 66% of Crop 1's policies insure less than 255 acres. Approximately 60% of Crop1's farmer customers operate less than 500 acres; 21% have between 500-1,000 acres. Only 19% are larger farmers with over 1,000 acres.**

**Myth: Farmer service suffers with PRP**

**Fact: Over 94% of PRP policyholders renewed their PRP policies this past year. Over 95% of the PRP policyholders who had a claim renewed their policies. Expert reviews by recognized ag economists suggest that PRP is likely to lead to more professional service, not less.**

**Myth: Crop 1 is operating without proper RMA oversight.**

**Fact. USDA's Chief Economist Dr. Keith Collins called Crop 1 "The most scrutinized crop insurance company" in his memory. Crop 1 not only succeeded in winning approval to sell PRP, but has also been audited, reviewed and reaudited**

throughout its three years of operation. Any amendment to stop PRP effectively punishes Occidental, Crop 1, and their agents for being successful. The question needs to be asked: Could other firms selling multiperil crop insurance at regular government-set rates withstand the same scrutiny?

**Myth: Only Crop 1 opposes an amendment to limit PRP.**

**Fact. Occidental, Crop 1, their 400 insurance agents, and thousands of farmer policyholders oppose the amendment. And, anyone wanting to avoid another crop insurance company bailout should oppose the amendment as well.**

### FORMAL TESTIMONY

Chairman Chambliss, Senator Harkin, members of the committee, my name is Billy Rose, and I am president and chief executive officer of Crop 1 Insurance, a privately held crop insurance provider in Urbandale, Iowa.

I want to thank the Chairman for convening this oversight hearing to review, in part, the significant merits of the premium reduction plan (PRP) authorized under Sec. 508(e) (3) of the Federal Crop Insurance Act (FCIA). While I won't deal with our specific comments on the RMA rulemaking to implement Sec. 508 (e) (3) of the FCIA, I ask that my formal statement, including Crop 1's formal comments on USDA's proposed rule, be made a part of the hearing record.

As the committee knows, Occidental Fire & Casualty Insurance of North Carolina, with its managing agency Crop 1 was the first to apply and be approved by USDA to provide PRP, or what we call our Premium Discount Plan (PDP). We welcome the opportunity to explain how Occidental and Crop 1 have made PRP work, to provide insight into how other companies can offer farmers and premium discount on their crop insurance, and, hopefully, to dispel rumors and innuendo perpetuated about not only PRP, but also Crop 1 as a company.

Crop 1's estimates show PDP has saved farmers over $1 million in premium cost in the last two years. It is important to note this premium reduction is strictly from expense savings. The farmer-paid portion of the premium available to pay losses has not changed as a result of the PRP. Thus, this premium reduction does not increase risk for insurers, reinsurers, the FCIC, or the American taxpayer.

Crop 1's PRP product is available in 15 states, many of which are represented by the members of this subcommittee. To date, Crop 1 has sold policies in 682 counties in those states. And, given the opportunity to service more farmers in more states, we will expand our service in a prudent, manageable business manner. It is our understanding six other companies applied to RMA for approval to sell PRP products prior to RMA beginning its current rulemaking process. It is Crop 1's hope that some or all of these companies will be approved because we strongly believe enhanced competition is good for the industry, the American farmer, and taxpayers.

### PHILOSOPHY, HISTORY, INNOVATION, OPERATION OF CROP 1

The business philosophy of Crop 1 agents is simple: Provide farmers the best possible crop insurance product -- with good service -- at the best price. We and our agents can successfully deliver on this philosophy because we've developed the technology and processes necessary to provide coverage and services to producers while controlling our administrative and operations expenses, coming in within the administration and operating (A&O) expense allowance provided by USDA.

Our goal has always been to help farmers reduce their insurance costs and reduce the time it takes agents to analyze the different risk management options available to farmers today. Before founding Crop 1, I managed a business helping farmers obtain loans and crop insurance. I saw first hand how hard it is for many farmers to make ends meet. More importantly, as a crop insurance agent I saw how difficult it is for them to come up with the extra cash to buy the higher levels of insurance coverage they actually needed. In addition, I saw how much time it takes to analyze all the different crop insurance options available to farmers. This is especially difficult when evaluating the marketing alternatives that must be considered when developing a risk management plan.

We decided something needed to be done to help the American farmer reduce his crop insurance cost and to help agents better analyze the different risk management options with their farm customers. This led to the development of Crop 1.

We worked hard to ensure our program complied with all the rules and regulations governing the crop insurance program while offering a savings to our farm customers. We also worked closely with our agents, who now number over 400, to develop a program that works for them and helps them provide better service to their farm customers.

It takes a lot of hard work by a dedicated team of employees at Crop 1, a team largely made up of people who, like me, have lived in rural America. This teamwork allows us to achieve what we set out to do: We help farmers purchase higher levels of insurance coverage without significantly increasing their costs.

As part of our investment in technology, we developed software enabling agents to efficiently analyze years of history and provide counsel and advice to their farm customers. We developed Internet websites for all of our agent affiliates, and continue to enhance those websites with information for both agents and their customers.

Today, Crop 1 offers PDP on all federally reinsured crop insurance programs except CAT, and offers farmers a guaranteed savings of up to 10.5% on the farmer-paid premium. PDP is available for all crops in Idaho, Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, Texas, Washington and Wisconsin.

It is important to note the reduced premium (savings) is strictly from expense reductions and that portion of the farmer premium available to pay losses does not change. Thus, this type of premium reduction does not bring more

Thus, this type of premium reduction does not bring more risk to the insurer, reinsurer, or federal government.

We are fortunate to have a well-managed insurance company supporting us, a company which also believes in our goal. Occidental Fire & Casualty of North Carolina has a surplus of over $100 million. More importantly it has senior management with many years of crop insurance experience. Attached is a letter from Ken Coon, senior vice-president of Occidental. Crop 1 collaborates closely with Occidental, which in turn provides oversight and support, as discussed in the letter from Mr. Coon.

In addition to support and oversight from Occidental, PDP is backed by Occidental's owner – a privately held company with more than $800 million in surplus and five highly rated private reinsurers. This year our reinsurance treaty was over-subscribed and we have excellent reinsurance support for our program.

As the members of the subcommittee can readily see, Occidental and Crop 1, with strong financial backing, intend to be in the crop insurance business for a long time, providing continuing service and innovation to all our farmer customers.

WHY PRP AND WHY NOW?
The issue before us is quite simple. Is a federal program allowing premium discounts to farmers in need of affordable crop insurance a good idea? Or put another way, should companies like Crop 1 – and other firms which can be expected to be approved to sell PRP – who are providing the best available crop insurance product at the best possible price to the farmer, be permitted to continue to offer this valuable service?

The answer, based on our experience, is an unequivocal "yes." However, our experience also suggests not all producers and agents may want PRP. Even so, the bottom line is that Crop 1 strongly believes producers should have the option to purchase crop insurance at a discount. We believe in free markets, competition, and playing by the rules.

Many on this committee participated over the years in various overhauls of the federal crop insurance program, including the efforts which led to authorizing PRP. As you'll recall, Congress enacted PRP authority in 1994 to give farmers more options to manage risk by allowing for price competition among crop insurance providers, all part of the broader goal of increasing farmer participation and increasing farmer coverage levels in the federal crop insurance program.

Such forward thinking is axiomatic to successful modern business. Competition spawns innovation, and innovation, properly managed increases quality, improves service, and lowers price. This is why we have PRP. It is an innovation sorely needed in an industry just beginning to move into the 21st century.

Congress, in authorizing PRP, recognized risk management tools and least-cost production are not mutually exclusive. Enhanced competition provides incentive to others.

Case 1:05-cv-01417-RWR    Document 18-2    Filed 08/29/2005    Page 26 of 67

particularly smaller companies, to participate in the crop insurance market. Let's not forget: The crop insurance industry, like much of production agriculture, is consolidating. In 1985, there were more than 50 companies in the crop insurance market; by comparison in 2002 – at the time Crop 1 entered the market, the number of companies participating in the program was in the low teens, with the two largest companies controlling more than half of the market.

There are those who allege PRP will "destabilize" the crop insurance industry. We submit PRP, rather than upsetting the industry balance, serves to stabilize and vitalize the crop insurance industry so it can provide to farmers what Congress intended: Readily available – and affordable -- crop insurance coverage that meets an individual farm operation's unique situation and demand.

One of the primary benefits of PRP is it causes those crop insurance companies who want to offer a PRP to operate within the A & O expense budget proscribed by the FCIC. Today, some companies have operating costs exceeding that A & O budget formula. These companies are forced to rely on speculative underwriting gains to cover operating expense. This is bad business.

When we have a year or years with poor weather and/or bad prices, companies relying on underwriting gains may not be able to pay their operating expenses. Losing crop insurance providers is what destabilizes the industry. This has happened in recent years in part because companies have operating costs exceeding A & O reimbursement, e.g., the collapse of Am Ag, formerly a company located in Council Bluffs, IA. The PRP program protects companies, the American farmer, and the American taxpayer from such situations because it causes them to operate within their A & O budgets.

If companies must rely on underwriting gains to pay their operating expenses they can only realistically operate in states where they are fairly confident they will receive an underwriting gain. However, under PRP a company can be confident it can pay its bills even without an underwriting gain. This "Live Within Your Means" strategy permits a firm to go into higher risk states where it has historically been difficult to generate underwriting gains. This is why in 2005 much of Crop1's volume was generated from higher risk areas in North Dakota and Texas

We do not believe companies should be forced to offer a PRP. Many agents and companies may choose to operate with the traditional business model. They should have that right. But, we believe that the traditional model presents a greater risk to the industry and American taxpayers.

We believe PRP enhances the ability of a new company like Crop 1 to enter higher risk crop insurance markets For example, this past year Crop 1 expanded into Texas. Historically, loss ratios in Texas have been relatively high. Without PRP, I doubt that we would have entered the Texas market. However, with PRP we not only entered the Texas market, we added more volume this past year in Texas than we did in any other state, and by a wide margin. We believe that this is strong evidence that we are not attempting to

that this is strong evidence that we are not attempting to "cherry pick". Mr. Chairman, there are not many cherries grown in Texas.

PRP is the logical next step in the evolution of the crop insurance industry. When first established, federal crop insurance was available only to drought-ravaged Plains states; today, crop insurance is available in all states. For decades, federal crop insurance was available only for grains, oilseeds and other program crops; today, it is available on almost all crops, including revenue coverage's and specialty crop production. In 2000, with passage of the Agriculture Risk Protection Act (ARPA), Congress added to the evolutionary process, providing first time authority to pilot test livestock risk protection insurance, giving livestock producers a much-needed risk management tool previously denied them.

ARPA 2000 also included language restating the need for less expensive federal crop insurance and enhanced price competition, reinforcing congressional intent to authorize crop insurance providers the opportunity to offer PRP products.

Prior to each of these landmark shifts, some clamored such a departure from the traditional system of crop insurance would mean the end of – or at the very least, severe damage to -- the crop insurance industry. However, each time Congress stood by its commitment to enhance farm risk management options, and today we see an industry where these predicted disasters are now revenue centers for crop insurance companies. So much for Chicken Little. The sky did not fall.

Some critics assert because nearly 80% of eligible acres were enrolled in the federal crop insurance program in 2004, innovations such as PRP are unnecessary. Seventy-five years ago these same naysayers would probably have claimed since we farmed 80% of the arable farmland in the U.S., we didn't need tractors.

In fact, what has happened since RMA added price competition into the expanding crop insurance menu is exactly what AgRisk Management's Dr. Bruce Babcock and Dr. Dermot Hayes predicted in their outside review of RMA's proposed rulemaking. Consider the following excerpts from this review:

"Agents will attempt to forestall competition through political pressure or other means ... (raising) all sorts of issues about how premium reduction plans are not good for the industry. For example, concerns raised about small, minority and limited resource farmers can be viewed as an attempt by those with a vested interest in the current system to derail competition."

What is occurring today is exactly what Dr. Babcock and Dr. Hayes predicted earlier this year. I am sure you have already heard quite a variety of false statements regarding PRP, as perpetuated by some who represent "The Big I" insurance lobby and others. In their independent expert review of PRP, Dr. Babcock and Dr. Hayes emphasize several other points, concluding that as price competition within the FCIC program moves forward, it can be expected "the agent

force will have a higher opportunity cost of time and they will become more professional ... (causing) the bundle of services that agents provide (to) change. Agents will provide only those services that farmers truly value ..."

Another way to look at these changes is through the eyes of GlobalAgRisk, Inc.'s RMA-commissioned outside review, which analyzed the average cost of selling and servicing a crop insurance policy. The study concluded that if companies offered a premium discount similar to that offered by Crop1 the past several years (3.5% of base premium) companies would have about the same amount of A & O expense reimbursement (even after adjustment for the new SRA) as they had in 1999. GlobalAgRisk also noted that it was "Not aware of any evidence that would suggest the average cost to sell and service a crop insurance policy has increased significantly over the past five years." In addition they recognized that had the new SRA not changed reimbursements to the premium subsidy structure for the four crops analyzed, "A & O expense reimbursements per buy-up policy would have increased by approximately 20 percent higher than it was in 1999."

Increasing participation was not the only reason Congress authorized PRP. Congress decided price competition among crop insurance companies was not necessarily a bad thing; in fact, Congress correctly reasoned price competition would bring benefits not only to farmers, but also to the crop insurance industry as a whole. Crop 1 agrees.

While it is important to keep acreage enrollment high, it is equally important to let premium price competition keep prices low, allowing farmers to buy higher coverage. Giving farmers the opportunity to buy higher levels of coverage without significantly increasing their operating cost was one of my goals in creating Crop 1.

The industry's goal – and certainly the explicit intent of Congress in 1994 and 2000 – is to protect farmers from risk, allow them to choose coverage levels appropriate to their individual risk management needs, and, implicitly, to protect American taxpayers from costly disaster programs and insurance company bailouts. As noted in the attached farmer and agent letters, we have proven that PRPs encourage farmers to buy higher levels of coverage.

PRP-enhanced price competition and innovation among companies are key to maintaining high farmer participation levels, increasing coverage levels, and to staying in business in an industry during years where there may be no underwriting gain.

It's in the farmer's best economic interest and that of the crop insurance industry to keep competition among remaining crop insurance companies as robust as possible while operating within a budget that does not rely on uncertain underwriting gains. This is what PRP helps ensure. Crop 1's success is tangible evidence of this fact.

Prior to PRP, crop insurance companies didn't compete on premium prices offered to farmers; rather they competed with each other on agent commissions. Companies recruited other firms' agents by offering higher and higher

commissions, leading to the departure from the marketplace of companies that could not afford the bidding war. Crop 1 reiterates: PRP allows companies to compete not on which firm can pay the most to an agent, but on price and service to their customers.

Crop 1 embraces universal availability as the foundation of crop insurance protection. However, with PRP, universal availability takes on a new dimension. Even though Crop 1 does not have a large crop insurance book, it has devoted considerable resources to helping its agents inform farmers of the PDP option. This has included sponsoring trade show exhibits, magazine ads, radio spots, advertising over satellite news networks, Internet websites, direct mail, and e-mails. Third parties have reviewed Crop1's prospect lists and found them to be "evenly balanced" among market segments. Crop1 has certainly not denied access to eligible farmers, as PRP opponents have suggested.

PRP opponents also argue that a farmer's crop insurance purchasing decision is complicated by factoring in price. Crop 1's experience demonstrates our farmer customers are not daunted by shopping price. Farmers expect to factor price on everything to do with their operation, so they welcome the ability to compare prices among crop insurance providers.

The Occidental/Crop 1 experience shows that given the ability to shop for crop coverage among providers, some offering PRP and others not, farmers seek the best package of coverage for their farming situation. Just as not all agents align with a company providing the highest commission, not all producers sign up with a company offering the lowest premium. There is balance, equilibrium not achievable without enhanced competition.

One of our Iowa customers said it best, "The premium discount enabled us to increase our coverage level with the same premium dollars. We feel it is very important for the crop insurance structure to be more of a 'free enterprise' and less of a bureaucracy." (Emphasis added)

PRP OVERSIGHT WELCOMED
Crop 1 is the best example – because it's the first and only example – of how Congress' foresight in authorizing PRP offers smaller companies a chance to compete effectively with larger firms. A marketplace dominated by a few large companies robs farmers of choices and cost savings. Market domination also limits industry innovation because it removes incentives for change. Managing general agencies and their policy-issuing companies applying for PRP authority are being required to demonstrate that their cost savings are realistic and demonstrable so as to prevent unfair competition based upon pie-in-the-sky cost savings projections. At the same time, RMA should revoke approval of any company offering PRP, which does not meet the federal standards of performance.

CONCLUSION
Occidental and Crop 1 commend Congress for having the foresight to authorize PRP in 1994 and reinforce that effort in 2000; we also applaud USDA for seeking to make permanent the process and criteria by which companies apply for and are approved to offer PRP, as well as providing

the oversight critical to PRP's success.

As the only company currently approved by USDA to offer PRP products, we fully understand our PDP program is a case history which can be studied by this committee and others who need to understand how well PRP works in the real world when offered by a company which takes its responsibility to the farmer customer seriously.

PRP is the latest step in the nearly 75-year evolution of the federal crop insurance program. Each time innovation has been proposed for the crop insurance program, there has been resistance, and ultimately, that resistance has been shown to be unwarranted. Crop 1 is confident history will repeat itself.

Given an opportunity to grow and expand as more companies enter the marketplace, PRP will become an even more important aspect of farm risk management, if only because PRP enhances competition among crop insurance providers, and inevitably leads to better products and services for the farmer customer.

Crop 1's experience demonstrates over and over again that including price comparison in the crop insurance shopping formula is a welcome improvement for farmers who constantly battle to develop the best possible combination of crop insurance options for their particular farming situation. To paraphrase one of our Iowa customers, shopping for crop insurance needs to be more free enterprise and less bureaucracy.

For the American farmer struggling to attain and maintain least-cost production, Crop 1 and its PDP program represent the first opportunity within the federal crop production program to shop and compare crop insurance coverage by price. This allows Crop 1 to deliver again and again on its business philosophy: We provide farmers the best available crop insurance products and service at the best possible savings.

Mr. Chairman, I thank you and the subcommittee for your attention, and I'd be happy to answer any questions you may have.

Respectfully submitted, Billy Rose President and Chief Executive Officer Crop 1 Insurance Urbandale, Iowa

EXHIBIT 4



*1ˢᵗ in savings*

THE STATEMENT OF


# MR. BILLY ROSE

# PRESIDENT & CHIEF EXECUTIVE OFFICER

# CROP 1 INSURANCE

# URBANDALE, IOWA


# BEFORE

# THE SUBCOMMITTEE ON GENERAL FARM COMMODITIES
# & RISK MANAGEMENT

# HOUSE COMMITTEE ON AGRICULTURE


# MAY 4, 2005

4532 114th Street – Des Moines, Iowa 50322
phone 866-765-0552 *(toll free)*    fax 866-765-0553 *(toll free)*    www.crop1insurance.com

# STATEMENT OF BILLY ROSE, PRESIDENT/CEO
# CROP 1 INSURANCE, URBANDALE, IOWA

Chairman Moran, Ranking Member Etheridge, members of the subcommittee, my name is Billy Rose, and I am president and chief executive officer of Crop 1 Insurance, a privately held crop insurance provider in Urbandale, Iowa.

I want to thank the Chairman for convening this oversight hearing to review the significant merits of the Risk Management Agency's premium reduction plan (PRP). While I won't deal with our specific comments on the RMA rulemaking now ongoing to implement Sec. 508 (e) (3) of the Federal Crop Insurance Act (FCIA), I ask that my formal statement, including Crop 1's formal comments on USDA's proposed rule, be made a part of the hearing record.

I'm accompanied today by Mr. Kelly Deterding, Senior Vice President City Bank Texas, Windmark Insurance Crop Division, a Crop 1 affiliate based in Lubbock, Texas, as well as Mr. Raymond Grabanski, President of Progressive Ag Systems from Fargo, North Dakota, who represents Crop 1 in the Dakotas, Minnesota and Wisconsin. Both gentlemen are available to answer any questions you may have. In addition, our formal statement for the record includes several letters of support from satisfied farmer customers and crop insurance agents.

As the subcommittee knows, Occidental Fire & Casualty Insurance of North Carolina, with its managing agency, Crop 1 is the only crop insurance provider today approved by USDA to provide PRP, or what we call our Premium Discount Plan (PDP). We welcome the opportunity to explain how Occidental and Crop 1 have made PRP work. Crop 1's estimates show PDP has saved farmers over $1 million in premium cost in the last two years. It is important to note that this premium reduction is strictly from expense savings and the farmer-paid portion of the premium available to pay losses has not changed as a result of the PRP. Thus, this premium reduction does not increase risk for insurers, reinsurers, the FCIC, or the American taxpayer.

Crop 1's PRP product is available in 15 states, many of which are represented by the members of this subcommittee. To date, Crop 1 has sold policies in 682 counties in those states. And, given the opportunity to service more farmers in more states, we will expand our service in a prudent manageable business manner.

It is our understanding six other companies have applied to RMA for approval to sell PRP products. It is Crop 1's hope more companies will be approved because we strongly believe enhanced competition is good for the industry, the American farmer, and taxpayers.

1

## PHILOSOPHY, HISTORY, INNOVATION, OPERATION OF CROP 1

The business philosophy of Crop 1 agents is simple: Provide farmers the best possible crop insurance product -- with good service -- at the best price. We and our agents can successfully deliver on this philosophy because we've developed the technology and processes necessary to provide coverage and services to producers while controlling our administrative and operations expenses, coming in within the expense allowance provided by USDA.

My goal has always been to help farmers reduce their insurance costs and the time it takes agents to analyze the different risk management options available to farmers today. Before founding Crop 1, I managed a business helping farmers obtain loans and crop insurance. I saw first hand how hard it is for many farmers to make ends meet. More importantly, as a crop insurance agent I saw how difficult it is for them to come up with the extra cash to buy the higher levels of insurance coverage they actually needed. In addition, I saw how much time it takes to analyze all the different crop insurance options available to farmers. This is especially difficult when evaluating the marketing alternatives that must be considered when developing a risk management plan.

I decided something needed to be done to help the American farmer reduce his crop insurance cost and to help agents better analyze the different risk management options with their farm customers. That led to the development of Crop 1.

I worked closely with the RMA to ensure our program complied with all the rules and regulations governing the crop insurance program while offering a savings to our farm customers. I worked closely with our agents, who now number over 400, to develop a program that works for them and helps them provide better service to their farm customers.

It took a lot of hard work by a dedicated team of employees at Crop 1, a team largely made up of people who, like me, have lived in rural America. This teamwork allowed us to largely achieve what we set out to do. We help farmers purchase higher levels of insurance coverage without significantly increasing their cost. We developed software enabling agents to efficiently analyze years of history and provide counsel and advice to their farm customers. We developed Internet websites for all of our agent affiliates, and are continuing to enhance those websites with information for both agents and their customers.

Today, Crop 1 offers PDP on all federally reinsured crop insurance programs except CAT, and offers farmers a guaranteed savings of up to 10% on the farmer-paid premium. PDP is available for all crops in Idaho, Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, Texas, Washington and Wisconsin. It is important to note that the reduced premium (savings) is strictly from expense reductions and the portion of the farmer premium available to pay losses does not change. Thus, this type of premium reduction does not bring more risk to the insurer, reinsurer, or federal government.

We are fortunate to have a well-managed insurance company supporting us which also believes in our goal. Occidental Fire & Casualty of North Carolina has a surplus of over $100 million. More importantly it has senior management with many years of crop insurance experience.

2

Attached is a letter from Ken Coon, senior vice-president of Occidental. Crop 1 collaborates closely with Occidental, which in turn provides oversight and support, as discussed in the letter from Mr. Coon.

In addition to support and oversight from Occidental, PDP is backed by five highly rated private reinsurers. This year our reinsurance treaty was over-subscribed and we have excellent reinsurance support for our program.

As the members of the subcommittee can readily see, Occidental and Crop 1 intend to be in the crop insurance business for a long time, providing continuing service and innovation to our farmer customers.

## WHY PRP AND WHY NOW?

The issue before us today is this: Is a federal program allowing premium discounts to farmers in need of affordable crop insurance a good idea? Or put another way, should companies like Crop 1 – and hopefully, other firms which will apply to sell PRP -- providing the best available crop insurance product at the best possible price to the farmer, be permitted to continue to offer this valuable service?

The answer, based on our experience, is a resounding "yes." However, our experience also suggests not all producers and agents will want a PRP. That's fine. We strongly believe producers should have the option to purchase crop insurance at a discount. We believe in free markets, competition, and playing by the rules.

Many on this subcommittee participated over the years in the various overhauls of the federal crop insurance program, including the efforts which led to authorizing PRP. As you'll recall, Congress enacted PRP authority in 1994 to give farmers more options to manage risk by allowing for price competition among crop insurance providers, all part of the broader goal of increasing farmer participation in the federal crop insurance program.

Such forward thinking is axiomatic to successful modern business, and particularly appealing to entrepreneurs like me: Competition spawns innovation, and innovation, properly managed increases quality, improves service, and lowers price. This is why we have PRP. It is an innovation sorely needed in an industry just beginning to move into the 21st century.

Congress, in authorizing PRP, recognized risk management tools and least-cost production are not mutually exclusive. Enhanced competition provides incentive to others, particularly smaller companies, to participate in the crop insurance market. Let's not forget: The crop insurance industry, like much of production agriculture, is consolidating. In 1985, there were more than 50 companies in the crop insurance market; at the time Crop 1 entered the market, there were less than 20, and the largest companies control the lion's share of the market.

There are those who contend PRP will somehow "destabilize" the crop insurance industry. I submit PRP, rather than upsetting the industry balance, will serve to help to stabilize and vitalize the crop insurance industry, so it can provide to farmers exactly what Congress always intended:

Readily available – and affordable – crop insurance coverage that meets an individual farm operation's unique situation and demand.

One of the primary benefits of PRP is it causes those crop insurance companies who wish to offer a PRP to operate within the administrative and operating expense budget authorized by the FCIC. Today, some companies have operating costs exceeding that A & O budget. These companies are forced to rely on speculative underwriting gains to cover operating expense. This is not good business.

When we have a year with poor weather or bad prices, companies that rely on underwriting gains may not be able to pay their operating expenses. Losing a crop insurance provider or two is what destabilizes the industry. That has happened in recent years because companies have operating costs exceeding A & O reimbursement. The PRP program protects companies, the American farmer, and the American taxpayer from such situations because it causes them to operate within A & O budgets. This makes good business sense.

We do not believe that companies should be forced to offer a PRP. Many agents and companies may choose to operate with the traditional business model. They should have that right. But, we believe that the traditional model presents a greater risk to the industry and American taxpayers.

We believe that the PRP enhances the ability of a new company like Crop 1 to enter higher risk crop insurance markets. If companies must rely on underwriting gains to pay their operating expenses they can only realistically operate in states where they are fairly confident they will receive an underwriting gain. However, under PRP a company can be confident it can pay its bills even without an underwriting gain. This permits a firm to go into higher risk states where it has historically been difficult to generate underwriting gains.

For example, this past year Crop 1 expanded into Texas. Historically, loss ratios in Texas have been relatively high. Without PRP, I doubt that we would have entered the Texas market. However, with PRP we not only entered the Texas market, we added more volume this past year in Texas than we did in any other state, and by a wide margin.

To Crop 1, PRP is the next logical step in the evolution of the crop insurance industry. When first established, federal crop insurance was available only to drought-ravaged Plains states; today, crop insurance is available in all states. For decades, federal crop insurance was only available on grains, oilseeds and other program crops; today, it is available on almost all crops, including specialty crop production. In 2000, with passage of the Agriculture Risk Protection Act (ARPA), Congress provided first time authority to pilot test livestock risk protection insurance, giving livestock producers a much-needed risk management tool previously denied them.

And lest we forget, in 2000 ARPA included language restating the need for less expensive federal crop insurance and enhanced price competition, reinforcing congressional intent to authorize crop insurance providers the opportunity to offer PRP products.

Prior to each of these landmark changes, there were those clamoring that such a departure from the traditional system of providing crop insurance would mean the end of – or at the very least,

4

severe damage to -- the crop insurance industry. However, Congress stood by its commitment to enhance farm risk management options, and today we see an industry where these predicted disasters are now revenue centers for crop insurance companies. So much for Chicken Little. The sky did not fall.

Some critics assert because nearly 80% of eligible acres were enrolled in the federal crop insurance program in 2004, innovations such as PRP are unnecessary. Seventy-five years ago naysayers would probably have claimed since we farmed 80% of the arable farmland in the U.S., we didn't need tractors. Competition and innovation are what has made American great. They should be encouraged, not discouraged.

While increasing participation was one reason Congress authorized PRP, this was not the only reason. Congress decided price competition among crop insurance companies was not necessarily a bad thing; in fact, Congress correctly reasoned price competition would bring benefits not only to farmers, but to the crop insurance industry as a whole. Crop 1 agrees.

While it is important to keep acreage enrollment as high as possible, it is equally important that premium price competition keeps prices low, rendering higher coverages more affordable. Allowing farmers to purchase higher levels of coverage without significantly increasing their operating cost was one of my goals in creating Crop 1.

The industry's goal – and certainly the explicit intent of Congress as evidence in 1994 and again in 2000 – is to protect farmers from risk, allow them to choose coverage levels appropriate to their individual risk management needs, and, implicitly, to protect American taxpayers from costly disaster programs and insurance company bailouts. As noted in the attached farmer and agent letters, we have proven that PRPs encourage farmers to buy higher levels of coverage.

PRP-enhanced price competition, and the innovation among companies that will result, are key to *maintaining* historically high farmer participation levels, increasing coverage levels, and operating in an industry in years where there may be no underwriting gain. Therefore, it's in the farmer's best economic interest and that of the crop insurance industry to keep competition among the remaining crop insurance providers as robust as possible while operating within a budget that is not reliant on uncertain underwriting gains. This is what PRP helps to ensure. Crop 1's success is tangible evidence of this fact.

Prior to PRP, crop insurance companies did not compete on the premium price offered to producers, but rather competed with each other on agent commissions. Companies recruited other firms' agents by offering higher and higher commissions, leading to the departure from the marketplace of companies that could not afford the bidding war. While we do not support a federal cap on agent commissions, Crop 1 reiterates that PRP allows companies to compete not just on which firm can pay the most to an agent, but on price and service to their customers – exactly the way other successful businesses operate.

Crop 1 embraces the premise of universal availability underpinning the federal crop insurance program. However, with the advent of PRP, universal availability takes on a new dimension. With Crop 1's entry into the crop insurance market, the federal government stepped away from

5

an arbitrary coverage price-setting function, instead providing parameters and the necessary strict oversight – including revocation of PRP authority for bad actors -- to allow farmers to confidently shop price as well as policy coverage and service when seeking crop insurance coverage.

Some argue a farmer's crop insurance purchasing decision is somehow dramatically complicated by factoring in price. Crop 1's experience demonstrates our farmer customers are not the least daunted by shopping price. In fact, farmers expect to factor in price on everything to do with their farming operation, so they welcome the ability to compare prices among crop insurance providers.

Crop 1's experience also shows us that given the ability to shop for crop coverage among providers both large and small, some offering PRP and others not, farmers ultimately seek the best package of coverage for their unique farming situation. Just as not all agents align with the company providing the highest commission, not all producers align with the company offering the lowest premium. There is balance, equilibrium not achievable without enhanced competition.

This point is best made by one of our Iowa customers, who said, "The premium discount enabled us to increase our coverage level with the same premium dollars. *We feel it is very important for the crop insurance structure to be more of a 'free enterprise' and less of a bureaucracy."* (Emphasis added)

## PRP OVERSIGHT NEEDED

Crop 1 is the best example – because it's the only example – of how Congress' foresight in authorizing PRP gives smaller companies a chance to compete more effectively with larger firms. A marketplace dominated by a few large companies robs farmers of choices and the opportunity for cost savings. Market domination also limits industry innovation because it removes incentives for change.

We accept and endorse vigorous RMA control and oversight over companies seeking to offer PRP. Farmers deserve to do business only with companies economically viable to participate in the program, and we believe RMA is pursuing a correct balance between vetting new entrants and adequate regulatory controls to protect farmers.

Any firm applying for PRP authority must demonstrate that its cost savings are realistic and demonstrable so as to prevent unfair competition based upon pie-in-the-sky cost savings projections. At the same time, RMA should revoke approval of any company offering PRP which does not meet the federal standards of performance.

RMA further must have an efficient regulatory mechanism to prevent companies from providing coverage only to particular geographic areas, crops, groups and/or individuals because the company perceives a lower risk of loss, i.e. "cherry-picking." As stated previously, Crop 1 enthusiastically supports the requirement that a company offering PRP make it available on all crops and to all producers in all states in which it does business. Further, Crop 1 supports

RMA's emphasis on enhanced marketing efforts to small and limited-resource, minority and female producers.

## CONCLUSION

Crop 1 commends Congress for having the foresight to authorize PRP in 1994 and reinforce that effort in 2000; we also applaud USDA for seeking to make permanent the process and criteria by which companies apply for and are approved to offer PRP, as well as providing the oversight critical to PRP's success.

As the only company currently approved by USDA to offer PRP products, Crop 1 fully understands its PDP program is a case history which can be studied by this subcommittee and others who need to understand how well PRP works in the real world when offered by a company which takes its responsibility to the farmer customer seriously.

PRP is the latest step in the nearly 75-year evolution of the federal crop insurance program. Each time innovation has been proposed for the crop insurance program, there has been resistance, and ultimately, that resistance has been shown to be unwarranted. Crop 1 is confident history will repeat itself.

Given an opportunity to grow and expand as more companies enter the marketplace, PRP will become an even more important aspect of farm risk management, if only because PRP enhances competition among crop insurance providers, and inevitably leads to better products and services for the farmer customer.

Crop 1's experience demonstrates over and over again that including price comparison in the crop insurance shopping formula is a welcome improvement for farmers who constantly battle to develop the best possible combination of crop insurance options for their particular farming situation. To paraphrase one of our Iowa customers, shopping for crop insurance needs to be more free enterprise and less bureaucracy.

For the American farmer struggling to attain and maintain least-cost production, Crop 1 and its PDP program represent the first opportunity within the federal crop production program to shop and compare crop insurance coverage by price. This allows Crop 1 to deliver again and again on its business philosophy: We provide farmers the best available crop insurance products and service at the best possible savings.

Mr. Chairman, I thank you and the subcommittee for your attention, and I'd be happy to answer any questions you may have.

Respectfully submitted,

Billy Rose
President and Chief Executive Officer
Crop 1 Insurance
Urbandale, Iowa

7

# IAT Group
## Special Products Division

*Acceptance Indemnity Insurance Company*
*Acceptance Casualty Insurance Company*
*Occidental Fire & Casualty of North Carolina*
*Wilshire Insurance Company*
*Harco National Insurance Company*

Kenneth C. Coon
Senior Vice President
e-mail:kcoon@iatm-ins.com

302 South 36th Street    Suite 500  Omaha, NE 68131  PO Box 3328  Omaha, NE 68103  Phone: 402-348-0705 Fax: 402-348-0704

April 29, 2005

Senator Ben Nelson
720 Hart Senate Office Building
Washington, DC 20510

Dear Senator Nelson,

I am writing to let you know of my support for Crop1 and the Premium Reduction Plan (PRP). Occidental Fire & Casualty of North Carolina has worked with Crop1 and its agents to help farmers in Nebraska and other states save money on crop insurance this past year through a PRP approved by the Risk Management Agency. We hope you will allow this important program to continue.

As the counter party to the standard reinsurance agreement with the Federal Crop Insurance Corporation (FCIC) Occidental is responsible for maintaining proper controls to ensure the program is delivered with integrity. Although we have arranged for Crop1 to coordinate the sales and servicing of the policies we issue, we have several employees (including myself) who monitor Crop1's financial and operational performance from Occidental's office in Omaha, Nebraska. Just this past week Crop1 was audited by the Risk Management Agency. Two Occidental employees participated in the process. I am pleased to report that the audit went very well, and based on the exit interview, there do not appear to be any major concerns. In fact, the auditors were complimentary regarding many facets of the program including Crop1's error rates which are among the lowest in the industry.

We also work quite closely with Crop1 in the risk management and fund assignment processes. We are pleased with the results of this process to date and have confidence in their senior management team.

Billy Rose, CEO of Crop1, has received recognition as Emerging Entrepreneur of the Year by Ernst & Young, Merrill Lynch and Inc. magazine. He was also given the Iowa Venture Award for outstanding business achievement by the Iowa Area Development Group. Mr. Rose lends considerable energy to the organization. There are, however, several other individuals whom we have worked closely who we feel contribute to the strength of this management team.

Howard McClennan, Crop1's CFO, has over 30 years experience in private accounting and internal control. He has held management positions with major agribusiness firms including Tenneco and JI Case. Mr. McClennan has not only provided us with accurate and timely financial reports, but also provided keen insight into the administrative controls necessary for our PRP to be successful.

Robert Boysen, Crop1's COO, has over 25 years of experience in agricultural sales, finance, and crop insurance with companies like John Deere Credit, Farm Credit Services, and Norwest Corporation. He has developed a number of the models used by Crop1 and Occidental to stress test and optimize returns per unit of risk from its portfolio. We have worked closely with Rob during the fund assignment process. We are comfortable with the risk controls he has developed and were pleased with the underwriting gain on the portfolio this past year.

We agree with the RMA's auditors who feel Crop1 is properly controlling the risk in its operation. Thus, we are hopeful that this program can be expanded. We believe it can benefit not only Nebraska farmers, but also the crop insurance industry nationwide. In addition, we believe the structure of the PRP program can benefit the American taxpayer. I have outlined my rationale below.

### Benefit to Nebraska Farmers

Crop1's Premium Reduction Plan offers Nebraska farmers a savings of up to 10% on their crop insurance. This is not the only benefit from the Premium Reduction Plan. Crop1 has developed Premium Saver software that enables its agents to help their customers select the most desirable risk management program. Without this program it would take agents hours of time to research and perform the calculations to provide this information. In addition to its Premium Saver software, Crop1 has developed a number of other processes that benefit its agents in providing the best possible service and crop insurance solutions to their clients.

### Benefit to the Crop Insurance Industry

Companies offering a Premium Reduction Plan must operate within the Administrative & Operating expense reimbursement which the FCIC provides to companies to cover their operating expenses. Other companies do not face this restriction and often times rely upon an underwriting gain to cover a portion of their basic operating expenses. These companies can therefore only afford to operate in areas where they are virtually assured of an underwriting gain. This makes it very difficult for new companies to expand into higher risk areas where they cannot be assured of an underwriting gain to cover their operating expenses. With the Premium Reduction Plan, Crop1 and Occidental have been able to move into higher risk sections of Nebraska and into higher-risk states like Texas.

This past year Crop1 expanded its business into Texas, which is generally viewed as a more volatile or high-risk state. It is unlikely that this expansion would have been possible if Crop1 had been forced to rely on an underwriting gain to pay its operating expenses. Thus, I feel if PRP plans are expanded to other companies they will be better positioned to serve all farmers and ranchers in the US, not just those fortunate to operate in areas where there is little risk of crop failure.

In 1985, shortly after the federal crop program was privatized, over 50 insurance providers participated in the crop insurance market. By the time Crop1 introduced the first RMA-approved

PRP in January 2003, there were barely a dozen approved insurance providers and the largest companies controlled an increasing share of the market. Before Crop1 introduced its PRP, providers were competing, not on price to the producer, but primarily by recruiting other companies' agents by offering higher and higher commissions, leading to the departure from the market of companies that could not compete on this basis. The introduction of PRPs into the market allows insurance providers to compete on price and service to producers, rather than simply on who pays the highest commissions.

The RMA has appropriately left agent commissions to be set by the market and I agree that a cap on agent commissions is not needed. In a free market I believe that agents should be free to "shop" among multiple insurance providers to obtain the best commission available to them. However, the American producer should have the right to shop for crop coverage among many providers, large and small, some offering PRPs and some not, to secure the most desirable program for the producer's operation at the lowest possible cost. Not all agents will align with the company offering the greatest commission, and not all producers will align with the company offering the lowest premium. There will be a balance. Without competition, market forces cannot cause such balance or market equilibrium to occur. PRPs are required to help the market find such a balance.

### Benefit to the American Taxpayer

When companies offering a federally subsidized program must rely on underwriting gains to pay their commission expense it places the American taxpayer at risk. Each federal multi-peril crop insurance policy states that the federal government guarantees that the farmer will receive an indemnity, if one is rightfully due. Thus, the federal government is ultimately responsible if one of the companies it has approved to provide crop insurance should fail.

The PRP rule now being debated by the RMA reduces risk to the American taxpayer since it requires all approved PRP providers to pay their operating expenses from the administrative and operating expense reimbursement that they receive. Non PRP companies may operate at expense levels that exceed this reimbursement and must count on speculative underwriting gains to pay their bills. This inherently increases the risk that these other companies may experience financial difficulty.

I hope you will support the Premium Reduction Plan. It is good for Nebraska farmers, the crop insurance industry, and the American taxpayer.

Sincerely,

Ken Coon

Senior Vice-President
Occidental Fire & Casualty of North Carolina

## COMMENTS OF CROP ONE INSURANCE DIRECT, INC. ("CROP1")
## ON PROPOSED RULE FOR PREMIUM REDUCTION PLANS
## (7 CFR PART 400)

### Introductory Comment by Crop1

Crop 1 Insurance Direct, Inc. ("Crop1") applauds the RMA for proposing the adoption of regulations (the "Proposed Rule") governing premium reduction plans ("PRPs"), implementing §508(e)(3) of the Federal Crop Insurance Act. The Proposed Rule is timely, and much needed to enhance competition in the crop insurance market.

Crop1 believes that the fundamental purpose of §508(e)(3) was to offer producers more choices while saving money on crop insurance, by increasing competition in the crop insurance market through offering crop insurance providers the opportunity to compete on price. In 1985, shortly after the program was privatized, over 50 insurance providers participated in the crop insurance market. By the time Crop1 introduced the first RMA-approved PRP in January 2003, there were barely a dozen approved insurance providers and the largest companies controlled an increasing share of the market. Before Crop1 introduced its PRP, providers were competing, not on price to the producer, but primarily by recruiting other companies' agents through offering higher and higher commissions, leading to the departure from the market of companies that could not compete on this basis. The introduction of PRPs into the market allows insurance providers to compete on price and service to producers, rather than simply on who pays the highest commissions. The Proposed Rule promotes the interests of the American producer by institutionalizing the PRP approval process into a permanent rule that will enable insurance providers to pass along cost savings to producers.

The RMA has appropriately left agent commissions to be set by the market and Crop1 does not support a cap on commissions. In a free market, Crop1 believes that, agents should be free to "shop" among multiple insurance providers to obtain the best commission available to them. However, the American producer should have the right to shop for crop coverage amongst many providers, large and small - some offering PRPs, some not - to secure the most desirable program for the producer's operation at the lowest possible cost. Not all agents will align with the company offering the greatest commission, and not all producers will align with the company offering the lowest premium. There will be a balance. Without competition, market forces cannot cause such balance or market equilibrium to occur.

We also applaud the RMA for recognizing the importance of allowing smaller companies the opportunity to offer PRPs and compete more effectively with larger companies. As indicated above, the market prior to PRPs was dominated by a few large companies, which is bad for producers as their choices and their opportunity for cost savings brought about by innovation and competition are limited. Of course, it is important that the RMA impose appropriate controls to allow only economically viable companies to participate in the program. The Proposed Rule strikes the right balance between allowing new entrants into the crop insurance marketplace, but with adequate controls to ensure that producers are protected.

The Proposed Rule also imposes appropriate review criteria for PRPs that should ensure the PRPs are based on cost savings that are realistic and demonstrable and to prevent unfair competition based on unrealistic and unattainable cost savings. It also imposes appropriate controls to prevent "cherry-picking" by insurance providers through PRPs; that is, targeting PRPs to apply only to particular geographic areas, crops, groups, or individual producers with lower risk of loss. Crop1 strongly supports the Proposed Rule's requirement that PRPs must be provided to all producers in all states in which the provider does business and be applicable to all crops. Crop1 also supports the emphasis in the Proposed Rule on marketing efforts to small and limited resource, women and minority producers.

The specific comments below are presented in the order contained in the Federal Register publication, and relate to the Proposed Rule itself, as well as the background information that precedes it. As to matters not specifically addressed in the comments below, Crop1 either has no position or is supportive but has no information to provide beyond that contained in the Proposed Rule or the background to the Proposed Rule.

## CROP1 COMMENTS ON "INDEPENDENT REVIEW" (p. 9001)

Overall, Crop1 agrees with the Independent Reviewers' expectation that PRPs are likely to result in "a modest increase in participation ... although increases in coverage levels are more likely." However, should proposals in the President's Budget and by some in the Congress for cuts in federal subsidies of the cost of insurance become law, PRPs will allow producers to mitigate increases in the cost of crop insurance and perhaps allow them to maintain their same level of coverage, notwithstanding those increases.

## CROP1 COMMENTS ON "BACKGROUND" (pp. 9003-9010)

### Implementation of Section 508(e)(3) and Guiding Principles (p. 9005)

Crop1 applauds the RMA for implementing §508(e)(3) through the promulgation of permanent regulations and promoting the interests of the American producer by institutionalizing the PRP approval process that will enable insurance providers to pass along cost savings to producers.

We agree with all four principles listed in the Background section that underlie the Proposed Rule. We note that the first principle (requiring documentation to demonstrate ability to operate within expense reimbursement and to reduce costs below the expense reimbursement received from RMA) and the second principle (requiring that claimed efficiencies be easily verifiable by RMA) are related. Section 508(e)(3) requires premium reductions to be based on real efficiencies that reduce a provider's costs below the RMA's expense reimbursement and that can be passed through to producers. It is both appropriate and necessary that such efficiencies be objectively documented and verifiable by the RMA. Allowing price reductions that cannot be documented or that exceed objectively demonstrable efficiencies likely will invite unfair competition by providers seeking to undercut their competition with discounts that cannot be matched through savings. This abuse could threaten the provider's solvency and also give rise to

2

market disruption by directing producers away from the more reputable providers. Having an existing, approved PRP, Crop1 knows that it is possible to satisfy these requirements.

Crop1 believes that approved insurance providers who apply and receive approval to offer a PRP should be required to offer the savings to all their producer customers, and that in advance of making the offering, the insurance provider should be required to prove within their marketing plan how they expect to reach these producers. Thus, Crop1 is supportive of the fourth principle, non-discrimination, and each of the four mechanisms listed (at p. 9005) in which the Proposed Rule would address unfair discrimination: (1) requiring PRPs to be provided to all producers insured by the provider, (2) requiring the submission of marketing plans to show how the provider will reach small and limited resource, women and minority producers; (3) denying approval of PRPs not supported by an adequate marketing plan, and (4) allowing for the withdrawal of approval of a PRP for failure to implement the approved marketing plan. We believe that each of these tools is important to ensure that all producers have equal access to cost savings offered by PRPs.

<u>Alternative Program Structure (pp. 9005-9006)</u>

The alternative program structure under consideration which proposes to share cost savings by insurance providers with producers after the fact is plainly inferior to a plan that provides premium savings up-front and could harm producers. The farming business is fraught with enough uncertainty without asking producers to bear the additional risk associated with an uncertain premium discount. Crop1 believes that, ideally, producers should know with certainty, before they decide among competing insurance providers, the cost of each choice so they can make an informed decision and engage in informed business planning.

Further, insurance providers are in the business of managing risk, and are therefore best positioned to manage uncertainty by providing the producer with a certain premium discount at the outset. Using appropriate business tools, insurance providers can accurately forecast (and demonstrate to the RMA) the amount of savings necessary to offer a PRP, and should be required to pass those savings - up-front -- on to producers.

The RMA has stated (at p. 9005) that the providers would not be able to "advertise or otherwise represent the amount of the premium reimbursement in advance of the sale...." The RMA has also stated (at p. 9006) that the insurance providers would not be able to market the plan "based on a guaranteed amount of premium reimbursement." It is unclear whether the RMA is contemplating a prohibition against *any* marketing, even of potential savings, or only guaranteed savings. If providers are allowed to market potential savings, it could allow or even encourage providers to make unrealistic or exaggerated projections about their anticipated savings in order to attract or keep their customers in a price competitive market. Not only will this cause competitive injury to providers attempting to compete fairly based on real cost savings and reasonable projections of such savings, but it will inevitably harm producers who are lured by the potential of large cost savings that prove to be illusory in the end. Further, even if the RMA's intent is to prohibit marketing of even potential savings, we question how such a prohibition could be enforced and whether the RMA has or is willing to commit the kind of resources

necessary to enforce this market conduct requirement. In the absence of strict enforcement, we believe that unscrupulous providers will inevitably boast exaggerated, illusory savings in order to attract market share.

To allow providers under the alternative approach to refer to historical reimbursements in their marketing is also problematic. Historical reimbursement levels are not necessarily a strong indication of what a producer will receive in the form of a discount in the upcoming year. Market conditions change from year to year, and a provider that achieves savings in one year might not achieve them in the next year. It would also allow a provider who achieves savings one year to market based on those savings the following year, even though it has no intention of implementing the necessary measures to achieve them in that year. Capping the provider for the following year or perhaps even the next three years as a penalty would help to discourage this practice, but it would not necessarily remedy in the meantime the harm caused to reputable competitors.

In response to the RMA's specific question as to provider workload, based on its experience, Crop1 believes that the workload to demonstrate savings up front is not materially greater than the workload to demonstrate savings after the fact. In this regard, we note that a core benefit to the current structure is that it requires participating insurance providers to focus on administrative costs up front, to demonstrate savings that can be achieved, and to impose the necessary mechanisms to achieve them. The alternative structure eliminates this incentive and discourages providers from identifying, designing and implementing necessary cost-saving mechanisms and practices before the savings can be realized.

Under the current structure, another core benefit to producers is that competing insurance providers will market their various programs with specific discount information, thereby permitting producers to make informed insurance purchasing decisions. The alternative approach eliminates this benefit. Deprived of knowing with certainty what their final premium cost will be up front, any benefit to producers under the alternative approach is a matter of pure chance.

Finally, we request that if the RMA decides to move forward with an alternative structure, that it do so by publishing its specific terms and conditions as a proposed rule so that Crop1, other insurance providers and members of the public will have the opportunity to review and provide comments on it.

## Fundamental Program Change (pp. 9006-9007)

Crop1 supports the requirement that approved insurance providers must offer the PRP in all states where the insurance provider does business, and for all applicable crops, policies and plans of insurance, and that there may be no variation in the amount of the premium reduction based on the percentage of the net book premium.

We agree that variability of discounts among states, crops, and insurance plans and policies requires complex accounting decisions. The "all states/all crops/all insurance plans and policies

requirement" also makes it easier for our customers, and eases the accounting and other necessary tracking of our business systems. This allows RMA to verify savings, and allows producers to make informed business decisions without having to evaluate different pricing structures offered by multiple providers based on numerous factors.

This requirement also prevents "cherry picking" by providers of more profitable producers. Congress intended that all producers – large, small, under-served or minority, and whatever the crop – be served. The "all states/all crops/all insurance policies and plans" requirement is in keeping with the intent of Congress.

a.    Competitive Harm (p. 9006)

Preceding the Crop1 PRP application approval, insurance providers had not competed on price and had no incentive to do so. We believe price competition is good for the American producer and the crop insurance delivery system. We also agree with the RMA's concern that allowing "targeted" premium reductions to meet specific market conditions would create the opportunity for unfair competition among providers. Care must be taken to assure stability in the private provider system. To suddenly allow a myriad of state-by-state choices could foster an unstable situation. We believe that the Proposed Rule and its "all states/all crops/all insurance policies and plans" requirement minimizes the risk of unfair competitive disadvantage among PRPs.

Crop1 also agrees with the RMA's position that varying levels of agent compensation from state to state should not be allowed to justify a difference in premium reduction from state to state, although Crop1 acknowledges that market forces cause insurance providers typically to pay different rates of agent compensation around the country.

As noted by the RMA, agent compensation is a large component of the expenses that are incurred in the delivery of crop insurance (currently seventy percent), and thus its reduction is a common, if not universal, component of PRPs. Over the more than two decades since the crop insurance delivery system was privatized, insurance providers, absent a PRP program, have competed by recruiting other companies' agents through offering higher and higher commissions. It is notable that agent commissions in 1981 when the delivery system was first privatized were in the 10-14% bracket. In recent years, some large agencies have enjoyed commissions of nearly twice the original amount when considering "transfer bonus" payments and other incentives offered in the agent recruiting process. This has contributed to the significant reduction in the number of providers in the program to the detriment of producers. The number of crop insurance providers has long been shrinking, from over 50 in 1985 after the program delivery system was originally privatized in 1981, to barely a dozen at the time Crop1 entered the market in January 2003.

Crop1 believes that, just as agents should be free to "shop" among multiple insurance providers to obtain the best commission available to them in the market, the American producer should have the right to shop for crop coverage among agents for multiple providers to secure the most desirable program for the producer's operation. Some producers will seek the lowest premium cost available, while others may decide that other factors outweigh the premium savings

available through a PRP. Quite simply, we strongly believe that just as agents are free to find the provider that will enable them to maximize their income, American producers should have a similar option enabling them to maximize profit by reducing their premium cost.

We further emphasize that such choice for the American producer can strengthen the crop insurance delivery system. It should be noted that recently, when a large crop insurance company collapsed, auditors discovered that its demise was not due to losses in its book of business, but rather to a high cost structure driven largely by relatively high agent commissions. Thus, without a strong PRP program, the crop insurance industry will simply fall back to the cycle of increasing commissions to gain new business that in the long-run endangers the delivery system.

     b.     <u>Verification by RMA (pp. 9006-9007)</u>

Crop1 agrees that allowing PRPs to vary premium reductions by state would greatly complicate the provider's administration of the PRP and the RMA's verification of the provider's efficiencies and reductions. It would require the application of unduly complex cost accounting rules by both the provider and the RMA. Additionally, it would be even more complicated, if not impossible, for providers who use captive agents to allocate costs across states, so such providers would be competitively disadvantaged when compared with independent agency providers who could vary price reductions by state and thereby target favorable market conditions and favored crops and producers, to the detriment of the crop insurance marketplace.

     c.     <u>Uniform Service and Unintended Effects (p. 9007)</u>

Crop1 agrees that state variability could adversely affect the level of service to some producers, which is directly contrary to the fundamental requirement of the crop insurance program that all producers are entitled to the same level of service, regardless of their size or loss history. In addition, it would require additional, more complicated bookkeeping not only for the RMA, but also for the provider and insurance agent. It would also disadvantage captive agent companies, for whom such bookkeeping would be even more burdensome and complex.

<u>Timing of Submissions (p. 9007)</u>

We concur that that "15 day" window for submission of revised plans is appropriate for this year only, since the finalization of the Proposed Rule will leave a very tight time frame. However, we believe that May 1 would be a more appropriate deadline for subsequent applications; an April 1 deadline for submissions comes too closely after the Spring crops sales closing deadline.

<u>Confidentiality Requirements (p. 9008)</u>

Crop1 agrees that it is absolutely necessary that all trade secrets and confidential commercial or financial information in submissions remain completely confidential.

# CROP1 COMMENTS ON PROPOSED RULE

**400.701**     **Definitions**

> *"Efficiency.  '... Only a portion of the approved insurance provider's monetary savings can come from a reduction in compensation, the rest must come from changes in administrative and operating procedures. ... Cost savings attributed to projected increased sales due to the offering of a premium reduction plan of insurance are not considered efficiency, nor are proposed reductions in loss adjustment expenses, unless such reductions in loss adjustment expense are a result of implementing loss adjustment procedures authorized by RMA. ... '"*

**Crop1 Comment**: We support the complete definition of "Efficiency" and feel that the RMA's effort not to place specific limits on compensation is appropriate.  A provider's overall cost of operation is what is most important and we believe the free market will ultimately determine the appropriate balance between agent compensation levels and service provided.  We believe agents should have the option to seek the most attractive compensation available in a competitive market, just as producers should be able to seek the most attractive crop insurance program available to them.  The most attractive program for agents and producers will likely require them to consider both associated costs and the level of service provided.

Crop1 also expresses support for the qualification in the second sentence quoted above, without which the playing field would be tilted in favor of large insurance providers over smaller providers.  We are strong believers in free market competition, which requires a fair, level playing field in which small and large providers alike may compete for the benefit of producers.

> *"Profit sharing arrangements.  'An arrangement to make a payment based on whether the approved insurance provider receives an underwriting gain on the total book of business ....'"*

**Crop1 Comment**: We support the definition as a whole, but point out specifically that "... gain on the total book...." (emphasis added) is important because the alternative would allow an approved insurance provider to divide its book for purposes of creating incentives and disincentives for agents.  Since the law requires equal service to all producers, Crop1 views the division of books of business to create such incentives/disincentives and any resulting market segmentation as likely to result in providers and/or their agents avoiding their legal obligation to serve all producers on an equal basis.

Further, we suggest that the amount of any profit sharing payment under a PRP should be subject to the same limit as the PRP reduction.  For example, if the maximum premium reduction is 4% under a PRP, Crop 1 recommends that this be the maximum profit sharing payment allowed in the year covered by the PRP.  In addition, to enhance the stability of the crop insurance program, we believe that providers should not be allowed to pay a "profit sharing bonus" if they have not

generated an average underwriting gain of at least 15% of gross premium over the preceding two years.

> *"Unfair Discrimination. 'A premium reduction plan will be considered unfairly discriminatory to a producer if .... is based on the loss history of the producer, the amount of premium earned under the policy, or precludes in any manner producers in an approved State from participating in the program.'"*

**Crop1 Comment**: We applaud this definition because it ensures that crop insurance providers and their agents serve all producers.

**Crop1 Comment**: **Request for Additional Definition** — We request a clear definition for "Producer." We recommend that "producer" be defined as a "crop insurance policy holder."

### 400.714   Revised Plans of Operations for premium reduction plans.

> *(a) For the 2006 reinsurance year, revised Plans of Operations must be received by RMA not later than [date 15 days after the date of publication of the final rule].*

**Crop1 Comment**: This "15 day" requirement is an extraordinarily tight deadline, but we support the requirement because we recognize that the crop season deadline is coming up very fast and thus the tight deadline is necessary.

> *(b) For all subsequent reinsurance years, revised Plans of Operations must be received by RMA not later than April 1 before the reinsurance year, or the date RMA otherwise determines the Plan of Operations is due.*

**Crop1 Comment**: Although we support the tight "15 day" deadline in Part (a) above, we are concerned about an April 1 deadline for future years. Since April 1 is only 15 days after the Sales Closing Date, and there is also an approved waiting period in which the agent can complete record keeping, we believe a later date is more appropriate. Recognizing that the RMA needs the opportunity to spread its work load evenly, we recommend May 1.

> *(c) Any revised Plans of Operations that is not timely submitted will not be considered by RMA and any other revised Plans of Operations submitted by the approved insurance provider during the reinsurance year will not be considered until the next reinsurance year.*

**Crop1 Comment**: We support this provision because we are committed to a level playing field in which producers have the opportunity to make insurance choices having full access to the information they need to make informed business decisions. In order to allow producers this opportunity, PRPs must be submitted by all providers and approved by the RMA in a timely and consistent fashion.

    (d) *A revised Plan of Operations may be withdrawn no later than 15 days after ... If a revised Plan of Operations has not been timely withdrawn, the approved insurance provider will be required to implement an approved premium reduction plan.*

**Crop1 Comment**: We agree. Since the law clearly requires that providers who make savings must pass them on to producers, there would be no valid reason to withdraw a PRP once savings are proven since they must be passed on to the producers. This provision benefits producers, as well as the FCIC Program as a whole, because it provides strong protections to producers.

    (e) *Any confidential commercial or financial information submitted with a revised Plan of Operations will be protected .... In accordance with, 5 U.S.C. 552 (b) (4).*

**Crop1 Comment**: The submissions to the RMA that are required in order to obtain approval of a PRP include a significant amount of confidential commercial and other information that, if disclosed, could cause significant competitive harm to the provider. Thus, insurance providers will not participate in the PRP program if confidential information in their submissions is open to public disclosure, defeating the purpose of the Proposed Rule.

We note, however, that 5 U.S.C. §554(b)(4) protects "trade secrets" as well as commercial or financial information. Accordingly, Crop1 suggests adding the following language to this subsection in order to track 5 U.S.C. §552(b)(4): "Any <u>trade secrets and</u> commercial or financial information submitted with a revised Plan of Operations will be protected ...."

**400.715    Limitations and prohibitions.**

    (a) *For the first two reinsurance years after [effective date of the final rule], the premium reduction plan may not offer a premium reduction based on an efficiency less than 1.0 percent nor greater than 4.0 percent of the net book premium. For subsequent reinsurance years, RMA will announce the minimum and maximum limitation on the premium reduction, if applicable. Premium reductions must be offered in .5 percent increments.*

**Crop1 Comment**: Crop1 supports the imposition of a cap. Crop1 believes it provides a benefit to producers by acting as a stabilizer to the marketplace and making sure that providers who seek approval of a PRP do so with due care and submit only accurate information. However, we urge the RMA to raise the cap to 5.0%. It will continue to benefit producers while maintaining stability in the market if the RMA allows this additional amount of flexibility for providers to identify and pass through cost savings to producers, and for the RMA to approve them if they are adequately documented.

    (b) *If a premium reduction plan is offered it must be offered in all states where the approved providers doing business and for all crops, coverage levels, policies.*

*(c) The amount of the premium reduction offered based on the percentage of the net book premium may not vary between states, crops, coverage levels, policies or plans of insurance, or on any other basis (For example, if the approved insurance provider can reduce costs by 2.5 percent, such reduction must be provided to all policyholders in all states where the approved insurance provider is doing business).*

**Crop1 Comment**:  As discussed above, Crop1 generally supports both provisions (b) and (c) because they are consistent with Congressional intent that all producers be served equally – all crops, all regions, all states, all policies and coverage levels – prohibiting what is informally called "cherry picking," (*i.e.*, agents and/or insurance providers individually selecting their customers so that they serve only the larger ones, or only the ones who are predicted to be least likely to have losses).  Crop1 views this provision as very specific necessary protection to producers across the nation.

However, Crop1 recommends that providers have the option not to offer a premium reduction on CAT policies as producers do not pay a premium (only an administrative fee) for CAT policies. Further, we would recommend the clause "or any other basis" be eliminated and replaced with "or any basis which could limit or restrict access to a premium reduction, in whole or in part, to some producers."  As long as cost savings programs are fair and equally available to all producers, they should be presented to and considered by the RMA.

**400.16        Contents of the revised Plans of Operations for a premium reduction plan.**

*(h)        Based on the applicable Expense Exhibits, a statement that summarizes the A&O costs before implementation of the efficiency, the cost savings associated with the efficiency, the A&O costs after implementation of the efficiency (which includes the budgeted cost of all reports and certifications required in §§400.714-720), the expected A&O subsidy, and the projected total dollar amount of premium reduction to be provided to producers (This statement must demonstrate that after the implementation of the premium reduction plan, the approved insurance provider's A&O costs, including the budgeted cost of all such reports and certifications, plus the amount of any premium reductions will not be greater than the provider's A&O subsidy.*

**Crop1 Comment.**  To ensure that efficiencies are evaluated accurately, Crop1 urges that any efficiencies related to agent compensation be evaluated on the basis of information that must be reported to the IRS and counted on 1099 tax forms. Crop1 also notes there is a conflict here in terms of reporting – annual basis vs. crop year basis – for bonuses which could be paid to agents after the crop season is over and after providers have accurately determined the amount of realized profits, if any.

*(i)        A financial reserve plan that:*
*(1)        Is triggered immediately upon discovery by the approved insurance provider or RMA that the total dollar amount of the actual efficiency is not sufficient to cover the total dollar amount of the premium reduction provided to producers;*

*(2)    Consists of actions to be taken by the approved insurance provider that would produce cost savings or income that is at least 25 percent of the projected total dollar of premium reduction to be provided to producers immediately upon discovery under paragraph (i)(1) of this section.*

**Crop1 Comment**: Crop1 supports this provision, but suggests that it be clarified to recognize that additional "income" may come from contracts or third party agreements executed by the approved provider that are designed to provide a reserve for such a contingency.

**400.719    Standards for Approval**

*(a)    RMA may approve the revised Plan of Operations if, in the sole determination of RMA, the revised Plan of Operations demonstrates that the following criteria are met:*

        \*\*\*

*(9) The marketing plan must be reasonable and effectively reach small producers, limited resources producers as defined in section 1 of the Basic Provisions, 7 CFR 457.8, women and minority producers.*

**Crop1 Comment**:  We very much support the need to actively market to small, limited resources, women and minority producers, as defined above.  However, we are concerned that as the size of acreage declines, so do the savings; thus, Crop1 respectfully suggests that the standard should focus only on whether the plan is reasonable in its approach and not on the marketing "effectiveness" of the plan's reach.  In cases where it appears that the plan's reach isn't working effectively, the RMA will work with the provider to strengthen the plan.

**400.720    Terms and conditions for approved premium reduction plans.**

*The following terms and conditions apply to all approved insurance providers whose revised Plans of Operations are approved:*
*(a)  Approved revised Plans of Operations for premium reduction will only be effective for one reinsurance year.*

**Crop1 Comment**:  For good business planning purposes as well as maximizing stability in the crop insurance marketplace, we strongly urge that approvals continue beyond one year.  As long as the rules are met, providers should not have to reapply for annual approval of the PRPs.

        \*\*\*

*(e) All producers insured by the approved insurance provider will automatically receive the premium reduction contained in the approved premium reduction plan.*

**Crop1 Comment**:    We support this provision because we believe that providers who offer PRPs must be required to serve all producers/all crops in the states in which they are licensed. This prevents "cherry-picking" and thus furthers Congressional intent.  However, we strongly

feel that this sentence should include the word, "applicable" following the words "receive the" in the preceding sentence. As previously noted, for CAT policies, no premium reduction would be applicable as the producer pays no premium.

\*\*\*

*(g)    The approved insurance provider must provide semi-annual reports, or more frequently as determined by RMA, that permit RMA to accurately evaluate the effectiveness of the premium reduction plan, in the manner specified by RMA.    At a minimum, each report must contain: .........*

*(3)    The number of small producers, limited resources producers as defined in section 1 of the Basic Provisions, 7 CFR 457.8, women and minority producers making application as result of the implementation of the marketing plan;*

**Crop1 Comments:** Crop1 agrees that it is very important that premium reductions are offered to all producers. The required reporting, however, should not be of the numbers of small, limited resources, women and minority producers that have made applications. In some regions of the country, it is likely there will be very few, if any, small/limited resources/women/minority producers. It is also likely for newer crop insurance providers that their sales to such groups may not be statistically valid as they enter new states. Thus, we recommend that each insurance provider offering a PRP only be required to report, and judged on, their outreach efforts as a whole in all states in which they are licensed.

\*\*\*

*(h)    If at any time RMA discovers that the cost reduction or efficiencies contained in the premium reduction plan are not attained, are not sufficient to cover the dollar amount of premium reduction, or that the reduction in premium is not corresponding to the efficiency, RMA will require that the amount of efficiency used to determine the premium reduction for the next applicable reinsurance year be limited to the actual cost savings obtained for the reinsurance year, excluding any financial reserve plan measures that may been used to make up for the effects of the deficiency.*

**Crop1 Comment:**    We support this provision on the basis that an "overstated" premium reduction is unfair to producers. Any company applying for approval to offer a PRP should be required to accurately document their savings, allowing for the "financial reserve plan" as a back-up. Overall, we see this as protection to producers, since approved providers might be tempted to use a PRP as a loss-leader to enter new markets if the savings are not substantiated and if they are not penalized for failing to achieve the savings they represented to the RMA would be made.

\*\*\*

*(i)    RMA will closely monitor the approved insurance provider's efforts to market the premium reduction plan to small producers, limited resources producers as defined in section 1 of the Basic Provisions, 7 CFR 457.8, women and minority producers to ensure that no unfair discrimination takes place and if it is discovered, RMA may withdraw*

*approval for the premium reduction plan, in accordance with paragraph (n) of this section.*

**Crop1 Comment**:  The Congress and RMA has been very clear that no "cherry-picking" is allowed in the delivery of the FCIC program.  Exceptions for PRPs should not be made.  Crop1 specifically supports this provision on the basis that a PRP is and should be good for <u>all</u> producers.

*(j)    The approved insurance provider is solely liable for all damages caused by any mistakes, errors, misrepresentations, or flaws in the premium reduction plan or its implementation.*

**Crop1 Comment**:  Crop1 agrees that the FCIC and RMA should not have any liability for damages arising from these matters, but is concerned that this provision attempts to re-allocate liability for damages among private parties, which should be left to state law.  For example, in the implementation of an approved PRP, an agent could make errors or misrepresentations for which the agent bears some or all of the liability to third parties injured thereby under applicable state law.  Moreover, this provision could be interpreted to create a new, federal cause of action for these matters, which Crop1 does not believe is or should be the RMA's intent.  Crop1 believes that state law should govern both the existence of a cause of action for these matters, as well as the allocation of liability among private third parties.  Accordingly, Crop1 proposes the following change:  "~~The approved insurance provider is solely~~ In no event shall the RMA, the FCIC or any other agency of the United States Government be liable for ~~all~~ any damages caused by any mistakes, errors, misrepresentations, or flaws in the premium reduction plan or its implementation."

**\*\*\***

*(m)    At its sole discretion and upon written notice, RMA may withdraw or modify its approval of any premium reduction plan if RMA determines that:*

*(1)    The approved premium reduction plan, or its implementation, no longer satisfied all the terms and conditions in 7 CFR 400.714-720;*

*(2)    There have been instances of unfair discrimination;*

*(3)    The stated efficiencies have not been realized or the approved insurance premium reduction is not provided to all existing policyholders and producers as required by subsection (e); or*

*(4)    The integrity of the crop insurance program is jeopardized in any way, as determined by RMA, by the premium reduction plan.*

*(n)    If any condition in paragraph (m) of this section exists, RMA will notify the approved provider in writing:*

*(1)    That approval has been withdrawn or a modification to the premium reduction plan is required;*

*(2)    The date such withdrawal is effective or modification must be made;*

   (3) *If modified, such modification must be approved by RMA before*
*implementation;*
   (4) *The basis for such withdrawal or modification; and*
   (5) *If approval is withdrawn, the approved insurance provider must cease*
*offering the associated premium reduction effective for the next sales closing date.*

**Crop1 Comment**: Crop1 agrees that the RMA should be able to withdraw approval or require modification of a PRP if any of the criteria in (m) exists. Crop 1 believes, however, that before it withdraws approval, the RMA should give the provider a thirty day cure period. The provider may not have been aware of the problem, and this gives it a reasonable period within which to fix it. Additionally, Crop1 requests that a provider whose PRP has been withdrawn or required to be modified should have the right to request reconsideration, as the Proposed Rule (400.719(c)(2)) would allow if a revised Plan of Operations is disapproved. Crop1 specifically proposes the addition of a new subsection (o) stating as follows:

   "(o)(1) Before withdrawing or modifying its approval of a premium reduction plan, RMA will notify the provider in writing of the contemplated withdrawal or modification of approval and the reason therefor, and allow the provider at least thirty days to cure. If the provider does not cure within such period to the RMA's reasonable satisfaction, the withdrawal or modification shall be effective after the expiration of such thirty day period and as of the date specified in the notice.

   (2) If approval of a premium reduction plan is withdrawn or modified, the insurance provider may request, in writing, reconsideration of the decision with the Deputy Administrator of Insurance Services, or a designee or successor, within 30 days after the effective date of such withdrawal or modification and such request must provide a detailed statement of the basis for the reconsideration."

FROM a Crop1 customer/family farmer from North Dakota

Medina, ND
December 8, 2003

We are just one of many family farmers who use the Premium Discount Plan to enable us to afford crop insurance. It is so important that congress continue this money saving plan for all of us.

Our church, Zion United Church of Christ, Medina, ND, is a green ribbon church which prays for justice for rural America. Programs like the Premium Discount Plan help keep family farmers on the farm and are just one step in getting justice for all of Rural America.

Sincerely,

Vernon & Donna Schelske

**FROM a Crop1 licensed crop insurance agent living in Minnesota**

—— Original Message ——
From: Bruce Larson
To: RMA.PRP@rma.usda.gov
Sent: Tuesday, March 29, 2005 8:14 PM
Subject: Premium Discount Plan

Dear Director,

Hi, my name is Bruce Larson. I farm in southwest Minnesota with my father. I have been a "full time" farmer for 7 years. I also hold 3 off the farm jobs to help support our farm. I was very pleased to become part of the Crop 1 family. I like the company so much that I decided to start selling it. I think it is great that Crop 1 is willing to abide by government rules, and be able to offer the same coverage for a better value for the farmer.

I have found that their is a lot of interest in the Premium Discount Plan. I am told that several other companies have also applied, but have not been granted access. There seem to be enough companies filling for bankruptcy. I think that it is great that those companies that can operate efficiently can be rewarded for doing so. I also think that it is highly commendable that they pass the savings onto the farmer, rather than keeping it for themselves.

Our farm has saved over $3000. I wish I could do that with every aspect in farming, maybe I could give up a job or 2 and just survive by the income on the farm.

I am also impressed with Crop 1's internet access. With the world becoming more technological advanced it is nice to see a company stepping up to the plate and becoming a leader, rather that waiting until everyone else does it first. I have also been told by customers that it is nice for those that work off the farm to be able to have access to information when it is convenient for them. It also makes my job as an agent faster and easier, allowing me to spend less time on each account, while still giving each one excellent care.

I would urge you to keep the Premium Discount Plan. I think it is great for the USDA, the crop insurance industry, the agents, and most of all the backbone of the United States the American farmer.

Thank you for your time.

Bruce Larson
925-211th St.
Balaton, MN 56115
blarson@frontiernet.net
507-829-3364

**FROM a Crop1 licensed crop insurance agent living in Nebraska**

From:       J.J. Lauby [goldengrain@charter.net]
Sent:       Monday, March 28, 2005 8:41 AM
To:         RMA.PRP@rma.usda.gov
Cc:         Terri Wallace

To whom it may concern,

My name is J.J. Lauby and I am a crop insurance agent in Holdrege, Nebraska. I am a relatively small agency with 15 customers in central Nebraska. I insure corn, soybeans and wheat in this part of the country. My book of business increased by $70,000 in premium the first year I joined Crop1, and this year I have added approximately $50,000.

I want to voice my support for CFR Citation 07 CFR 400 and want to continue to be able to offer FCIC-gauranteed crop insurance to my producers at a competitive price. With the continued, seemingly relentless increases in input costs for farmers, it is important to continue with the PDP that Crop1 provides. My customers saved about $1 per acre last year on their crop insurance coverage. This may not seem like a large sum, but every dollar counts out here in the country. I had a large number of losses last year, mainly on the revenue side, and I have to say that I am 100% satisfied with the timeliness and professionalism of the adjustments and payments of the losses; as are my customers.

I believe that Crop1 and the PDP are of extra importance to smaller producers that don't have the financial strength to purchase the coverage that they really need. Although the total savings to a small producer seems negligible, the per acre savings is significant.

In closing, I would like to again voice my support of CFR Citation 07 CFR 400. The failure of this proposed Rule would be a detriment to agents such as myself who have become aligned with Crop1, and a huge disservice to producers who also need a competitive advantage in keeping our nation supplied with the highest quality food supply in the world.

Thank You for your time,
J.J.Lauby
Lauby Crop Insurance
(308) 995-5769

**FROM a Crop1 Insurance licensed agent from Texas**

—— Original Message ——
From: craig henrich
To: RMA.PRP@rma.usda.gov
Sent: Monday, April 25, 2005 10:30 AM
Subject: Premium Reduction Plan

The following is offered as a different perspective regarding the Premium Reduction Plan. I have been part of the Federal Crop Insurance Industry for 32 years. I have worked for the FCIC and in the private sector. The first knee jerk reaction I had, when Congress legislated to allow companies the ability to offer a discount, was this is the damnation of crop insurance.

I have presented the Crop1 Premium Discount Plan to agents and insured's alike over the past five months. The reception from agents is mixed, they don't like the idea of having less commission. On the other hand, agents that have farmed or still farm themselves recognize the need for farmers to save each dollar possible. They are readily willing to offer the discount plan to their customers and make less from the product.

The farmer wants the discount, however many are apprehensive to participate because of mis-truths and intentional mis-information from the agent not willing to offer the discount. Those farmers that are participating in the discount plan are glad to have the opportunity to do so. They want the savings to continue. They definitely want to know the amount of discount prior to planning and planting the next years crop. They may wish to purchase an increased level of coverage based on the discount savings. They don't want to be surprised after the fact.

Many of the companies and agents reaction to the discount plan are much like my initial reaction, one of greed. How can we survive on less? It is actually an opportunity to offer the farmer a savings when all other prices are on the rise.

If you can't increase the premium subsidy, then keep the discount plan in place. You will see increased participation in the Premium Reduction Plan the longer it is available.

Craig Henrich

4/25/2005

FROM a Crop1 licensed crop insurance agent from Indiana

**From:** Chris Webb [mailto:cwebb@westlandcoop.com]
**Sent:** Thursday, April 21, 2005 10:10 AM
**To:** rma.prp@rma.usda.gov
**Cc:** sales
**Subject:** Proposed PDP Changes

Dear Sirs:

In regards to the proposed changes to the Premium Discount Plan, I would like to share some of my thoughts and experiences. As an agent who sells for Crop1 Insurance, I have seen how the discount can help producers. I have witnessed many farmers who chose to use the discount so that they could purchase additional coverage, and many farmers have seen the ads talking about the discount and purchased crop insurance for the first time in many years. The premium discount is not going to be used by every farmer. Many farmers are happy with their current coverage and agents. However, there are many farmers who do like to use the discount plan.

As I mentioned, farmers have utilized the premium reduction to purchase additional coverage. If the discount is not guaranteed, the producer will not take to chance to increase coverage. That's just how farmers are when it comes to financial issues. They take enough risk as it is. Let the insurance companies take the risk and utilize their expertise in managing risk.

The other issue that I would like to take issue with is the potential ability of insurance companies to offer discount and non-discount insurance in the same state. This goes against everything that the current crop insurance delivery system stands for. I believe that there are several laws that talk about "discrimination" when it comes to selling crop insurance. Letting companies offer both discount and non-discount insurance in the same state would lead to the biggest case of "Cherry-Picking" the crop insurance industry has ever seen. That's not fair to the producer or the integrity of the crop insurance delivery system.

I would be happy to see some competition as it relates to the premium discount plan. That would be good for the industry as a whole. I would only ask that you make it fair for all that are concerned. Thank you.

Chris Webb
Crop Insurance Sales
Westland Co-op
Crawfordsville, IN

**FROM a Crop1 licensed crop insurance agent living in North Dakota.**

-----Original Message-----
From: Ray Grabanski [mailto:rlg@progressiveag.com]
Sent: Tuesday, March 29, 2005 1:05 PM
To: rma.prp@rma.usda.gov
Subject: Support for CFR Citation 07 CRF 400

I am a crop insurance agent who sells insurance with both a full service company and Crop1.

I have heard much agent lobbying for why discount crop insurance is bad for the industry
and bad for agents.  They have even tried to say its bad for farmers in various ways, but
mostly in talks to politicians or other agent groups - not to farmers!  I have yet to meet
a bona fide farmer who thinks a discount is bad for him.

In the end, in all the lobbying for and against PDP hardly anyone has talked about whats
good for the customer.  The discount is good for the customer, period.  How could anyone
seriously try to convince us otherwise?

If the customer did not benefit, the discount would go away on its own.
Is it any wonder why RMA is getting intense lobbying now to kill PDP and price competition?
Could it be they fear it will succeed?  Without price competition, you just leave it open
for various types of non-price competition and there has been a lot of crazy plans by
companies to compete with various non-price service offers (mapping, agronomy services,
etc).  Why not keep it simple and direct for the customer?
Price competition works for everything else (including other insurance, utilities, phone
service, airlines and others that are tradionally thought of as natural monopolies) so why
isn't it good for crop insurance?

Ray Grabanski, President
Progressive Ag

# Graff Insurance

20 West Central  P.O. Box 132 Springfield, Minnesota 56087
Telephone / Fax 507-723-9988



## Urgent Fax Message

February 12, 2004

To: J.B. Penn - USDA, Under Secretary, FFAS
    FAX # 202-720-8254

From: Dave Graff @ Graff Insurance Agency (2 pages)

RE: Crop1 and PDP (Premium Discount Plan)

Dear Mr. Penn,

It's my understanding that a decision regarding the marketing of crop insurance by Crop1/Occidental and approval for the PDP may be made on February 13, 2004. I sincerely hope approval will be granted at this time as the March 15, 2004 sales closing date is rapidly approaching.

I have been farming all of my life and am very aware of the ever present and ever changing risks to our crops. Due to the high costs of producing our crops, I and most other farmers have purchased crop insurance to reduce the risks because we can't depend on disaster aid or government assistance to replace our income.

Crop insurance only allows me to insure up to 85% of my guaranteed yield. Insuring at that level becomes almost cost prohibitive in spite of the government premium subsidy. The PDP savings makes the cost of crop insurance and the cost of higher coverage options more affordable, which is even more important in 2004 since coverages and premiums are going to be higher due to higher grain prices.

I have also been an insurance agent since 1974, selling crop insurance since its privatization. When it became a requirement to carry crop insurance if disaster payments were received, being a crop insurance agent became a very lucrative business.

Our business philosophy is to serve our customers by providing quality insurance coverages at the most competitive cost. Apparently very few other crop insurance agents share that attitude. We are members of the Minnesota Big 1 agents association. They have solicited funds and support from agents to resist and eliminate the marketing of PDP by Crop1. I understand agents associations from other states have also done this. From the information I have received, the resistars cite "your compensation for selling crop insurance is in danger of being cut in half".

Auto  Home  Health  Life  Farm
Crop  Hail  MPCI  Business  Work Comp.

*"WE WORK FOR YOU"*

This attitude is pretty sad.    The crop insurance program is in place to protect the income of the farmers (who by far outnumber insurance agents), not to protect the incomes of insurance agents.

Our agency represented Crop1/Converium in 2003 and I can assure you that we were able to provide the usual traditional crop insurance services to our customers for the reduced commissions we received.  I can also assure you that we received very satisfactory service and support from Crop1.  We saw no reduction of service or support than what we're accustomed to receiving from other crop insurance companies.

I sincerely request your support for prompt and favorable approval for Crop1/Occidental and PDP.  Our customers in 2003 and others definitely would like to benefit from PDP in 2004 and beyond.  Until approval is given, our hands are tied.  With only a month until sales closing, we will have our work cut out for us.  Please!

Sincerely,

Dave Graff

## William "Billy" Rose
## Biography
## Age 44

### Crop1 Insurance Direct Inc.
### 2000 through present

Mr. Rose founded Crop1 in 2000. Mr. Rose is the C.E.O, and Chairman of the Board of the Company. Mr. Rose identified the opportunity presented by the Ag Risk Protection Act of 2000, built a business plan, recruited the human resources and the supplied the capital to launch the Company. Mr. Rose is responsible for the direction of the Company, the operating and strategic plans that guide the Company, and day-to-day operations. Mr. Rose is active in developing business opportunities and strategic alliances with other companies and organizations. Mr. Rose's vision and understanding of agriculture and the crop insurance industry have lead to the rapid success of Crop 1 Insurance Direct, in the crop insurance market.

### AG1.COM

### 1998 through 2000

Billy Rose founded AG1.Com in 1998. Mr. Rose served as the C.E.O. and Chairman of Ag1. AG1 was the agricultural industries first E-Commerce platform offering financing, insurance, inputs and marketing directly to the farmer. AG1 negotiated $143 million in private label lines of credit financing for its Ag1 customers, developed a crop insurance super agency that became one of Iowa's largest independent agencies and created a proprietary operating system incorporating sales, accounting and E-Commerce. Ag1 averaged 2 million web users per month and the web site won the 1999 Addy award for best interactive web site in Iowa. In 1999, Mr. Rose negotiated a strategic alliance with Data Transmission Network (DTN) the largest agricultural content provider via satellite, which included DTN investing capital into the Company in 1998. DTN executed their call option to purchase controlling interest in the Company in 1999.

### Uncle B's Bakery
### 1985 through 1998

Billy Rose founded Uncle B's Bakery in 1985. Mr. Rose served as the C.E.O. of Uncle B's Bakery. Uncle B's launched a line of branded, manufactured and refrigerated dairy case supermarket bagels. The Company grew to be the nation's number one supplier of dairy case bagels. Mr. Rose created this new innovative category in retail supermarkets by developing its product, marketing and sales strategies. Uncle B's Bakery began with 20 employees and grew to 240 employees with annual sales of over $25 million. Mr. Rose in conjunction with venture capital provided $5M of the initial capital for the company and in 1993 the Company completed an Initial Public Offering lead by Kinnard of $6M in 1993. The Company embarked on a $10 million dollar plant expansion in 1995 based on new contracts from Dunkin Donuts. Mr. Rose resigned from the Company in 1998 to start Ag1.

Uncle B's Bakery was recognized as one of the nation's fastest growing small publicly held companies for three consecutive years by Inc. magazine. Rose was named the regional Emerging Entrepreneur of the Year in 1995 awards program sponsored by Ernst & Young, Merrill Lynch and *Inc.* magazine for its success. He was also given the Iowa Venture Award for outstanding business achievement by the Iowa Area Development Group.

## Sound–N-Vision Inc.

1984 through 1986

Mr. Rose founded Sound–N-Vision Inc. in 1984 a video, tape and record chain that he started in 1984. Mr. Rose was named Iowa Young Entrepreneur of the year in 1989 by the S.B.A. This award required the recipient to be under 30 years of age and to show evidence of success as measured by a three-year track record of continued growth in sales, profits and employment.

Mr. Rose received his BBA and Marketing degree from the University of Iowa in 1984. Rose has also received several awards for annual reports, national print, radio and television advertising campaigns by the advertising council of the state of Iowa.

**Committee on Agriculture**
**U.S. House of Representatives**
**Required Witness Disclosure Form**

House Rules* require nongovernmental witnesses to disclose the amount and source of
Federal grants received since October 1, 2003.

Name: _William "Billy" Rose_

Address: _Cropl Insurance, 4532 114th St. Des Moines, IA 50322_

Telephone: _515-278-1805_

Organization you represent (if any): _Cropl Insurance_

_____

1. **Please list any federal grants or contracts (including subgrants and subcontracts)
   you have received since October 1, 2002, as well as the source and the amount of
   each grant or contract. House Rules do NOT require disclosure of federal payments
   to individuals, such as Social Security or Medicare benefits, farm program
   payments, or assistance to agricultural producers:**

   Source:_____    Amount:_____

   Source:_____    Amount:_____

2. **If you are appearing on behalf of an organization, please list any federal grants or
   contracts (including subgrants and subcontracts) the organization has received since
   October 1, 2002, as well as the source and the amount of each grant or contract:**

   Source: _FCIC A+O reimbursement_   2005 — Amount: _$ 255,086.49_ *

   Source: _FCIC A+O reimbursement_   2004 — Amount: _$ 5,821,350.05_ *

   * Cropl is managing general agency for Occidental Fire + Casualty

   Please check here if this form is NOT applicable to you: _of North Carolina, and_
                                                         _thus acts as a subcontractor_

   Signature: _William T Rose_         _for Occidental._

* Rule XI, clause 2(g)(4) of the U.S. House of Representatives provides: *Each committee shall, to the
greatest extent practicable, require witnesses who appear before it to submit in advance written
statements of proposed testimony and to limit their initial presentations to the committee to brief summaries
thereof. In the case of a witness appearing in a nongovernmental capacity, a written statement of proposed
testimony shall include a curriculum vitae and a disclosure of the amount and source (by agency and
program) of each Federal grant (or subgrant thereof) or contract (or subcontract thereof) received during
the current fiscal year or either of the two previous fiscal years by the witness or by any entity represented
by the witness.*

**PLEASE ATTACH DISCLOSURE FORM TO EACH COPY OF TESTIMONY.**